**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v-<br><br>ANDREY KOSTIN et al.,<br><br>               Defendants. | Case No. 1:24-cr-00091 (GHW) |

### DEFENDANT VADIM WOLFSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TAKE RULE 15 DEPOSITION

K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
Attorneys for Defendant Vadim Wolfson

Defendant Vadim Wolfson respectfully submits this memorandum of law in support of his Motion to Take Rule 15 Deposition (the "Motion"). Mr. Wolfson seeks leave of Court to depose Ms. Irina Skittides in Limassol, Cyprus, regarding the core allegation in the indictment: whether Andrey Kostin, a sanctioned Russian financial executive, received any benefit from the 2019 real estate transaction at issue in this case. Ms. Skittides will offer material, exculpatory evidence directly rebutting the government's theory of the case. While unwilling to travel to the United States and therefore unavailable for purposes of Rule 15, Ms. Skittides has expressed a willingness to voluntarily appear for a deposition in Cyprus well in advance of trial, so granting this motion will have no impact on currently scheduled deadlines. Mr. Wolfson would like to schedule the deposition for the week of January 20, 2025, and respectfully requests a ruling sufficiently in advance of that date so as to permit coordination of the parties' travel to Cyprus. In support of this motion, Mr. Wolfson submits a declaration from undersigned counsel, David C. Rybicki, as well as the government's notes of its interview with Ms. Skittides.

**INTRODUCTION**

Although the crux of the government's case is that Mr. Wolfson paid approximately $12 million in 2019 "for KOSTIN'S benefit," ECF No. 13 ¶ 56, the indictment does not allege payment of any funds by Mr. Wolfson to Mr. Kostin directly. Moreover, during a meeting with undersigned counsel, the government proffered that it has no evidence of a direct payment by Mr. Wolfson to Mr. Kostin. Declaration of David C. Rybicki ¶ 5 (hereinafter "Rybicki Declaration"). Instead, this prosecution is predicated on the wholly unsupported theory that ▮▮▮▮▮▮▮▮▮▮ ("CC-3" in the indictment) and CC-1, who were the owners of CapitalInvest, the entity that received the $12 million payment, are nominees for Mr. Kostin. *Id.* ¶ 48. Of the two, only CC-3 is even arguably relevant here because CC-1's purported interest in

1

CapitalInvest was *de minimis* such that it would be immaterial from a sanctions-compliance perspective.[1]

In 2019, Mr. Wolfson repaid a loan he received from CapitalInvest's parent company in 2014 that he had used to purchase a residential property in Aspen, Colorado.[2] This Memorandum refers to the 2019 loan repayment as the "2019 Transaction." In the absence of any evidence linking the funds from the 2019 Transaction to Mr. Kostin, the government intends to argue that a benefit to Mr. Kostin can be *inferred* from the mere fact of CC-3's involvement in the 2019 Transaction. Specifically, the government plans to introduce purported extrinsic evidence of alleged connections between CC-3 and Mr. Kostin in unrelated contexts that do not involve Mr. Wolfson or the 2019 Transaction.[3]

For instance, the indictment alleges that CC-3 "was a close associate of ANDREY KOSTIN" and that she "and opened an office in Cyprus specifically to assist with the management of many of KOSTIN's shell companies and assets." ECF No. 13 ¶ 48. None of this, of course, has anything to do with the 2019 Transaction, but the government's (unsupported and irrational) theory appears to be that CC-3, at all times and in all contexts, acts as a nominee for Mr. Kostin such that every dollar that she receives from any source is necessarily a dollar

---

[1] A sanctioned individual must have at least a 50-percent interest in an entity in order for U.S. persons to be prohibited from transacting with the entity. *See Entities Owned by Blocked Persons (50% Rule)*, U.S. Dep't of Treasury, *available at* https://ofac.treasury.gov/faqs/398. CC-1's alleged interest in CapitalInvest is not believed to have ever exceeded 10 percent.

[2] The government inaccurately asserts that Mr. Wolfson first purchased the Aspen property in 2019, when in fact he had purchased the property five years earlier in 2014.

[3] To date, the government has refused to share details related to the nature of its proof in this respect.

2

paid to Mr. Kostin.[4]  By contrast, a central tenant of Mr. Wolfson's anticipated defense is that CapitalInvest's parent company, through CC-3, extended him a legitimate third-party loan, as routinely happens in privately financed real estate transactions every day throughout the world, and that he repaid that loan to CapitalInvest, not Mr. Kostin, in full compliance with U.S. sanctions laws.

