**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v-<br><br>ANDREY KOSTIN et al.,<br><br>    Defendants. | Case No. 1:24-cr-00091 (GHW) |

# DEFENDANT VADIM WOLFSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS PRIVILEGED RECORDS

K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
Attorneys for Defendant Vadim Wolfson

# TABLE OF CONTENTS

PAGE

INTRODUCTION .................................................................................................................. 1

    A.     The Firm Represented Mr. Wolfson and Owed Him a Duty of Confidentiality ........................................................................................... 1

    B.     The Government Leveraged the Recent Imposition of U.S. Sanctions to Induce Lawyer 1 and Lawyer 2 to Violate the Privilege ................................................................................................. 2

    C.     The Firm Produced Privileged Documents Without a Waiver .................. 5

    D.     The Government Potentially Overlooked Signs of Lawyer 1's ▮▮▮▮▮▮▮ ....................................................................................... 8

ARGUMENT ......................................................................................................................... 9

    A.     Suppression Is Required Due to the Privilege Violations ......................... 9

    B.     Various Options Are Available to Effectuate Suppression ..................... 10

CONCLUSION .................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Cnty. of Erie*,
   473 F.3d 413 (2d Cir. 2007)..................................................................................................9

*In re Richard Roe, Inc.*,
   168 F.3d 69 (2d Cir. 1999)....................................................................................................9

*In re von Bulow*,
   828 F.2d 94 (2d Cir. 1987)....................................................................................................9

*Nat'l City Trading Corp. v. United States*,
   635 F.2d 1020 (2d Cir. 1980)..............................................................................................10

*SEC v. Forma*,
   117 F.R.D. 516 (S.D.N.Y. 1987) ........................................................................................10

*United States v. Krug*,
   868 F.3d 82 (2d Cir. 2017)....................................................................................................9

*United States v. Mejia*,
   655 F.3d 126 (2d Cir. 2011)..................................................................................................9

*United States v. Schulte*,
   No. S-2 17 CR. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019)...........................10

**Statutes**

International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq*. ..................................2

**Other Authorities**

Cyprus Bar Association, Code of Conduct Regulations ¶ 13 .........................................................6

N.Y. Bar Ass'n Comm. on Prof'l and Jud. Ethics, Formal Op. 2005-03 (2010)...........................11

U.S. Dep't of Just., Just. Manual § 9-13.410 ..................................................................................8

U.S. Dep't of Just., Just. Manual § 9-13.420 ................................................................................11

Defendant Vadim Wolfson respectfully submits this memorandum of law in support of his Motion to Suppress Privileged Records. The Cyprus-based law firm ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Firm") produced more than 16,000 pages of documents to the government in this case, many of which relate to Mr. Wolfson and his entities. ▮▮▮▮▮ ▮▮▮▮▮▮ ("Lawyer 1"), formerly Managing Director of the Firm, and his adult daughter employee, ▮▮▮▮▮▮▮▮▮▮▮▮ ("Lawyer 2"), also sat for a combined four interviews with the government in this matter. None of this should have ever happened. Prior to these interviews and productions, the government knew that the Firm represented Mr. Wolfson. Mr. Wolfson never waived the attorney-client privilege over his records and communications with counsel. Nonetheless, Lawyer 1, desperate to curry favor with the U.S. government in a bid to save his law firm from recently imposed U.S. sanctions, violated the privilege. The government allowed—indeed, encouraged—this violation. The fruits of these plain violations of the attorney-client privilege must be suppressed.

**INTRODUCTION**

**A.    The Firm Represented Mr. Wolfson and Owed Him a Duty of Confidentiality**

Mr. Wolfson engaged the Firm as early as 2014. Although substantiation of that original engagement comes from Lawyer 2's testimony and from a review of the produced emails, the existence of an attorney-client relationship is beyond dispute, as reflected in a signed engagement letter between the parties from December 2018. Declaration of David C. Rybicki ("Rybicki Decl.") ¶ 3, Ex. A; *id.* ¶ 6, Ex. D at 4, 6; *id.* ¶ 12, Ex. J. Mr. Wolfson signed the engagement letter and is identified therein as the client. *Id.* ¶ 3, Ex. A at 00876.[1] He hired the Firm specifically to provide legal advice related to his wholly owned entities Spencer

---

[1] The engagement letter and other documents included with this motion sometimes refer to Mr. Wolfson as "Vadim Belyaev," his name prior to obtaining a legal name change.

