UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v-

ANDREY KOSTIN et al.,

           Defendants.

Case No. 1:24-cr-00091 (GHW)

# DEFENDANT VADIM WOLFSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS DEVICE PASSCODE AND RELATED FRUITS

K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
Attorneys for Defendant Vadim Wolfson

**TABLE OF CONTENTS**

PAGE

FACTUAL BACKGROUND ................................................................................................ 1

    A.    The FBI Conducted an Unnecessary Dawn Raid ................................................... 1

    B.    Despite Clear Instructions, FBI Agents Unlawfully Obtained the Passcode to Mr. Wolfson's Devices ........................................................................................ 2

    C.    The Government Failed to Timely Produce Evidence of the Interrogations ......... 6

ARGUMENT .................................................................................................................... 6

    A.    Police Interrogations Without Adequate Warnings Are Forbidden ....................... 6

    B.    Police Must Issue Warnings Before Asking About Passcodes to Electronic Devices During Custodial Interrogations ............................................................... 7

    C.    Suppression of the Devices' Contents Is Required ............................................... 9

    D.    Mr. Wolfson Requests an Evidentiary Hearing ................................................... 12

CONCLUSION ................................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Dickerson v. United States*,
    530 U.S. 428 (2000)...................................................................................................7

*Doe v. United States*,
    487 U.S. 201 (1988)...................................................................................................7

*Georgison v. Donelli*,
    588 F.3d 145 (2d Cir. 2009).......................................................................................7

*Kaupp v. Texas*,
    538 U.S. 626 (2003).................................................................................................11

*Miranda v. Arizona*,
    384 U.S. 436 (1966)............................................................................................ *passim*

*Missouri v. Seibert*,
    542 U.S. 600 (2004).................................................................................................11

*Rhode Island v. Innis*,
    446 U.S. 291 (1980)...................................................................................................7

*United States v. Clark*,
    683 F. Supp. 3d 97 (D. Mass. 2023) ......................................................................8, 9

*United States v. Dickson*,
    No. 7:11-CR-399 VB, 2011 WL 3701839 (S.D.N.Y. Aug. 22, 2011) ....................12

*United States v. Djibo*,
    151 F. Supp. 3d 297 (E.D.N.Y. 2015) .....................................................................10

*United States v. Gray*,
    No. 21-CR-713 (PAE), 2024 WL 1526368 (S.D.N.Y. Apr. 9, 2024) ...................7, 8

*United States v. Newton*,
    369 F.3d 659 (2d Cir. 2004).......................................................................................7

*United States v. Patane*,
    542 U.S. 630 (2004) (pl. op.).................................................................................4, 10

*United States v. Rogozin*,
    No. 09-CR-379 S M, 2010 WL 4628520 (W.D.N.Y. Nov. 16, 2010)......................8

*United States v. Shvartsman*,
    722 F. Supp. 3d 276 (S.D.N.Y. 2024)..................................................................................7

*United States v. Wilson*,
    11 F.3d 346 (2d Cir. 1993)....................................................................................................11

*United States v. Wilson*,
    914 F. Supp. 2d 550 (S.D.N.Y. 2012)..................................................................................11

**Constitutional Provisions**

U.S. Const. Amend. V……………………………………………………………………… 6

**Other Authorities**

*Physical Fruits vs. Digital Fruits: Why Patane Should Not Apply to the Contents
    of Digital Devices*, U. Ill. J.L. Tech. & Pol'y, Spring 2021 ......................................................10

Defendant Vadim Wolfson respectfully submits this memorandum of law in support of his Motion to Suppress Device Passcode and Related Fruits. After conducting a dawn raid on Mr. Wolfson's residence, FBI agents unlawfully elicited the numerical passcode to Mr. Wolfson's iPhone and iPad without having provided him with *Miranda* warnings. The agents knew doing so was unlawful—their warrant application expressly forbade it, and immediately before one agent asked Mr. Wolfson for the passcode, the agent acknowledged to a colleague that it was not proper to do so. But mere seconds later, he asks anyway. The government then failed to produce evidence of this violation and instead furnished Mr. Wolfson with a misleading report that omitted all mention of the fact that the agents had asked for and obtained the passcode to his devices. Only months later in connection with the parties' conference regarding this suppression motion did the government finally produce the crucial body camera footage from the dawn raid revealing the *Miranda* violation.