Ms. Skittides, the proposed deponent, will directly rebut the government's anticipated narrative and buttress Mr. Wolfson's defense.  The government knows this because the prosecution team already interviewed Ms. Skittides in Cyprus earlier this year, and she made numerous exculpatory statements.  In short, Ms. Skittides is a Cyprus-based attorney who has represented CC-3 and certain of her entities.  Rybicki Decl. ¶ 6.  Her work extended to CapitalInvest and its parent company, and the government's discovery has included evidence of her receipt of records related to those entities.  *Id.*

Ms. Skittides, as reflected in the government's interview notes—attached as Exhibit A to the enclosed Rybicki Declaration[5]—and reinforced in undersigned counsel's interview of her, is expected to offer the following testimony if deposed pursuant to Rule 15:

- During two decades of direct experience with CC-3 between approximately 2002 and 2022, including as her lawyer, Ms. Skittides never observed or knew of any connection between CC-3 and Mr. Kostin.

- In connection with her contemporaneous legal work for CC-3 and otherwise, Ms. Skittides had the opportunity to review voluminous records, including financial

---

[4] CC-3 was not sanctioned at the time of the 2019 Transaction, so there was nothing unlawful about paying her company.  Although she was subsequently sanctioned, it is telling that the government did not allege in announcing the sanctions against her any purported connection between her and Mr. Kostin. *See Treasury Hardens Sanctions With 130 New Russian Evasion and Military-Industrial Targets*, Dep't of Treasury, *available at* https://home.treasury.gov/news/press-releases/jy1871.

[5] Pursuant to the parties' protective order, and following consultation with the government, Mr. Wolfson is concurrently filing a motion to seal this exhibit.

- records and beneficial owner information, related to CC-3. She never saw in that paperwork any documentation of or reference to a relationship between CC-3 and Mr. Kostin.

- Based on the nature of her relationship over the years with CC-3, Ms. Skittides would expect to know if CC-3 was acting as a nominee for Mr. Kostin or anyone else.

- CC-3's office was located in a prominent business center in downtown Limassol, Cyprus, and had a staff of approximately 10 people. She used legitimate service providers, including the Cypriot office of PwC, which conducted audit work.

- CC-3 was an independently wealthy businesswoman, investor, and banker, ran numerous businesses, and had a reputation in the Cypriot community as a legitimate businesswoman.

- CC-3's business activities included extending loans to individuals like Mr. Wolfson.

- Sophisticated parties, including major private institutions and regulators, routinely conducted due diligence on CC-3, and the relevant transactions were allowed to proceed following sanctions screening.

*See* Rybicki Decl. ¶ 8(a)-(g).

## ARGUMENT

To obtain leave to take a deposition pursuant to Federal Rule of Criminal Procedure 15, a movant must show that: (1) the prospective witness is unavailable for trial; (2) the testimony is material; and (3) the testimony is necessary to prevent a failure of justice. *See United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001). All three requirements are satisfied here.

A.   *Ms. Skittides Is Unavailable*

Ms. Skittides, who resides in Cyprus and is not subject to the defense's subpoena power, is unavailable because she has indicated that she will not voluntarily travel to the United States to testify at trial. Rybicki Decl. ¶ 6. Undersigned counsel has expressed Mr. Wolfson's willingness to pay for Ms. Skittides's travel expenses, but she remains resolute in her unwillingness to appear. *Id.* ¶ 9. She is therefore unavailable for purposes of Rule 15. *See, e.g.*, *United States v.*

4

*Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) ("Unavailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial."); *United States v. Al Fawwaz*, No. S7 98 CRIM. 1023 LAK, 2014 WL 627083, at *1 (S.D.N.Y. Feb. 18, 2014) ("Foreign witnesses who are not subject to…subpoena power and, despite the moving party's appropriate efforts, refuse to travel to this country to testify routinely are found unavailable."). A declaration from counsel, which accompanies this motion, is sufficient to establish the witness's unavailability; no separate submission from the witness is required. *See United States v. Vilar*, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008).

### B.    *The Testimony Sought Is Material*

Ms. Skittides's testimony is material and exculpatory because it directly rebuts the government's proffered theory that CC-3's involvement in the 2019 Transaction necessarily means that Mr. Kostin benefitted from it. Testimony meets the materiality standard "within the meaning of Rule 15 if it is highly relevant to a central issue in the case." *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017) (internal quotation marks omitted). In *Wey*, for instance, the court found material anticipated testimony that would "contradict allegations that [the defendant] exercised transactional authority" over shares of securities allegedly held by nominees. *Id.* at *25. This included evidence that the deponent "never did business with or received trading instructions or payments from [the defendant]" and that "certain Nominee entities were, to his knowledge, under the control of advisers based in China." *Id.* The court also viewed as important the deponent's ability to provide "legitimate" explanations for transactions and information about vetting done by a "major financial institution." *Id.*