Investments Limited and Altamonte Holdings Limited ("Altamonte"). *Id.* at 000878. Issues related to Altamonte are directly relevant to this case because Altamonte was involved in the 2019 transaction that the government alleges to be a violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq*. *See* Indictment ¶¶ 54–60.

The engagement letter's identified scope specifies "legal services and advice" on issues of Cypriot and international law. Rybicki Decl. ¶ 3, Ex. A at 000867. The confidentiality provisions of the agreement prohibit disclosure "to any third party" of any information "concerning [Mr. Wolfson's] affairs" without Mr. Wolfson's consent. *Id.* at 00872. This confidentiality obligation expressly survives termination of the agreement. *Id.* at 00875. There is no question the government knew about this agreement when they repeatedly interviewed Lawyer 1 and Lawyer 2 and received privileged attorney-client communications from them— Lawyer 1 and Lawyer 2 indicated during their interviews that the Firm represented Mr. Wolfson. *See id.* ¶ 5, Ex. C at 10; *id.* ¶ 6, Ex. D at 2, 4; *id.* ¶ 7, Ex. E at 3. The government even used Mr. Wolfson's engagement letter with the Firm as an exhibit during one of the interviews. *Id.* ¶ 5, Ex. C at 10.

### B. The Government Leveraged the Recent Imposition of U.S. Sanctions to Induce Lawyer 1 and Lawyer 2 to Violate the Privilege

At the time of the interviews and productions of privilege-protected documents and information, the government had significant leverage over Lawyer 1 and Lawyer 2. Lawyer 1, Lawyer 2, Lawyer 1's adult son ▮▮▮▮▮▮▮▮, and the Firm had been added to the Specially Designated Nationals and Blocked Persons list ("SDN List") of the Office of Foreign Assets Control ("OFAC") on ▮▮▮▮▮▮▮, setting in motion a chain of events that quickly led to the collapse of the Firm. *Id.* at 2. A mere 12 days later, a distraught Lawyer 1 came to the

U.S. embassy in Nicosia, Cyprus, to be interviewed by embassy personnel, including about this investigation. *Id.* ¶ 4, Ex. B at 1.[2]

From the outset, it was plain that Lawyer 1 was desperate to trade information for the chance at reversal of the OFAC sanctions imposed on the Firm, himself, and his adult children. According to notes of this April 24 interview, Lawyer 1 "requested his son and daughter to be removed from the OFAC sanctions list. He also requested access to his bank account for the purpose only to pay his employees." *Id.* He expressed that his "reputation is ruined, and his family is destroyed as a result of the sanction." *Id.* He even went as far as to offer up an introduction to OFAC-sanctioned Russian oligarch ▇▇▇▇▇▇▇ in an effort to curry favor with the U.S. embassy personnel interviewing him. *Id.*

Starting in late April 2023, Lawyer 1, through counsel, began contacting the FBI and Department of Justice "to inquire about meeting with the U.S. Government to ease or alleviate sanctions." *Id.* ¶ 20, Ex. R at USAO_00000298. The government was happy to listen. On July 26, 2023, Lawyer 1 met in Athens, Greece, with two FBI agents and a member of the prosecution team. *Id.* ¶ 5, Ex. C at 1. At the outset of the interview, Lawyer 1 bemoaned the "effect of the sanctions on [him] and [his] family." *Id.* He reiterated that his "professional integrity and reputation had been trashed" and said that "everything was closing around [him]." *Id.* at 2. Lawyer 1 then described the nature of the privileged work that he did for Mr. Wolfson. *Id.* at 10–11. He also provided information about other clients, including summaries of conversations that he had with them, as well as co-defendant Gannon Bond. *See generally id.* With respect to CC-3, who the government claims is a strictly "nominee" straw owner who owns