Because the government gained unlawful entry to Mr. Wolfson's devices, Mr. Wolfson's unwarned statements and the fruits of the searches of those devices must be suppressed.

## FACTUAL BACKGROUND

**A.   The FBI Conducted an Unnecessary Dawn Raid**

On February 22, 2024, a team of heavily armed FBI agents woke Mr. Wolfson, his wife, and young children and arrested Mr. Wolfson at approximately 5:57 a.m., a few minutes before the time authorized by the warrant. Declaration of David C. Rybicki ("Rybicki Decl.") ¶ 3, Ex. A at USAO_00000691; *id.* ¶ 4, Ex. B at WOLFSON_00000001. There was no reason for a dawn raid. Mr. Wolfson had been aware of the instant criminal investigation since 2022. *Id.* ¶ 5. He had engaged counsel and produced voluminous documentation to the government. *Id.* He had left the United States, returned without incident, and even sought permission from FBI in advance of his international travel. *Id.* ¶ 6. There was neither a risk of flight nor a danger of spoliation. But

for around fifteen minutes early that morning, FBI agents left him handcuffed and standing on the sidewalk outside his house with his hands behind his back, wearing only underwear, before finally providing him with t-shirt and athletic pants. *Id.* ¶ 7.

> **B.  Despite Clear Instructions, FBI Agents Unlawfully Obtained the Passcode to Mr. Wolfson's Devices**

Prior to Mr. Wolfson's arrest, the FBI obtained a search warrant for Mr. Wolfson's devices. In the accompanying warrant affidavit, the FBI explained what it intended to do and, more importantly here, what it recognized that it could not do. *Id.* ¶ 3, Ex. A. One major prohibition related to device passcodes. The affidavit specifically stated that the FBI would have no authority to "compel WOLFSON to provide a numeric passcode." *Id.*, Ex. A at USAO_00000683.

The agent who initially sought Mr. Wolfson's passcode—believed to be Special Agent Roland ▇▇▇▇▇▇—appeared intimately familiar with this restriction. Indeed, SA ▇▇▇▇▇▇ colleague can be heard on the body camera video asking him if he wanted to "sit here for a few [minutes] to talk to [Mr. Wolfson] to try to get him to give you his passcode." *Id.* ¶ 8. In apparent recognition of the impropriety of such a tactic, SA ▇▇▇▇▇▇ declines and instead indicates that they should "figure out where his phone is." *Id.* The other agent then says to SA ▇▇▇▇▇▇, "You wanna ask where his phone is?" *Id.* SA ▇▇▇▇▇▇ responds "Yeah." *Id.* The other agent suggests that this information is needed because someone else just exited the house with "three phones in her hand." *Id.*

SA ▇▇▇▇▇▇ then approaches Mr. Wolfson. At that moment, Mr. Wolfson is seen sitting in the back seat of a law enforcement vehicle handcuffed with his arms pinned behind his back. *Id.* He had just recently expressed how uncomfortably tight the handcuffs were, and he had been provided clothing for the first time approximately three minutes earlier. *Id.* Moreover, there is no

2

indication that anyone had read Mr. Wolfson his rights at that point in time. *Id.* In this context, the following exchange occurs:

> **SA ▇▇▇▇▇▇**: Um, so, we have a, uh, search warrant for your phone.
>
> **Mr. Wolfson:** It's upstairs.
>
> **SA ▇▇▇▇▇▇**: It's upstairs?
>
> **Mr. Wolfson:** Where I sleep.
>
> **SA ▇▇▇▇▇▇**: In your bedroom? On the nightstand?
>
> **Mr. Wolfson:** Yes.
>
> **SA ▇▇▇▇▇▇**: Okay.
>
> **Mr. Wolfson:** It's charging.
>
> **SA ▇▇▇▇▇▇**: [to another agent] Hey ▇▇▇▇, it's on the nightstand, the phone, it's charging on the nightstand in the bedroom.
>
> **Other Agent:** Color?
>
> **SA ▇▇▇▇▇▇**: [to Mr. Wolfson] Color?
>
> **Mr. Wolfson:** It's in [a] white case. Can someone bring my glasses as well please?
>
> **Other Agent:** Where are your glasses? Right next to it?
>
> **Mr. Wolfson:** Yes.
>
> **SA ▇▇▇▇▇▇**: Uh, and then for your phone, is it facial recognition?
>
> **Mr. Wolfson:** Yes.[1]
>
> **SA ▇▇▇▇▇▇**: Okay and there's also a passcode as well?
>
> **Mr. Wolfson:** One six one six.