As in *Wey*, we expect Ms. Skittides will testify that, to her knowledge, CC-3 and CapitalInvest were not "under the control" of Mr. Kostin, that CC-3 "never did business" with Mr. Kostin, that Mr. Kostin did not exercise "transactional authority" over CC-3's deals, that the government's theory about nefarious transactions actually has a "legitimate" explanation, and that CC-3 underwent vetting by and received approval from "major" institutions. *Id.* Given these aspects of the proposed testimony, "there can be [no] doubt that [the testimony] is material within the meaning of Rule 15." *Id.*[6] Although this evidence goes to the lack of a relationship between CC-3 and Mr. Kostin and is therefore "negative" evidence, it is nonetheless highly probative of the main theory of the government's case. *See, e.g.*, *United States v. Mohamed*, No. 18-CR-603 (ARR), 2020 WL 1545522, at *6 (E.D.N.Y. Apr. 1, 2020) (finding, for purposes of Rule 15, that testimony about the absence of a relationship between alleged co-conspirators is "highly relevant").

Much of Ms. Skittides's testimony goes to Mr. Wolfson's factual innocence—the absence of a benefit to Mr. Kostin from the 2019 Transaction—but it is also highly material to Mr. Wolfson's lack of *mens rea*. Mr. Wolfson is charged with "willful[]" violation of the International Emergency Economic Powers Act ("IEEPA"). *See* 50 U.S.C. § 1705(c). As a result, to prove up their IEEPA charges, not only must the government prove that CC-3 was a mere nominee or pass-through for Mr. Kostin, but it also must adduce evidence that Mr. Wolfson knew that this was the case and intended to pay Mr. Kostin via CC-3. Even assuming, *arguendo*, that CC-3 was in fact acting as a nominee for Mr. Kostin, the fact that she ran what appeared to sophisticated parties to be independent, legitimate businesses is evidence of Mr. Wolfson's lack of *mens rea*. *Cf. United States v. Lankford*, 955 F.2d 1545, 1550-51 (11th Cir. 1992) ("It is thus

---

[6] From context, the omission of the word "no" in the original text appears to be a typographical error.

6

highly probative for the defense to show that the defendant's belief—whether or not mistaken—was reasonable; evidence of a belief's reasonableness tends to negate a finding of willfulness and to support a finding that the defendant's belief was held in good faith."); *Mohamed*, 2020 WL 1545522, at *5 (finding proposed testimony material to the "central issues of whether [the defendant] had…mens rea").

In response, the government has argued to undersigned counsel that Ms. Skittides's testimony is not admissible, which is not a relevant criterion for purposes of the Rule 15 analysis. *See Wey*, 2017 WL 237651, at *25 (noting that "whether anticipated deposition testimony is 'material' under Rule 15 and whether it will ultimately be deemed material and admissible at trial are different matters, and the Court need not pass on the latter to grant a Rule 15 motion") (internal quotation marks and alteration omitted). Indeed, Rule 15(f) specifically provides that an "order authorizing a deposition to be taken under this rule does not determine its admissibility."

Additionally, the government's position is ironic given its stated intention to offer extrinsic evidence of a purported relationship between CC-3 and Mr. Kostin. Although it is true that Ms. Skittides cannot definitively testify to who benefitted from the 2019 Transaction, neither can the government's witnesses. While is it possible that Mr. Wolfson may object to the admissibility of the government's evidence in this respect, in the event the Court allows the government to offer its evidence, it is only fair that Mr. Wolfson be permitted to submit his contrary evidence as well. The government cannot have it both ways. As reflected above, however, decisions about admissibility are properly deferred until later and do not form part of the Rule 15 analysis. All that is important at the moment is that the proffered testimony is at least as material as the government's proposed evidence to a central element of the case.

7

### C. Denying the Motion Would Be Contrary to the Interest of Justice

Finally, allowing the deposition of Ms. Skittides is in the interest of justice, a criterion in the Rule 15 analysis. *See* Fed. R. Crim. Proc. 15(a)(1). Where the remaining requirements are met, this criterion is typically satisfied automatically so long as "there are no substantial countervailing factors militating against the taking of the deposition." *Wey*, 2017 WL 237651, at *24 (internal quotation marks omitted). Here, the deposition will not require any alterations to the trial schedule. Additionally, although Rule 15 depositions sometimes present logistical challenges given that defendants have the presumptive right to be present, Mr. Wolfson is willing to waive this right pursuant to Federal Rule of Criminal Procedure 15(c). The government has not identified any other countervailing interests that would be relevant under this factor.

### CONCLUSION

Mr. Wolfson respectfully requests that the Court enter an order at its earliest convenience, in time for a deposition the week of January 20, 2025, permitting him to take testimony from Ms. Skittides.

Dated: November 12, 2024

Respectfully submitted,

*/s/ David C. Rybicki*
David C. Rybicki
Michael C. Harper
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
David.Rybicki@klgates.com
*Counsel for Defendant Vadim Wolfson*