---

[2] This memorandum describes various interviews to provide context about the scope of the privilege violations, but the relief sought is limited to suppression of the produced documents. In the event that the government later attempts to introduce privileged testimony or to rely in any way on what was said during the interviews, Mr. Wolfson will object at the appropriate time.

companies on Mr. Kostin's behalf, Lawyer 1 said that he believed she operated her own independent businesses, as well as some for Mr. Kostin. *Id.* at 7–8. At one point, an employee of Lawyer 1 who accompanied him to the interview offered to undertake additional research about certain companies that were of interest to the government and stated that she and Lawyer 1 would revert back to the government "the following day" with their findings. *Id.* at 11.

Two days later, on July 28, 2023, Lawyer 1 had another meeting with the FBI and a member of the prosecution team in Athens. *Id.* ¶ 7, Ex. E. Lawyer 1 explained how he had been investigating his own clients at the government's behest in order to provide information, saying that he "started looking into things" when he "received the names of individuals who the interviewers were interested in." *Id.* at 5. This included Mr. Wolfson. *See id.* at 3. During the July 28 interview, Lawyer 1 again described privileged work he did for Mr. Wolfson and gave his mental impressions, based on his access to privileged information, of the central issue in this case, which is who owned the Aspen, Colorado, property during the key time periods. *Id.* Lawyer 1 told the government that he had believed that Mr. Wolfson—not Mr. Kostin—owned the Aspen property. *Id.*

Separately, Lawyer 2, an attorney at her father's firm, met with the FBI and a member of the prosecution team on July 27, 2023. *Id.* ¶ 6, Ex. D. Like Lawyer 1, Lawyer 2, practically speaking, admitted to becoming an investigative arm of the U.S. government by poring over privilege-protected files to glean information about the Firm's clients for the FBI, stating that she "began researching the firm's holdings related to [Andrey] Kostin to assist [her] father to prepare for interviews with the US government." *Id.* at 2. She provided extensive information about Mr. Wolfson, including about the transaction at issue in this case. *Id.* at 2–6.

## C. The Firm Produced Privileged Documents Without a Waiver

Then came the document productions, consisting of more than 16,000 pages from client files, including Mr. Wolfson's. *Id.* ¶ 23. Based on metadata, it appears that these productions began in September 2023. *Id.* ¶ 24. The Firm produced these documents in the absence of a grand jury subpoena based on pressure for information from the government and the desire for a favorable resolution regarding the OFAC sanctions, which were proving to be catastrophic for Lawyer 1 and Lawyer 2's business interests, personal finances, and reputation in Cyprus. The Firm, in an apparent desire to please the prosecution team, decided to provide everything the government asked for without undertaking a meaningful privilege review based on the erroneous, *post hoc* rationale that the Firm was not providing legal services to its clients and instead was assisting with non-privileged corporate governance matters. *Id.* ¶ 25. This transparently situational rationale directly conflicts with the language from Mr. Wolfson's engagement letter, which describes the work as "legal services and advice," as well as the work the Firm actually undertook on Mr. Wolfson's behalf. *Id.* ¶ 3, Ex. A at 00867; *see also id.* ("The client wishes to engage and retain the Law Firm as its permanent legal advisor, for the purposes of obtaining legal services and support….").

The conduct of Lawyer 1 and Lawyer 2 is also inconsistent with Cypriot legal authority and bar rules. Cypriot law acknowledges that it is "of overriding importance for the proper administration of justice that a client should be able to have complete confidence that what he tells his lawyer will remain secret." *Id.* ¶ 21, Ex. S at 16. (emphasis omitted). As a result, it is "of the highest importance to the administration of justice that a solicitor or other person in possession of confidential and privileged information should not act in any way that might appear to put that information at risk of coming into the hands of someone with an adverse

interest." *Id.* (emphasis omitted).  Additionally, Cyprus is a member of the European Union, and the European Court of Justice has observed that "individuals who consult a lawyer can reasonably expect that their communication is private and confidential." *Id.* ¶ 22, Ex. T ¶ 27. Cypriot bar rules also provide that "[p]rofessional secrecy is recognised as the fundamental and primary right and obligation of advocates and must be protected by the Court and any State or public authority," and that "[a]dvocates are guardians of the confidential information and evidence entrusted to them by their client" and must, "without any time limitation, respect the secrecy of all confidential information or evidence which has come into their knowledge in the course of their professional activity." *See* Cyprus Bar Association, Code of Conduct Regulations ¶ 13.[3]