*Id.*

---

[1] There is no indication that the FBI attempted to access Mr. Wolfson's devices using the facial recognition feature. In any event, Mr. Wolfson's unwarned statement about facial recognition is itself inadmissible due to the *Miranda* violation.

3

The entirety of the exchange is clearly problematic, as even enlisting Mr. Wolfson's assistance in identifying which of the many devices was his, without having *Mirandized* him, was unlawful. *See United States v. Patane*, 542 U.S. 630, 641–42 (2004) (pl. op.). But even assuming that the agents had a proper basis for identifying where his phone was, the questioning at a minimum should have ended after the discussion of Mr. Wolfson's glasses. The only basis for interrogating further was to unlawfully elicit Mr. Wolfson's passcode from him.

At some point thereafter, SA ███ broaches *Miranda* for what appears to have been the first time. Rybicki Decl. ¶ 9. But SA ███ doesn't even finish advising Mr. Wolfson of his rights before interrupting the process to interrogate Mr. Wolfson once again about his passcode when it becomes clear that two digits are missing from the six-digit passcode. This second exchange begins with SA ███ prefacing his attempt to elicit the passcode from Mr. Wolfson by again mentioning the search warrant. *Id.* SA ███ says: "We have an arrest warrant. I'll show you the paperwork when we have a chance here. Like I said we have a search warrant for your phone. They'll be taking that. And then there's a few other things on the search warrant that we're looking for—electronic devices and three paintings." *Id.* SA ███ then shifts to the subject of *Miranda* and presents Mr. Wolfson with a Form FD-395, the advice-of-rights form. *Id.* SA ███ notes that he has copies in English and Russian. *Id.* Mr. Wolfson indicates a preference for Russian, but it is unclear which version agents actually give Mr. Wolfson. *Id.* Mr. Wolfson remains handcuffed during this exchange, and SA ███ proceeds to ask Mr. Wolfson for his home address so that SA ███ can complete the form. *Id.*

There is then a brief discussion of the date and time before another agent is heard in the background saying "it's a six-digit passcode." *Id.* Intent on obtaining the passcode, SA ███ then interrupts the *Miranda* process and says to Mr. Wolfson: "It's a six-digit passcode. What's

the passcode to your phone?" *Id.* This time, Mr. Wolfson provides the complete passcode, which adds two more digits to the original "one six one six" passcode he provided in response to SA ███████ prior questioning. *Id.*

There is no indication in the body camera footage that SA ███████ had read Mr. Wolfson his rights at the time of this second interrogation about the passcode. *Id.* Nor did Mr. Wolfson have an adequate opportunity to review the advice-of-rights form—the video shows him trying to read the form when SA ███████ restarts his questioning about the passcode. *Id.* Moreover, Mr. Wolfson had previously requested that agents provide him with his glasses, and it is not clear that they had done so by the time the form was placed in front of him. *Id.* And, critically, the FBI's report of the encounter shows that not even the FBI considered that Mr. Wolfson had adequately received or waived his *Miranda* rights that morning. The report states that because "SA ███████ was aware that Wolfson was represented by an attorney, SA ███████ informed Wolfson that agents did not intend to ask him any substantive questions about the charges against him nor about the investigation under which he was being arrested." *Id.* ¶ 4, Ex. B at WOLFSON_00000001. Inexplicably, nowhere in the report does the FBI indicate that Mr. Wolfson had already been questioned about his passcode twice, notwithstanding the express prohibition in the warrant—"This authority is not to compel WOLFSON to provide a numeric passcode"—and the FBI's knowledge that he was represented by counsel. *Id.* ¶ 3, Ex. A at USAO_00000683. Indeed, the report entirely omits how the FBI gained access to Mr. Wolfson's devices.