Unsurprisingly, given the Firm's lack of pre-production screening, the resulting production was laden with privilege-protected materials.  For example:[4]



---

[3] These rules are available at www.cyprusbarassociation.org/files/disciplinary/New_code_of_counduct_eng.pdf.

[4] Although Mr. Wolfson would ordinarily seek to file these materials in an *ex parte* submission given their privileged nature, the prosecution team has already had them for over a year.

6



Rybicki Decl. ¶¶ 9–19.

The government unquestioningly accepted these productions without seeking any representations that the attorney-client privilege had been waived. Indeed, the prosecution team has represented to Mr. Wolfson that the "Government did not obtain, or request or instruct that any custodian obtain, waivers of the attorney-client privilege." *Id.* ¶ 8, Ex. F. Instead, the government accepted whatever Lawyer 1, through counsel, was willing to provide. Shockingly, the government did not even run the Firm's production through a filter team despite knowledge that the source was an attorney for Mr. Wolfson, a target of the investigation. *Id.* And because the government did not issue a subpoena and the Firm produced the records voluntarily— although without Mr. Wolfson's consent—the prosecution team appears to have skirted

important institutional safeguards for collecting attorney materials, such as approval by the Assistant Attorney General or a Deputy Assistant Attorney General for the Criminal Division, that would apply in the event of a subpoena. *See* U.S. Dep't of Just., Just. Manual § 9-13.410 (2016).

### D. The Government Potentially Overlooked Signs of Lawyer 1's ▮▮▮▮▮

Although this fact pattern is already sufficiently egregious, it gets worse, as there is a substantial basis to doubt whether Lawyer 1 even had the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Following the indictment, undersigned counsel attempted to speak with Lawyer 1—who, to reiterate, was Mr. Wolfson's attorney and has associated professional obligations to respond to requests made on Mr. Wolfson's behalf related to the representation. However, U.S. counsel for Lawyer 1 refused to make him available and indicated that Lawyer 1 has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, questions arise as to the government's decision to continue pressing him for confidential information.

# ARGUMENT

### A. Suppression Is Required Due to the Privilege Violations

The attorney-client privilege "play[s] a critical role in our judicial system." *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999). "The attorney-client privilege protects communications: (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).[5] With regard to the third prong, the communication does not need to be exclusively legal in nature; rather, the question is whether "the predominant purpose of the communication is to render or solicit legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 420 (2d Cir. 2007). The privilege "belongs solely to the client and may only be waived by him." *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987). As a result, it is axiomatic that Lawyer 1, Lawyer 2, and the Firm lacked any authority to waive the attorney-client privilege on Mr. Wolfson's behalf. It is immaterial that Mr. Wolfson employed agents or lawyers from his family office to seek advice on his behalf rather than communicating directly the Firm, as the privilege also protects correspondence with "agents of the client…who facilitate communications between the client and the lawyer…." *United States v. Krug,* 868 F.3d 82, 87 (2d Cir. 2017) (internal quotation marks omitted).

The communications here clearly satisfy the privilege test. For example, in one email, Mr. Wolfson's agent asks for legal advice regarding the propriety of "mak[ing] a capital contribution without additionally issued shares to the company." Rybicki Decl. ¶ 12, Ex. J at 0009737. The Firm responds with its legal advice. *Id.* at 0009736. Later in the same thread, Mr. Wolfson's agent provides "draft documents" for legal "review and comment" and raises an

---

[5] As reflected above, Cypriot law likewise recognizes the sanctity of the attorney-client privilege.