The report is obviously inaccurate for several reasons. First, as noted, the FBI did interrogate Mr. Wolfson, repeatedly, to obtain his passcode, which goes entirely unmentioned in the report. The report also indicates that an agent "read to Wolfson the FD-395 Advice of Rights Form in English," when the video does not reflect that and instead shows SA ███████

terminating the *Miranda* process before any rights were read so that that he could resume his interrogation and obtain the passcode.  *Compare id.* ¶ 4, Ex. B at WOLFSON_00000001, *with id*. ¶ 9.  And the report inaccurately states that Mr. Wolfson "indicated to SA ▆▆▆▆▆ that he could understand the English version," when the body camera footage plainly shows that Mr. Wolfson asked for the Russian-language version of the form.  *Compare id.* ¶ 4, Ex. B at WOLFSON_00000001, *with id*. ¶ 9.

The government also memorialized in a separate technical report that its sole avenue for accessing Mr. Wolfson's phone, as well as his iPad, which shared the same passcode, was the information Mr. Wolfson provided during the un-*Mirandized* interrogation.  *Id.* ¶ 10, Ex. C at WOLFSON_00000344.  The report states that the passcode was "provided by the owner" of the devices.  *Id.*

### C. The Government Failed to Timely Produce Evidence of the Interrogations

Although the government purported to have produced on April 5, 2024, the relevant information, including videos and reports, regarding Mr. Wolfson's arrest, that production omitted the crucial body camera footage of the interrogation regarding the passcode and the technical report (dated March 2024 and available to the prosecution team for months) reflecting that the devices were accessed using the unlawfully obtained passcode.  *Id.* ¶ 11.  These materials were only provided on November 6, 2024, after undersigned counsel informed the government that Mr. Wolfson intended to move to suppress and asked the prosecution team to proffer the testimony that the FBI would provide if asked how agents gained access to the devices.  *Id.*

**ARGUMENT**

### A. Police Interrogations Without Adequate Warnings Are Forbidden

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  In furtherance of the Fifth Amendment's

core protections, for more than a half century it has been well settled law that police officers may not interrogate a suspect who has been taken into custody until the suspect has been provided an adequate warning. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *Dickerson v. United States*, 530 U.S. 428, 443–44 (2000). When a suspect who is subjected to a custodial interrogation "is not so warned, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief." *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). As described below, the fruits of any such unwarned statements must also be suppressed under the circumstances applicable in this case.

There is no doubt that a person under formal arrest is in custody for purposes of the *Miranda* requirement. *See, e.g.*, *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009). "Interrogation," for purposes of the Fifth Amendment analysis applicable here, includes "not only express questioning, but also any words or actions on the part of the police…that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A statement is considered testimonial, and therefore subject to *Miranda* protections, if it requires an individual to "disclose the contents of his own mind." *Doe v. United States*, 487 U.S. 201, 211 (1988) (internal quotation marks omitted).

### B. Police Must Issue Warnings Before Asking About Passcodes to Electronic Devices During Custodial Interrogations

Federal district courts have repeatedly held that uttering the passcode to an electronic device is both testimonial and incriminating such that individuals in custodial settings must not be asked to provide their passcodes in the absence of a valid *Miranda* warning and subsequent voluntary waiver. *See, e.g.*, *United States v. Shvartsman*, 722 F. Supp. 3d 276, 315 (S.D.N.Y. 2024) ("Under fundamental Fifth Amendment principles, Garelick's disclosure of his passcode to Officer Gonzalez was both testimonial and incriminating."); *United States v. Gray*, No. 21-CR-

713 (PAE), 2024 WL 1526368, at *2 (S.D.N.Y. Apr. 9, 2024) ("[T]he Court finds that the Fifth Amendment bars the Government from compelling a criminal defendant to disclose the passcode to his smartphone."); *United States v. Rogozin*, No. 09-CR-379 S M, 2010 WL 4628520, at *6 (W.D.N.Y. Nov. 16, 2010) ("Moreover, defendant's statement as to the password was testimonial in nature.").

There can be no dispute that the FBI conducted a custodial interrogation of Mr. Wolfson—he had been arrested and was handcuffed in the back seat of a law enforcement vehicle. This is a classic example of custody for purposes of *Miranda*. The agent's questions regarding Mr. Wolfson's passcode were also plainly intended to elicit a testimonial response. Indeed, there was no reason to ask the questions other than to obtain the passcode.