9

issue of British Virgin Islands law. *Id.* at 0009735. In another example, the Firm tells Mr. Wolfson's agent that "[w]e are looking forward to receiving the drafts of the agreements for review," and the agent later sends Mr. Wolfson's proposed structure for review. *Id.* ¶ 10, Ex. H at 0009820–21.

Because the government has acknowledged the lack of a privilege waiver, suppression is the appropriate remedy. When "files obtained…were privileged, the remedy is suppression and return of the documents in question…." *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980); *see also SEC v. Forma*, 117 F.R.D. 516, 523 (S.D.N.Y. 1987) ("Thus, evidence obtained in violation of the attorney-client privilege may be suppressed simply because its admission would violate the rules of evidence.").

**B.     Various Options Are Available to Effectuate Suppression**

Mr. Wolfson acknowledges that courts are reluctant to suppress productions in their entirety on the basis that some of the files are privileged and instead seek to tailor the remedy to the violation. *See, e.g.*, *United States v. Schulte*, No. S-2 17 CR. 548 (PAC), 2019 WL 5287994, at *2 (S.D.N.Y. Oct. 18, 2019) (noting that the "general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial, not to order wholesale suppression") (internal quotation marks omitted). To facilitate this remedy, Mr. Wolfson respectfully suggests two potential approaches.

The most appropriate remedy is for the Court to order return of all documents to the Firm, through its U.S. counsel, and allow the government to issue a subpoena, along with proposed protocols for handling potentially privileged materials, for records that are plausibly related to this case. Mr. Wolfson and other interested parties should be afforded the opportunity to move to quash the subpoena as they deem appropriate. In the event that compliance is

directed, the Firm should be required to review the documents, including for privilege, and produce only those that are non-privileged and within scope of the subpoena.

This remedy is appropriate because, quite simply, there never should have been a voluntary production of documents to the government in the first place. The Firm was ethically obligated to refuse to produce records in the absence of compulsory process and to afford Mr. Wolfson and other clients every permissible opportunity to assert their rights. Tellingly, the Firm's engagement letter with Mr. Wolfson has a section about the Firm's obligations, including to provide notice where possible, in the event of compulsory legal process but nowhere purports to permit disclosure in the absence of compulsion. Rybicki Decl. ¶ 3, Ex. A at 00872–73. Ethics opinions abound that prohibit attorneys from the type of voluntary, unauthorized productions that occurred in this case. *See, e.g.*, N.Y. Bar Ass'n Comm. on Prof'l and Jud. Ethics, Formal Op. 2005-03 (2010). This obligation extends beyond privileged materials and also bars voluntary production of confidential or secret information. *See id.* ("Secret is defined far more broadly, as any other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.") (internal quotation marks omitted). As discussed above, Cypriot law also requires lawyers to guard client confidences.

In the alternative, all files produced by the Firm should be required to go through filter team review. While this review is pending, the prosecution team should have no further access to the Firm's production. This is the procedure that likely would have occurred had the government not sought, and had Lawyer 1 not provided, an unauthorized "voluntary" production. *See, e.g.*, Just. Manual § 9-13.420. The government should not be permitted to circumvent the ordinary protections by leaning on an attorney—especially one with an obvious personal motive

to betray client confidences—to turn over client records. This is not the first example in this case of the government failing to implement an appropriate privilege review, *see* ECF No. 41, and Mr. Wolfson is concerned that the prosecution team, having had access to Lawyer 1's records for over a year, may have been tainted by privileged materials. At a minimum, the filter team should be required to review the production to assess the extent of potentially privileged materials before the government can continue to rummage around in an attorney's records under circumstances where it is clear that the client never provided consent.

## CONCLUSION

Many legal guardrails exist to ensure that no party, including the government, improperly obtains access to privileged information. Unfortunately, the government and the Firm blew past all of them. The outcome was the production of privileged documents without any opportunity for Mr. Wolfson to raise objections in advance. This result should not be countenanced, and the privileged materials in the government's possession should be suppressed.

Dated: November 25, 2024

Respectfully submitted,

*/s/ David C. Rybicki*
David C. Rybicki
Michael C. Harper
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
David.Rybicki@klgates.com
*Counsel for Defendant Vadim Wolfson*