The facts here are strikingly similar to, albeit more aggravated than, a recent case in which a Massachusetts federal court found a *Miranda* violation stemming from the FBI's elicitation of a defendant's passcode. *See United States v. Clark*, 683 F. Supp. 3d 97 (D. Mass. 2023). In *Clark*, as here, during a dawn raid FBI agents handcuffed a defendant wearing only undergarments who was provided a Form FD-395 and advised of her rights before being asked for her passcode. *Id.* at 102–06. The *Clark* defendant "remained handcuffed, although deemed a low risk, and was not actually allowed to write on the form." *Id.* at 106. The interrogation occurred "[s]everal minutes" after she was advised of her rights and took place in a different room of the defendant's house. *Id.* at 102–03.

In this sense, the facts of the instant case are more egregious. Whereas the *Clark* defendant had not been asked anything about her device prior to being shown the Form FD-395, here the FBI had already obtained Mr. Wolfson's passcode—albeit missing two digits—before even attempting to show him the advice-of-rights form. And when agents obtained the complete passcode from

8

Mr. Wolfson during their second un-*Mirandized* interrogation of him, they had just provided the form and not afforded him the opportunity to read it. Like the *Clark* defendant, Mr. Wolfson remained handcuffed, despite not presenting a risk, and was not allowed to write on the form or otherwise acknowledge that he read and understood it.

In concluding that the defendant's provision of her passcode was the result of an unconstitutional interrogation, the *Clark* court relied on numerous factors that apply with equal force here. For example, the *Clark* court noted that the "agents involved clearly understood that Defendant had *not* waived her rights at that time" because: (1) the advice-of-rights form did not indicate the defendant's consent to questioning; and (2) the "agents were informed at the briefing that Defendant had counsel and they were cautioned to limit their questions because she was represented." *Id.* at 106–07 (emphasis in original). As the FBI acknowledged in its own memorialization of the arrest in this case, both of *Clark*'s considerations are present here, too. *See* Rybicki Decl., ¶ 4, Ex. B at WOLFSON_00000001 ("Given that SA ▓▓▓▓ was aware that Wolfson was represented by an attorney, SA ▓▓▓▓ informed Wolfson that agents did not intend to ask him any substantive questions about the charges against him nor about the investigation under which he was being arrested. For this reason, as well as the fact that he was handcuffed, Wolfson did not sign the FD-395 form."). Based on the totality of the circumstances, the *Clark* court concluded that the evidence "clearly supports the presumption that Defendant did not waive her rights." *Clark*, 683 F. Supp. 3d at 106. The same holds true here.

### C. Suppression of the Devices' Contents Is Required

The only remaining question is the appropriate remedy for the violation. Suppression is warranted here with respect to the utterance of the passcode as well as the contents of the iPhone and iPad, which were accessed using the passcode. Relying on *Patane*, the government historically has taken the position that suppression is only appropriate when the unwarned testimonial

9

statement is involuntary.  See 542 U.S. at 643-44 (concluding that *Miranda* does not require suppression of the "physical fruits of the suspect's unwarned but voluntary statements").  In *Patane*, the Supreme Court suppressed a defendant's statement identifying the location of a gun but allowed the gun itself to be introduced into evidence as the physical fruit of a voluntary, albeit un-*Mirandized*, statement.  *Id.*  In contrast to *Patane*, however, the contents of electronic devices are *digital*, not *physical*, fruits—rendering the rationale for the *Patane* rule inapplicable.  *Patane* does not apply in the context of digital devices because

> [A] cell phone is not just a physical object containing information. It is more personal than a purse or a wallet, and certainly more so than the firearm that was used in evidence against Respondent Patane. It is the combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually and sometimes even sexually, in the owner's life, and it pinpoints the whereabouts of the owner over time with greater precision than any tool heretofore used by law enforcement without aid of a warrant. In today's modern world, a cell phone passcode is the proverbial "key to a man's kingdom."

*United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015); *see also generally* Abbey Flynn, *Physical Fruits vs. Digital Fruits: Why Patane Should Not Apply to the Contents of Digital Devices*, U. Ill. J.L. Tech. & Pol'y, Spring 2021.

But even if involuntariness were required for suppression, that test is also satisfied here. Mr. Wolfson was pulled from his house in a state of undress before dawn and placed into a car with his arms pinned behind his back in handcuffs that were, per his contemporaneous statement, uncomfortably tight.  An FBI agent, despite acknowledging aloud the impropriety of the line of questioning before attempting to obtain any information from Mr. Wolfson, nonetheless, mere seconds later, inexplicably proceeded to ask him the forbidden questions about his passcode. Crucially, the agent on both occasions prefaced his questions about the passcode with a statement that the FBI had a search warrant for Mr. Wolfson's devices—the clear implication to any listener in Mr. Wolfson's custodial posture being that the listener had a legal obligation to furnish the

passcode to an agent who was demanding a passcode pursuant to a search warrant. Mr. Wolfson could not possibly have known in that coercive setting that—ironically enough—the warrant itself prohibited him from being compelled to provide his passcode. Moreover, he had not been advised of his rights at all during the first episode of questioning. And then shortly afterward, again, instead of advising Mr. Wolfson of his rights and completing the *Miranda* process, the agent decided to interrogate Mr. Wolfson yet a second time about his passcode. The agent was obviously highly motivated to obtain that passcode notwithstanding his clear legal obligation not to do so.

A lack of voluntariness can be evidenced by "mere acquiescence in a show of authority." *United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012) (quoting *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993)). That is precisely what happened here. In evaluating whether a statement was made voluntarily under analogous circumstances, the Supreme Court has noted that "[i]f reasonable doubt were possible on this point, the ensuing events would resolve it: removal from one's house in handcuffs on a January night with nothing on but underwear for a trip to a crime scene on the way to an interview room at law enforcement headquarters." *Kaupp v. Texas*, 538 U.S. 626, 631–32 (2003). The Supreme Court's description in *Kaupp* informs the analysis here, and under the circumstances of this case, there can be no doubt that Mr. Wolfson perceived an obligation to answer the FBI's questions about his passcode.

The government's ostensible lack of good faith also supports suppression. *Miranda* was designed to deter problematic law enforcement conduct, and the Supreme Court has been clear that suppression is warranted when confronted with a "police strategy adapted to undermine the *Miranda* warnings." *Missouri v. Seibert*, 542 U.S. 600, 616 (2004). Here, the very agent who interrogated Mr. Wolfson about his passcode acknowledged only seconds earlier that doing so was impermissible. Then, the FBI drafted an incident report that conspicuously fails to note that Mr.

11

Wolfson was repeatedly interrogated about the password and also contains other misstatements related to the circumstances of his arrest. Moreover, the government produced the video footage of the passcode interrogations and associated technical report indicating that Mr. Wolfson's devices were accessed using the passcode only after undersigned counsel told the prosecution team that Mr. Wolfson would move to suppress—prior to that call all the government had provided was the inaccurate and misleading incident report and certain video footage that was irrelevant to the present inquiry. To allow the fruits of these violations into evidence would be to encourage future misconduct.

### D. Mr. Wolfson Requests an Evidentiary Hearing

In the event any factual disputes exist regarding the voluntariness of Mr. Wolfson's statements, Mr. Wolfson respectfully requests an evidentiary hearing. An affidavit from counsel is sufficient to prompt an evidentiary hearing when the affidavit is based on counsel's review of video footage of key events. *See United States v. Dickson*, No. 7:11-CR-399 VB, 2011 WL 3701839, at *1 (S.D.N.Y. Aug. 22, 2011) ("The attorney's affidavit, however, based on her personal knowledge of the video recording…is sufficient to create an issue of fact warranting an evidentiary hearing."). Accordingly, the attached Rybicki Declaration should trigger a hearing if this Court determines that there are material fact issues requiring resolution.

## CONCLUSION

The FBI twice interrogated Mr. Wolfson about his passcode without having provided *Miranda* warnings. As a result, Mr. Wolfson involuntarily provided the passcode, which opened his devices. Both his unwarned statements and the fruits of the resulting searches should be suppressed.

Dated: November 25, 2024

                Respectfully submitted,

                */s/ David C. Rybicki*
                David C. Rybicki
                Michael C. Harper
                Robert S. Silverblatt

                K&L Gates LLP
                1601 K Street, N.W.
                Washington, DC 20006
                Telephone: (202) 778-9370
                Facsimile: (202) 778-9100
                David.Rybicki@klgates.com
                *Counsel for Defendant Vadim Wolfson*