**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:24-cr-00091 (GHW) |
| -v- | |
| ANDREY KOSTIN et al., | |
| Defendants. | |

## DEFENDANT VADIM WOLFSON'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS, STRIKE, FOR A BILL OF PARTICULARS, AND FOR PRODUCTION OF GRAND JURY MATERIALS

K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100

*Counsel for Defendant Vadim Wolfson*

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................ 1

ARGUMENT ................................................................................................... 3

I.  The Contents of Mr. Wolfson's Devices Should Be Suppressed ..................... 3

    A.  Mr. Wolfson's Statements Were Not Voluntary ....................................... 3

    B.  Law Enforcement Misconduct Tainted the Search ................................. 7

    C.  Inevitable Discovery Does Not Apply ............................................... 10

        i.  Inevitably discovery is not available here as a matter of law ................. 10

        ii.  Inevitable discovery is not available here as a matter of fact ................. 12

            a.  The government ignores Mr. Wolfson's Speedy Trial Act rights ...................................................................... 13

            b.  The government's declarations fail to meet the heavy burden ......................................................................... 13

            c.  At a minimum, the data the government concedes was not inevitably discoverable should be suppressed ........................... 22

        iii.  Mr. Wolfson requests an evidentiary hearing on inevitable discovery ...................................................................... 22

II.  Privileged Records Improperly Obtained from the Firm Should Be Suppressed ........... 23

    A.  Mr. Wolfson did not waive any remedies ........................................... 23

    B.  The Firm's production included Mr. Wolfson's privileged records ................... 24

    C.  Mr. Wolfson's privilege claims are appropriately tailored ........................ 26

    D.  The government cannot make a blanket crime-fraud argument ........................ 27

III.  The Fruits of Improperly Obtained Warrants Should Be Suppressed, or in the Alternative, the Court Should Hold a *Franks* Hearing ..................................... 27

IV.  Mr. Wolfson Is Entitled to a Bill of Particulars ................................... 34

V.  The Government Should Be Ordered to Produce Grand Jury Materials .................... 36

CONCLUSION ................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Properties*,
    830 F.3d 66 (2d Cir. 2016).................................................................12

*Apex Mun. Fund v. N-Grp. Sec.*,
    841 F. Supp. 1423 (S.D. Tex. 1993) ..................................................23

*Campaneria v. Reid*,
    891 F.2d 1014 (2d Cir. 1989)..............................................................6

*Florida v. Royer*,
    460 U.S. 491 (1983) (pl. op.)...............................................................4

*Hurst v. F.W. Woolworth Co.*,
    No. 95 CIV. 6584 CSH, 1997 WL 61051 (S.D.N.Y. Feb. 11, 1997) ....................23

*Kaupp v. Texas*,
    538 U.S. 626 (2003) (per curiam)......................................................4, 5

*Missouri v. Seibert*,
    542 U.S. 600 (2004)............................................................................7

*Nix v. Williams*,
    467 U.S. 431 (1984)..........................................................................10

*Palacios v. Burge*,
    470 F. Supp. 2d 215 (E.D.N.Y. 2007) ..................................................5

*Parsad v. Greiner*,
    337 F.3d 175 (2d Cir. 2003)..............................................................5, 6

*People v. d'Estree*,
    2024 COA 106 (Colo. App. Oct. 3, 2024)..........................................16

*In re Richard Roe, Inc.*,
    68 F.3d 38 (2d Cir. 1995) .................................................................27

*State v. Bao*,
    2024 MT 308 (Mont. Dec. 17, 2024)..................................................19

*United States v. Booker*,
    561 F. Supp. 3d 924 (S.D. Cal. 2021)......................................14, 15, 17

*United States v. Ceballos*,
    812 F.2d 42 (2d Cir. 1987)..........................................................................................6

*United States v. Clark*,
    683 F. Supp. 3d 97 (D. Mass. 2023) .......................................................................14

*United States v. Costanzo*,
    No. 22-CR-281 (JPO), 2024 WL 2046053 (S.D.N.Y. May 8, 2024) .....................27

*United States v. Crespo*,
    834 F.2d 267 (2d Cir. 1987)..........................................................................................6

*United States v. Dalpour*,
    No. 1:24-cr-264-JPC, ECF No. 10 (S.D.N.Y. May 17, 2024)................................17

*United States v. Dickson*,
    No. 7:11-CR-399 VB, 2011 WL 3701839 (S.D.N.Y. Aug. 22, 2011) ....................9

*United States v. Djibo*,
    151 F. Supp. 3d 297 (E.D.N.Y. 2015) ...............................................................14, 17

*United States v. Draconis*,
    No. 11 CR 1003 (DAB), 2012 WL 1267838 (S.D.N.Y. Apr. 11, 2012) .................6

*United States v. Fiseku*,
    No. 15 CR. 384 (PAE), 2015 WL 7871038 (S.D.N.Y. Dec. 3, 2015)....................7

*United States v. Fox*,
    No. 22-CR-0053(JLS)(JJM), 2023 WL 9100639 (W.D.N.Y. Sept. 15, 2023),
    *report and recommendation adopted*, 2023 WL 8645009 (W.D.N.Y. Dec. 14,
    2023) .............................................................................................................................6

*United States v. Gonzalez*,
    864 F. Supp. 375 (S.D.N.Y. 1994).................................................................................7

*United States v. Gray*,
    No. 1:21-cr-00713-PAE, ECF No. 109 (S.D.N.Y. Apr. 22, 2024)....................16, 21

*United States v. Guia-Lopez*,
    No. 22-50234, 2023 WL 5236764 (5th Cir. Aug. 15, 2023) .................................16

*United States v. Haak*,
    884 F.3d 400 (2d Cir. 2018).........................................................................................6

*United States v. Hankison*,
    No. 3:22-CR-84-RGJ, 2024 WL 4112339 (W.D. Ky. Sept. 6, 2024)...............17, 18

*United States v. Haynes*,
No. 19-CR-250 (WMW/ECW), 2020 WL 3420869 (D. Minn. Apr. 27, 2020),
*report and recommendation adopted*, 2020 WL 3420675 (D. Minn. June 22,
2020) ...................................................................................................................16

*United States v. Hernandez*,
No. 1:22-cr-20557-BB, ECF No. 242 (S.D. Fla. June 8, 2024)..............................21

*United States v. Khalil*,
214 F.3d 111 (2d Cir. 2000)...................................................................................7

*United States v. Lauria*,
70 F.4th 106 (2d Cir. 2023) ..................................................... *passim*

*United States v. Ramos*,
753 F. Supp. 75 (W.D.N.Y. 1990) ..........................................................................5

*United States v. Rico*,
No. (S1) 18 CR. 661 (PGG), 2019 WL 4014826 (S.D.N.Y. Aug. 26, 2019) ...........6

*United States v. Shvartsman*,
No. 1:23-cr-00307, ECF No. 53-5 (S.D.N.Y. Dec. 22, 2023) ..................................9

*United States v. Siddiqui*,
699 F.3d 690 (2d Cir. 2012), *as amended* (Nov. 15, 2012).....................................7

*United States v. Sosa*,
379 F. Supp. 3d 217 (S.D.N.Y. 2019)....................................................................21

*United States v. Vilar*,
530 F. Supp. 2d 616 (S.D.N.Y. 2008)....................................................................22

*United States v. Wilson*,
914 F. Supp. 2d 550 (S.D.N.Y. 2012).....................................................................4

*United States v. Wilson*,
11 F.3d 346 (2d Cir. 1993)......................................................................................4

*United States v. Yunis*,
859 F.2d 953 (D.C. Cir. 1988).................................................................................6

*United States v. Zavala*,
541 F.3d 562 (5th Cir. 2008) ................................................................................11

**Statutes**

18 U.S.C. § 3161(c)(1)............................................................................................13

**Other Authorities**

*Apple Security Releases*, Apple, https://support.apple.com/en-us/100100 (last visited Jan. 5, 2025) ................................................................................................19

*Confusion As iPhones Mysteriously Reboot and Lock Cops Out*, Forbes (Nov. 8, 2024), https://www.forbes.com/sites/kateoflahertyuk/2024/11/08/confusion-as-iphones-mysteriously-reboot-and-lock-cops-out/ ...........................................18

*FAQ No. 398*, Office of Foreign Assets Control (Aug. 11, 2020), https://ofac.treasury.gov/faqs/398#:~:text=OFAC's%2050%20Percent%20Rul e%20speaks,to%20OFAC's%2050%20Percent%20Rule ......................................28

Defendant Vadim Wolfson respectfully submits this reply brief in support of his motions:

1. To suppress a device passcode and the fruits of the government's *Miranda* violation (ECF No. 79);

2. To suppress privileged materials (ECF No. 76);

3. To suppress the fruits of improperly obtained warrants or, in the alternative, to hold a *Franks* hearing (ECF No. 83 at 9–13);

4. To require the government to produce a bill of particulars (ECF No. 83 at 6–8); and

5. To obtain access to grand jury materials (ECF No. 83 at 13–15).

The common threads tying together these forms of relief are the government's lack of evidence, unwillingness to engage with important facts, and refusal to provide information about intended proof.  In support of this brief, Mr. Wolfson submits a declaration from Michael Succi, a former FBI and United States Secret Service agent who attests to fatal flaws in the government's inevitable discovery argument, and a supplemental declaration from undersigned counsel.

## BACKGROUND

The government ignores key facts in its response to each and every one of the pretrial motions.  These issues are explored in more detail below, but Mr. Wolfson highlights them at the outset to show the importance of these facts to the resolution of the pending motions:

- **<u>Motion to suppress the device passcode and the fruits of the searches of Mr. Wolfson's iPhone and iPad</u>**.  The government does not address the coercive effect of the FBI agent's repeated references to a search warrant when interrogating Mr. Wolfson about his passcode.  The government also submits a declaration from the agent who conducted the interrogations, in which the agent claims that he did not understand the need to provide *Miranda* warnings to Mr. Wolfson prior to the interrogations, but neither the prosecution team nor the agent even references the agent's statement on

video in which he appears to acknowledge the impropriety of his conduct mere seconds before engaging in it. These facts are central to evaluating the appropriateness of suppression and directly relate to involuntariness and law enforcement misconduct. Separately, in asking the Court to apply the inevitable discovery doctrine, the government omits a litany of facts that could materially impact law enforcement's ability to extract information from Mr. Wolfson's phone without his passcode.

- **<u>Motion to suppress privileged documents</u>**. In arguing that Mr. Wolfson was not the privilege holder for the relevant documents, the government fails to acknowledge an email included in the original motion that plainly shows that the sender is acting as an agent of Mr. Wolfson. And in contending that the lack of an engagement letter between Mr. Wolfson and the Firm[1] prior to 2016 means that that no attorney-client relationship existed before then, the government ignores testimony from a lawyer at the Firm that it was not the Firm's practice to issue engagement letters during that earlier time period.

- **<u>Motion for a bill of particulars</u>**. The government refuses to make the simple concession that it lacks any direct evidence that Andrey Kostin received funds in the 2019 Transaction. Likewise, the government does not engage with Mr. Wolfson's argument that there is no evidence that certain payments from the Capital Entities are for the purposes asserted by the government.

- **<u>Motion to suppress the fruits of improperly obtained warrants or, in the alternative, to hold a _Franks_ hearing</u>**. The government incorrectly states that the affidavits did not contain material inaccuracies, while overlooking the repeated and

---

[1] Capitalized terms have the same meaning as in Mr. Wolfson's motions.

baseless assertions in those affidavits that Mr. Kostin was paid through the 2019 Transaction.

- **<u>Motion for access to grand jury materials</u>**.  The government fails to address the manner in which the very factual arguments that it continues to pursue in its opposition are inconsistent with the statute under which Mr. Wolfson is charged, raising substantial questions about whether the grand jury was misled about the elements of the alleged crime.

## ARGUMENT

## I. THE CONTENTS OF MR. WOLFSON'S DEVICES SHOULD BE SUPPRESSED

Although the government concedes that FBI violated Mr. Wolfson's *Miranda* rights and does not oppose suppression of his statement identifying his passcode, the prosecution team strains to contest suppression of the fruits of the unlawful search.  However, even assuming for the sake of argument that suppression requires involuntariness or law enforcement misconduct,[2] both are clearly present here.  Additionally, the doctrine of inevitable discovery cannot cleanse the government's misconduct—the defense is unavailable here as a matter of law and it also fails as a matter of fact due to numerous deficiencies in the government's argument.

### A. *Mr. Wolfson's Statements Were Not Voluntary*

The government cannot use the fruits of the unlawful search of Mr. Wolfson's devices because he did not voluntarily provide his passcode.  In arguing otherwise, the government ignores a key fact and cites to a litany of cases bearing no resemblance to this one.  Because Mr. Wolfson's statements constituted "mere acquiescence in a show of authority," the Court should conclude that

---

[2] Mr. Wolfson maintains that those factors are not relevant in the context of digital fruits of unlawful searches.  *See* ECF No. 79 at 9–10.  Because the argument is fully briefed, Mr. Wolfson references it here without restating it.

they were not voluntary. *See United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012) (quoting *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993)). The government bears the burden to show voluntariness, and it has failed to do so. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) (pl. op.) (noting that the "State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given").

As an initial matter, as Mr. Wolfson noted in his opening brief, the Court need look no further than the factually similar circumstances in *Kaupp v. Texas*, 538 U.S. 626, 631–32 (2003) (per curiam), to find involuntariness here. *See* ECF No. 79 at 11. The government's response— that *Kaupp* is distinguishable because it involved an "illegal arrest," ECF No. 93 at 34—is inapposite, as the lawfulness of the arrest has no bearing on the voluntariness of an individual's statements once in police custody. The government's focus on the defendant's age in *Kaupp* is likewise unconvincing, as the Supreme Court mentioned it only once in its discussion of voluntariness, and there is no suggestion that it was dispositive. *See* 538 U.S. at 631 (referring to defendant as an "adolescent"). In sum, the similarities—the dawn raid, use of handcuffs, and appearance of lawful authority to bolster improper demands during interrogation—are far more significant than the immaterial differences.

The government also ignores one of the most significant indicia of compulsion that occurred during Mr. Wolfson's custodial interrogations: Special Agent Roland Chattaway's repeated references to a warrant, which preceded each question about Mr. Wolfson's passcode and created the unmistakable—and false—impression that the warrant required Mr. Wolfson to provide the information.[3] In prefacing the first interrogation, SA Chattaway told Mr. Wolfson,

---

[3] Although Mr. Wolfson redacted SA Chattaway's name at the government's request in the motion to suppress, this brief does not do so in light of the government's election to file a publicly available

"Um, so, we have a, uh, search warrant for your phone." ECF No. 79 at 3. And before the second interrogation, he stated, "Like I said we have a search warrant for your phone. They'll be taking that." *Id.* at 4. The juxtaposition of the references to the warrant and the questions about the passcode created the impression that Mr. Wolfson had no choice but to provide the information, as he had no basis to know that the team of armed FBI agents that were holding him handcuffed in a law enforcement vehicle lacked the authority under that very warrant to compel an answer. *Cf. Kaupp*, 538 U.S. at 631 (noting that police use of words like "we need to go and talk" presents "no option" other than to comply) (internal quotation marks omitted); *see also Palacios v. Burge*, 470 F. Supp. 2d 215, 221–22 (E.D.N.Y. 2007) ("That the men in the club complied with officers' instructions demonstrates not consent, but a mere submission to a claim of lawful authority.") (internal quotation marks omitted); *United States v. Ramos*, 753 F. Supp. 75, 80 (W.D.N.Y. 1990) ("[T]he government never established that she knew she had the right to refuse the search or that she was given any indication of her rights until after the cocaine was found. The government has the burden of proving that consent was obtained freely and that burden is not satisfied by showing a mere submission to a claim of lawful authority.") (internal quotation marks omitted).

The facts from the government's long list of purportedly contrary precedent are readily distinguishable. Indeed, many of the government's cases deal with statements made *after* defendants had been given *Miranda* warnings and understood that they could decline to answer questions. *See, e.g.*, *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003) ("Although we assume that petitioner made his initial inculpatory statements while in custody, and in the absence of *Miranda* warnings, petitioner's subsequent inculpatory statements, which occurred after the

---

declaration from SA Chattaway admitting to—and apologizing for—violating Mr. Wolfson's *Miranda* rights. *See* ECF No. 93-15.

detectives advised him of his *Miranda* rights, are not necessarily inadmissible as 'fruit' of the original *Miranda* violation."); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) ("Campaneria argues that, because of his poor grasp of English and the confusing circumstances surrounding the questioning, he did not understand the *Miranda* warnings when they were given to him and therefore did not effectively waive his privilege against self-incrimination. We find this claim unpersuasive."); *United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987) ("Nothing in the record suggests that he was incapable of understanding or appreciating his *Miranda* rights."); *United States v. Crespo*, 834 F.2d 267, 269 (2d Cir. 1987) ("Once the agents entered the apartment…Crespo was arrested, handcuffed and given *Miranda* warnings."); *United States v. Yunis*, 859 F.2d 953, 956 (D.C. Cir. 1988) ("The agents then gave Yunis a form, on which the warnings required under *Miranda v. Arizona* were written in Arabic.") (citation omitted); *United States v. Rico*, No. (S1) 18 CR. 661 (PGG), 2019 WL 4014826, at *24 (S.D.N.Y. Aug. 26, 2019) (discussing whether "Rico signed the *Miranda* waiver form knowingly"); *United States v. Draconis*, No. 11 CR 1003 (DAB), 2012 WL 1267838, at *1 (S.D.N.Y. Apr. 11, 2012) ("Ms. Draconis was advised of her rights two times during the interrogation, and signed a form waiving those rights."). The government's description of certain of these cases as involving "non-*Mirandized* statements" is inaccurate as to *Campaneria* and *Ceballos*, where *Miranda* warnings were provided, and misleading at best as to *Parsad*, which focused in the relevant portion on post-*Miranda* statements. *See* ECF No. 93 at 32–33.

Certain of the government's other cases involved individuals who, unlike Mr. Wolfson, were not in custody at the time of the interrogations, meaning that there was decidedly less coercion. *See, e.g.*, *United States v. Haak*, 884 F.3d 400, 402 (2d Cir. 2018) ("The parties agree that Haak was never in custody throughout this time."); *United States v. Fox*, No. 22-CR-

0053(JLS)(JJM), 2023 WL 9100639, at *4 (W.D.N.Y. Sept. 15, 2023) ("Fox was [n]ot in [c]ustody."), *report and recommendation adopted*, 2023 WL 8645009 (W.D.N.Y. Dec. 14, 2023). And the balance contain distinctive facts that bear little resemblance to this case. *See, e.g.*, *United States v. Siddiqui*, 699 F.3d 690, 706 & n.13 (2d Cir. 2012), *as amended* (Nov. 15, 2012) (defendant kept in "soft restraints" that enabled a "fair range of mobility," and agent routinely asked whether the defendant "wanted to talk" before engaging in questioning); *United States v. Khalil*, 214 F.3d 111, 121 (2d Cir. 2000) (un-*Mirandized* interrogation permissible due to public safety exception); *United States v. Fiseku*, No. 15 CR. 384 (PAE), 2015 WL 7871038, at *17 (S.D.N.Y. Dec. 3, 2015) (defendant "offered, of his own accord, the police the opportunity" to conduct a search); *United States v. Gonzalez*, 864 F. Supp. 375, 381, 388 (S.D.N.Y. 1994) (certain statements were made spontaneously and not in response to interrogation; as for other statements, the only interrogation was in the context of asking whether defendant would be willing to provide a shirt to someone he knew because that individual's existing clothing was deemed to pose a security risk). Here, given the clear indications of coercion and the lack of precedent to satisfy the government's burden, Mr. Wolfson's statements should be deemed involuntary.

### B. Law Enforcement Misconduct Tainted the Search

The government's concession that statements that "result[] from police misconduct" are involuntary is fatal to their argument. ECF No. 93 at 28; *see also Missouri v. Seibert*, 542 U.S. 600, 616–17 (2004). Attempting to argue that no such misconduct occurred here, the government presents a declaration from SA Chattaway, who conducted the unlawful interrogation, but the assertions in that document strain credulity. In trying to minimize the violation by suggesting it was the result of failing to read a single sentence in a 25-page affidavit, ECF No. 93-15 ¶ 7, SA Chattaway overlooks four key realities.

First, his statement that he believed the interrogation was "permissible," *id.* ¶ 4, is directly contradicted by his videotaped statement to a fellow agent just seconds before asking Mr. Wolfson for his passcode. Specifically, the video shows SA Chattaway talking to a fellow agent about how it would be improper to ask Mr. Wolfson for his passcode. *See* ECF No. 79 at 2. Although the precise words he used are unclear, the message he conveyed is unmistakable. It is therefore alarming that the Chattaway Declaration would assert otherwise, without even attempting to address the clear, contradictory evidence from the video.

Second, this case does not deal with some esoteric, infrequently arising area of the law. Agents seize phones every day, and it has been well established for years in courts throughout the country that law enforcement may not compel individuals to provide their passcodes—this is law enforcement 101. *See, e.g.*, ECF No. 79 at 7–8 (collecting cases from New York federal courts). Agents are trained on this as a matter of basic education and also receive briefings on technical issues prior to warrant executions. Declaration of Michael Succi ("Succi Decl.") ¶ 16. It is simply not credible that an agent chosen to lead a raid for a marquee Justice Department Task Force would be ignorant of such rudimentary aspects of law enforcement operations.

Third, it's not too much to expect agents to read and be familiar with the search warrants, including supporting documentation, that authorize the raids they are conducting. After agents dragged Mr. Wolfson and his wife from their house and separated them from their minor children, the minimum expectation is that the agents would comply with the clear parameters placed on their authority by the court. And the fact that the relevant prohibition appears in the affidavit—which the government apparently views as distinct from the warrant—undermines rather than supports the government's case. In particular, the magistrate did not need to raise the issue of passcodes in the first instance. Instead, FBI preempted that by affirmatively representing that it understood that

agents could not lawfully compel passcodes. This was not by any means unusual language—this is boilerplate used in warrants all the time. *See, e.g.*, *United States v. Shvartsman*, No. 1:23-cr-00307, ECF No. 53-5 at 27 (S.D.N.Y. Dec. 22, 2023). All of this demonstrates that FBI, recognizing the clear caselaw in this area, expects its agents to understand that the very conduct that occurred here is improper.

Fourth, SA Chattaway has acknowledged that he was aware at the time of the arrest that Mr. Wolfson was represented by counsel. ECF No. 79 at 5. Given the significant Fifth and Sixth Amendment issues at stake in questioning a represented defendant, one would expect FBI to err in all instances on the side of caution. But in this case, FBI did exactly the opposite by intentionally eliciting testimonial evidence from Mr. Wolfson.

At a minimum, a hearing is necessary to allow to cross-examination of SA Chattaway so that the Court can make a determination as to bad faith. Apart from the manner in which his declaration directly contradicts the plain video evidence, there are also the separate issues of the government: (1) not providing the footage of the *Miranda* violation until Mr. Wolfson specifically raised the issue in connection with pretrial motions; and (2) producing a materially inaccurate written report memorializing the arrest. *See id.* at 5–6. Under the circumstances, in the event that the Court does not grant the motion on the papers, Mr. Wolfson submits that testimony from SA Chattaway is needed.[4]

---

[4] To the extent the government suggests that a declaration from Mr. Wolfson is required to properly present the motion to suppress, it is mistaken. The Rybicki Declaration attached to the motion is plainly sufficient because it was based on a review of the relevant video footage of Mr. Wolfson's arrest and interrogation. *See United States v. Dickson*, No. 7:11-CR-399 VB, 2011 WL 3701839, at *1 (S.D.N.Y. Aug. 22, 2011) ("The attorney's affidavit, however, based on her personal knowledge of the video recording…is sufficient to create an issue of fact warranting an evidentiary hearing."). Moreover, the government's submission of the video footage does not negate the need for a hearing, as SA Chattaway's declaration contradicts the video.

### C. Inevitable Discovery Does Not Apply

#### i. Inevitably discovery is not available here as a matter of law

Inevitable discovery is not available in situations where the government never actually initiated an alternative process to collect evidence and instead only raised the doctrine after a defendant had established that law enforcement engaged in unlawful conduct. In a recent case the government does not cite, the Second Circuit held that "the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed." *United States v. Lauria*, 70 F.4th 106, 123 (2d Cir. 2023). Arguments therefore suffer from a "fundamental flaw" when they are based on the "assumption that the government, *once alerted to defects in [its procedure]*, could easily have corrected or supplemented" the procedure. *Id.* at 124 (emphasis in original).

A classic example of a permissible use of inevitable discovery is when a search party was converging on the location of a victim's body at the time the defendant gave a coerced statement identifying the location, as the search party would have certainly discovered the body through its grid search even without the defendant's statement. *Id.* at 122–23 (discussing *Nix v. Williams*, 467 U.S. 431 (1984)). By contrast, inevitable discovery is not available when, "but for the defense's exposure of [violations], the government would have had no reason—and, therefore, would have been unlikely—to pursue alternative lawful means to procure the evidence at issue." *Id.* at 124. In rejecting inevitable discovery, courts may consider the fact that the government failed to correct its errors before the filing of a suppression motion. *See id.* ("Certainly, the record is bereft of any evidence that, in the two-month interval between the government learning of Molina's link to the -4879 cell phone and Molina's suppression motion, the government took any steps to seek new warrants lawfully to obtain the challenged evidence.").

Relying on inevitable discovery is particularly inappropriate when, as here, the alternative means of investigation *did not even exist* at the time of the violative conduct. Inevitability is measured as of the time of the misconduct, and the government must prove that it was "actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008). Indeed, in order for the "inevitable discovery exception to apply, the alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized." *Id.* at 580 (internal quotation marks omitted).

Here, although the government predicates its argument on a software update to its hacking tool, Graykey, that became available almost seven months after the relevant conduct, it is beyond dispute that the government never actually tried to break into Mr. Wolfson's devices using Graykey or any other means. Indeed, the government concedes that it lacked any ability to do so at the time of the seizure and for many months thereafter, which helps explain why SA Chattaway unlawfully coerced Mr. Wolfson into providing his passcode. *See* ECF No. 93-16 ¶ 6 (government declaration admitting that "[b]efore September 9, 2024, the FBI did not possess the technological capability to access the Wolfson Phone without a passcode"); ECF No. 93-17 ¶ 5 (second government declaration with the same concession). At the time of the violation, it was not even clear that the requisite technology would *ever* exist to extract information from Mr. Wolfson's phone. And even to the extent law enforcement was confident in the future existence of such technology, the timing of any such update was purely speculative—would it come in weeks, months, or years?

After unlawfully obtaining the passcode, the government then concealed that violation for more than eight months, during which time it accessed the devices only using the passcode. *See*

ECF No. 78 ¶ 11.  On September 9, 2024, the same day the Graykey update was released, the prosecution team emailed undersigned counsel to arrange for return of Mr. Wolfson's devices, which is conclusive proof that the government never intended to actually attempt to force its way into the devices and perform a Graykey extraction.  Declaration of David C. Rybicki ("Rybicki Decl.") ¶ 8, Ex. F.[5]  Only after Mr. Wolfson filed his motion did the government come up with the argument about accessing the phone through Graykey without a passcode.  But that was too late.  Under *Lauria* and related caselaw, the government cannot use inevitable discovery as a *post hoc* rationalization to rewrite history and overcome its *Miranda* violation.

### ii.    Inevitable discovery is not available here as a matter of fact

Even if the doctrine were available, it would not apply here for numerous reasons.  The government bears the heavy burden of showing that it "certainly would have discovered the evidence" through alternative means.  *Lauria*, 70 F.4th at 124 (emphasis omitted).  Although the government's standard is a preponderance of the evidence, it must prove with a "high level of confidence that each of the contingencies required for lawful inevitable discovery of the disputed evidence would in fact have occurred."  *Id.* at 122–23 (internal quotation marks omitted); *see also In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 102 (2d Cir. 2016) ("We have previously characterized the Government's obligation as one of 'certitude' that the evidence would have been

---

[5] Citations to "Rybicki Decl." refer to the declaration submitted along with this reply.  Prior declarations from undersigned counsel are cited by their ECF number.

discovered."). As a result, breaking even one link in the chain is enough to doom the government's purported inevitability argument. *See Lauria*, 70 F. 4th at 124.

### a. The government ignores Mr. Wolfson's Speedy Trial Act rights

Had the government not violated Mr. Wolfson's *Miranda* rights and buried the video evidence of the unlawful interrogations, it is likely that the trial would have been over by the time the Graykey update became available in September 2024. The government's burden is to show that, in a hypothetical universe in which it never obtained Mr. Wolfson's passcode from him, it would still have broken in through Graykey in time to use the evidence at trial. Mr. Wolfson, who made his initial appearance on March 18, 2024, had a right under the Speedy Trial Act to proceed to trial no later than May 28, 2024. *See* 18 U.S.C. § 3161(c)(1). At the time of the initial appearance, the government had no means of breaking into the devices and no projected timeline for when, if ever, it would obtain that capability. Under those circumstances, if the government had not unlawfully accessed the devices, Mr. Wolfson would have demanded a speedy trial. The government has no right to construct a hypothetical universe that holds all historical variables other than the method of access constant when Mr. Wolfson would have been highly incentivized to change those variables. Because the government has conceded that it would not have been able to access the devices prior to the Speedy Trial Act deadline, the analysis should end there.

### b. The government's declarations fail to meet the heavy burden

Even assuming the government can overcome this hurdle, it still must make it through a veritable obstacle course of potential technological impediments in order to meet its burden to demonstrate inevitability. It has not even attempted to do so, instead relying on vague, unsupported statements in two materially identical declarations that each state, without an evidentiary basis, that the respective declarant is "virtually certain" that FBI would have been able to break into Mr.

13

Wolfson's phone months after the misconduct as a result of a September 9, 2024, update to Graykey.  *See* ECF No. 93-16 ¶ 8; ECF No. 93-17 ¶ 6.[6]

But those declarations do not withstand even minimal scrutiny and instead follow a blueprint that courts have previously rejected in the context of the myriad tools the government has claimed, time and again, would be magic bullets against iPhone security.  *See, e.g.*, *United States v. Booker*, 561 F. Supp. 3d 924, 934–35 (S.D. Cal. 2021) (rejecting inevitable discovery in case involving iPhone based on the government's "unwarranted assumptions" as to whether the proposed hacking tool was "sufficiently reliable" and whether the "information on the phone would…be compromised through attempts to unlock it," and noting that, although there was "some likelihood that the Government would have ultimately unlocked the iPhone 6 Plus and accessed the information from the phone without having obtained Mr. Booker's passcode, there is also a non-negligible possibility that they would not have"); *United States v. Djibo*, 151 F. Supp. 3d 297, 310–11 (E.D.N.Y. 2015) (finding inevitable discovery unavailable where the evidence about the hacking method was "vague," "unsupported by documentary evidence," and at odds with the government's concessions in another case); *see also United States v. Clark*, 683 F. Supp. 3d 97, 110 (D. Mass. 2023) ("Regardless of how probable it might seem to law enforcement that they will one day possess the necessary technical tools to independently access the evidence on Defendant's cellphone, a future possibility does not demonstrate inevitability for purposes of this legal doctrine….Applying the inevitable discovery rule in these circumstances would impermissibly reward the government for Agent Barth's unlawful interrogation and encourage law enforcement to take similar illegal shortcuts in the future.").  Courts have reached those

---

[6] It is not clear why the government chose to submit two virtually identical declarations.  In fact, they are so similar that both repeat the same mistake by referring to a 2-terabyte iPhone 15.  ECF No. 93-16 ¶ 5; ECF No. 93-17 ¶ 5.  No such model exists.

conclusions notwithstanding the government's unsupported assurances that the relevant technology was foolproof. *See, e.g.*, *Booker*, ECF No. 87-1 ¶ 4 (law enforcement agent expresses confidence that the tool "has the capability" to unlock a particular device and "would then provide the passcode").

Here, the government's declarations contain numerous glaring deficiencies, including the failure to address:

- Whether FBI has successfully accessed devices that are equivalent to Mr. Wolfson's iPhone[7] in terms of model and software. Although the affidavits proffer that Graykey has supported Mr. Wolfson's iPhone model since September 2024, it is not clear whether FBI has successfully tested the update.

- In the event that FBI has used the updated Graykey version on similar models, what the success rate has been in terms of accessing devices without passcodes. This would include the percentage of devices that were accessed only in part, as well as information about which portions of those devices were accessed.

- Information more generally, and not limited to post-September 2024, about the success rate of Graykey on iPhones without passcodes.

- The mean and median times it takes Graykey to access iPhones without passcodes.

- The number of times that Graykey has run for more than 9 months—the amount of time between the September 2024 update and the June 2025 trial date—regardless of whether Graykey was ultimately successful in accessing the devices.

- The basis for FBI's apparent belief that it could conduct an After First Unlock ("AFU") extraction, as opposed to a Before First Unlock ("BFU") extraction.

- The manner in which the testimony would change if the iPhone was in a BFU state at the time of the seizure or at any time after the seizure but before extraction.

- Other device-specific variables that can impact the ability to extract data.

- The rationale for the apparent confidence that all parts of the phone other than emails, health data, and location information could be accessed.

---

[7] As discussed below, the government has conceded that inevitable discovery does not apply to the iPad.

- The number of Graykey devices with the September 2024 update that FBI has access to.

- The status of the backlog of phones waiting to be plugged into Graykey, and the anticipated date that Mr. Wolfson's device would have been tested.

These are not mere hypothetical issues. Rather, the affidavits elide numerous issues that have repeatedly arisen in similar cases.

First, Graykey is not able to access every device, even if it generally supports the models, and in circumstances where it does work, both the timing and the scope of accessible data can vary wildly. *See, e.g.*, *United States v. Gray*, No. 1:21-cr-00713-PAE, ECF No. 109 at 1 (S.D.N.Y. Apr. 22, 2024) (prosecution team concedes that law enforcement's "best estimate is that, at the outside, it could take many more months for the Forensic Tool to bypass the iPhone's passcode"); *United States v. Guia-Lopez*, No. 22-50234, 2023 WL 5236764, at *7 n.5 (5th Cir. Aug. 15, 2023) (HSI agent concedes that "using Graykey is 'not guaranteed'"); *United States v. Haynes*, No. 19-CR-250 (WMW/ECW), 2020 WL 3420869, at *6 (D. Minn. Apr. 27, 2020) (police officer testifies that "Graykey cannot access 100 percent of Apple devices" and that, even when devices are broken into, certain videos and pictures may not be accessible), *report and recommendation adopted*, 2020 WL 3420675 (D. Minn. June 22, 2020); *People v. d'Estree*, 2024 COA 106, ¶ 49 (Colo. App. Oct. 3, 2024) (noting, in case involving Graykey, that police expert "testified that a brute force attack could have taken up to eleven years, so there was no guarantee that police would have gained access to the phone in time for trial *without* relying on the illegally obtained shortcut (the PIN code)") (emphasis in original). Additionally, as reflected in the Succi Declaration, law enforcement has highly variable experiences extracting from certain applications, such as WhatsApp—an application on Mr. Wolfson's phone—meaning that the government must meet its

burden with respect to each and every portion of the phone and not resort to general claims of an ability to extract data. Succi Decl. ¶ 13.

In an argument from May 2024, an Assistant U.S. Attorney from the Southern District of New York represented that Graykey can take up to four years to get into a phone. *See United States v. Dalpour*, No. 1:24-cr-264-JPC, ECF No. 10 at 13 (S.D.N.Y. May 17, 2024) (transcript of hearing from May 2, 2024) ("[T]he mechanism that law enforcement uses to get into these phones is essentially brute forcing them. It's a term called Graykey which goes through every single phone combination in existence. So that could take a day. *It could take four years.*") (emphasis added). As a result, there is substantial uncertainty about whether Mr. Wolfson's phone could have been accessed and, if so, on what timeline and with what data gaps. This is sufficient to preclude the government from meeting its burden to establish inevitability.

Given this long trail of government concessions when pressed on the issue, there appears to be no basis for the assertions in the two declarations in this case that law enforcement is "virtually certain" of success—let alone of success prior to the scheduled trial. *Compare* ECF No. 93-16 ¶ 8, and ECF No. 93-17 ¶ 6, *with Booker*, 561 F. Supp. 3d at 934 (criticizing the "changing landscape" of the government's positions), and *Djibo*, 151 F. Supp. 3d at 310–311 (taking judicial notice of the contrary views expressed by the government in other litigation). Because the declarations do not even acknowledge the substantial countervailing authority, they should be rejected as "vague" and "unsupported by documentary evidence." *Djibo*, 151 F. Supp. 3d at 310.

There are also device-specific variables. *See, e.g.*, *United States v. Hankison*, No. 3:22-CR-84-RGJ, 2024 WL 4112339, at *2 (W.D. Ky. Sept. 6, 2024) ("[W]hile the FBI had the requisite software capable of accessing Taylor's version of iPhone, it could not perform a successful extraction because of the condition of this specific phone.") (internal quotation marks omitted).

This includes the possibility that law enforcement officers may trigger additional security on devices through "unsuccessful attempts to enter passcodes." *Id.* (internal quotation marks omitted). Especially in this case, where Mr. Wolfson inadvertently provided the incorrect passcode before supplying the right one, ECF No. 79 at 4, there is reason to believe that agents might have attempted to enter passcodes before trying to break in.

Separately, the declarants offer no foundation for their assertion that the iPhone was in an AFU state at the time of seizure. If the iPhone was turned off at the time FBI seized it, or even if it was powered on but the passcode had not been entered since the last reboot, it would have been in a BFU state. Phones can be in a BFU state in a number of situations, including following software updates or when someone plugs a dead device into an outlet before bed and does not enter a passcode prior to the device's seizure the next morning—a perfectly plausible scenario when dealing with a dawn raid. There was also public reporting in November 2024 that iPhones in law enforcement possession were rebooting *en masse*, causing the devices to enter BFU states. *See* Kate O'Flaherty, *Confusion As iPhones Mysteriously Reboot and Lock Cops Out*, FORBES (Nov. 8, 2024), https://www.forbes.com/sites/kateoflahertyuk/2024/11/08/confusion-as-iphones-mysteriously-reboot-and-lock-cops-out/.

The difference between AFU and BFU is significant. AFU devices are "easier to crack when law enforcement needs to and offer[] more data on the display screen," whereas BFU state "means it's tricky for cops to access the content by force." *Id.* Specifically, reported decisions reflect that Graykey, which works by attempting to bypass Apple's limitations on the number of attempts for entering incorrect passcodes, can make astronomically higher numbers of guesses in AFU state as compared to BFU state. As one court explained just last month:

> When decrypting an Apple device, the duration of the GrayKey process depends on when the phone was powered off or previously unlocked by the user. An "After

First Unlock" (AFU) process allows GrayKey to make 300,000 attempts at decrypting a phone every ten minutes—a "fast brute force"—because the device had been unlocked at some point prior to the seizure by law enforcement and remained powered on, rendering 95% of the device's data available instantly. Conversely, a "Before First Unlock" (BFU) process is required when the phone was off when seized or "had a power event after" seizure. When a phone is reset, "most of its data, including contacts, messages, and other personal data" is still encrypted. In a "slow brute force" BFU situation, GrayKey can make one attempt to decrypt the phone every ten minutes. An AFU—or a particularly lucky BFU—might render the device accessible to law enforcement within a day. Or a BFU brute force could require up to 23 years to more than 200 years to decrypt a device depending on the method and sophistication of encryption.

*State v. Bao*, 2024 MT 308, ¶ 9 (Mont. Dec. 17, 2024).

As reflected in the Succi Declaration, it is not uncommon for law enforcement to seize devices in a BFU state, or for such devices to enter a BFU state after seizure but prior to forensic analysis. Succi Decl. ¶¶ 10–11. Moreover, notwithstanding the government's insistence that it would have stored the phone in a manner that would facilitate later extraction,[8] its own technical report appears to reflect that the device was left with a cellular connection as opposed to in airplane mode until at least March 7, 2024, and possibly beyond that date. Rybicki Decl. ¶ 4, Ex. B at WOLFSON_00000344. This creates any number of possibilities for intervening events that could have prevented the government from later accessing the phone, including the potential that the iOS update released on March 5, 2024, would have been installed, thereby triggering a reboot and putting the device into a BFU state months before the government purportedly obtained the ability to break into it. *See Apple Security Releases*, APPLE, https://support.apple.com/en-us/100100 (last visited Jan. 5, 2025).

---

[8] On this point, the government's witness offers conflicting statements—inexplicably expressing "zero doubt" that this would have occurred, notwithstanding the concession that proper storage only occurs in "almost" all cases. *See* ECF No. 93-16 ¶¶ 6–7.

The government has also produced an image of a sealed evidence bag purportedly containing Mr. Wolfson's phone. Rybicki Decl. ¶ 9, Ex. G. The image appears to reflect the bag being sealed on February 29, 2024, and the image was taken May 23, 2024. *Id.* During that time period, the device also spent six days in transit between FBI facilities in Texas and Virginia. *Id.* ¶ 4, Ex. C at USAO_00000929. In the event the phone was left unconnected to a power device for months, or even during the six-day transport, it certainly would have died and would have entered a BFU state upon reboot. Succi Decl. ¶ 12. Given that the government's declarants offer no evidence that the iPhone was in an AFU state at the time of seizure and no compelling reason to believe that the device would have been preserved for months in an AFU state if it was initially found that way, the Court is left to guess whether an extraction, even if successful, would have taken days, months, or even years. It is therefore by no means inevitable that a successful extraction could have occurred prior to trial.

Additionally, even assuming Graykey could access Mr. Wolfson's phone in a reasonable timeframe, there is no reason to believe that the government would have commenced its attempts immediately following the September 2024 update. To the contrary, FBI notoriously has a backlog of phones requiring forensic analysis. Given that the iPhone 15 was released in September 2023 and was not supported by Graykey until September 2024, that would include a year's worth of iPhone 15 seizures, in addition to the other devices that form part of the backlog. As one FBI agent explained in testimony from September 2023:

> So when I said that [the FBI's analysts] were backed up, I mean that the FBI—and not only the FBI, but other law enforcement agencies submit their phones at times to the FBI because typically we might have greater resources for them. The backlog comes from not just—they're not just there to serve my investigation's needs, but they're in the process of serving active cases, working violent crimes against children. Unfortunately, there is—we have to triage what phones get submitted. And there are people that are out there actively being hurt, different things, so those phones do take priority before our phones. And if you can imagine every FBI field

office that collects phone evidence, in addition, their partners in local law enforcement, the partners that might be requesting the FBI to assist them, the backlog can get—I want to say *over a year at least, easy.* And I don't know the log. I just know that *it's a very insane amount of phones that are being dealt with first.*

*United States v. Hernandez*, No. 1:22-cr-20557-BB, ECF No. 242 at 27–28 (S.D. Fla. June 8, 2024) (transcript of testimony from September 29, 2023) (emphasis added); *see also Gray*, 2024 WL 1526368, at *1 (reflecting that the government did not attempt to access an iPhone until 15 months after the relevant software update); *United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (noting that the "most logical (and fairly obvious) explanation" for 15-month delay in completing search of phone "is one of resource allocation"); Succi Decl. ¶ 15 (describing the backlog and the lack of uniformity in searching previously collected devices following Graykey updates).

Given that this is a non-violent, white-collar case involving a years-old real estate transaction, it is reasonable to assume that Mr. Wolfson's phone would not have been FBI's first priority when the update was released. There is no reason to believe that the search would have been completed within the nine months between September 2024 and the June 2025 trial—even assuming that, in this hypothetical universe, that remained the date—let alone with enough time to allow the defense to meaningfully review the materials.

Finally, it remains unclear whether FBI would have been permitted to conduct a post-September 2024 extraction. Notes from FBI's Computer Analysis Response Team ("CART") reflect that the prosecution team submitted an "opt-request" to the CART team on July 7, 2024, to enable a discussion of the case and that, as a result, "[p]er FBI policy, no additional work shall be performed by CART Examiners after an opt-out agreement has been reached." Rybicki Decl. ¶ 3, Ex. A at WOLFSON_00000341.

### c. At a minimum, the data the government concedes was not inevitably discoverable should be suppressed

The government concedes that its inevitable discovery argument does not apply to Mr. Wolfson's iPad. ECF No. 93 at 35 n.25. Nor does it apply to the "emails, recently visited locations, and iOS Health application data" on his phone. ECF No. 93-16 ¶ 8. Given those concessions, that data should be suppressed.

### iii. Mr. Wolfson requests an evidentiary hearing on inevitable discovery

Finally, in the event the Court determines that inevitable discovery is legally available as a defense and believes that there are factual issues that need to be resolved, Mr. Wolfson requests a hearing on inevitable discovery, as well as all other issues properly framed by the motion to suppress. As noted above, the government's declarations contain material omissions and purport to address software updates that have only been in existence for around four months. Given these deficiencies and the contrary evidence presented in the Succi Declaration, a hearing is appropriate.

The government's claim that Mr. Wolfson waived a hearing on inevitability is baseless. Mr. Wolfson requested a hearing on voluntariness in his initial motion because that was the issue that was then before the Court. Inevitable discovery is a defense to unlawful conduct and, like most defenses, is subject to waiver. *See, e.g.*, *United States v. Vilar*, 530 F. Supp. 2d 616, 623 (S.D.N.Y. 2008) (noting that waiver can be appropriate in cases of failure to raise a defense to suppression "in a timely fashion during the litigation") (internal quotation marks omitted). Mr. Wolfson was not required to predict that the government would raise a defense based on technology that apparently did not exist until September 2024 and to affirmatively preempt that defense in his motion. Because inevitability was first presented in the government's opposition, it is appropriate and indeed normal to request a hearing on the issue in connection with this reply brief.

## II. PRIVILEGED RECORDS IMPROPERLY OBTAINED FROM THE FIRM SHOULD BE SUPPRESSED

Seeking an easy way out of its violations of Mr. Wolfson's attorney-client privilege, the government baselessly asserts a waiver. There is no support for this contention, and Mr. Wolfson's compliance with the Court's schedule means that this argument should readily be rejected. On the substance, the government attacks a strawman, ignoring the key pieces of evidence showing the existence of privilege, and makes an improper blanket assertion of the crime-fraud doctrine.

### A. Mr. Wolfson did not waive any remedies

Mr. Wolfson did not waive the remedy of suppression. The government has not cited a single case for the proposition that a criminal defendant waives suppression of documents produced by his attorney without permission where the defendant raises the issue in a timely pretrial motion under the Court's scheduling order. As noted, violations of the attorney-client privilege are properly addressed through the filing of motions to suppress. *See* ECF No. 76 at 10. That is precisely what Mr. Wolfson did here.

The government fails to cite any criminal cases and instead relies on two irrelevant civil cases, each of which is more than 25 years old. The first case, *Hurst v. F.W. Woolworth Co.*, No. 95 CIV. 6584 CSH, 1997 WL 61051 (S.D.N.Y. Feb. 11, 1997), has nothing to do with claiming privilege over produced documents and instead deals with a waiver due to a party's decision to withhold records without providing a privilege log. *See id.* at *6 ("Despite plaintiff's repeated requests, and subsequent confirmation through depositions that the documents existed, defendant produced neither the documents nor a privilege log."). The second case involves a company that left its privileged materials unsecured and abandoned and failed to take "any precautions to prevent the disclosure of the documents" by a former employee. *Apex Mun. Fund v. N-Grp. Sec.*, 841 F. Supp. 1423, 1433 (S.D. Tex. 1993). By contrast, Mr. Wolfson never had possession of the Firm's

records and could not have taken steps to prevent their disclosure, as he was not contemporaneously aware that the Firm was producing them without his consent.

Here, the prosecution team surreptitiously and through use of its significant leverage obtained Mr. Wolfson's privileged documents. By the time Mr. Wolfson found out that the Firm had produced documents, the prosecution team had already had them for months. They were not run through the filter team, so there was no occasion for Mr. Wolfson to address the documents in connection with his prior motion about filter team issues, which was designed to obtain relief related to documents that the prosecution team had not already seen. The government has produced millions of pages of documents of discovery in this matter, and it was eminently reasonable for Mr. Wolfson to take time to evaluate the productions and raise his suppression arguments at the Court's designated deadline for pretrial motions. Moreover, because Mr. Wolfson does not seek suppression of all documents produced by the Firm and instead only those that are privileged, the timing of Mr. Wolfson's motion does not interfere with the government's trial preparation.

### B. The Firm's production included Mr. Wolfson's privileged records

The government's assertions about the timing of the attorney-client relationship and the privileged nature of the communications ignore key pieces of evidence from Mr. Wolfson's motion. As an initial matter, Lawyer 2 told the government that the type of engagement letter that Mr. Wolfson signed in 2016 was not used historically by the Firm. ECF No. 75 ¶ 6, Ex. D at 6. That does not mean that no attorney-client relationship existed prior to 2016, but rather that it was not the Firm's practice to document such relationships in the same way that it did in later years. Additionally, notwithstanding the government's rank speculation that "[a]ny attorney-client relationship that existed prior to December 27, 2016, at least as relevant to the email communications Wolfson challenges, was between the Law Firm and Otkritie Financial

Corporation," ECF No. 93 at 15, the record clearly demonstrates otherwise. For instance, although the government appears to suggest that emails from an open.ru domain cannot pertain to matters for which Mr. Wolfson is the privilege holder, Mr. Wolfson's motion cited an email to the Firm from that very domain stating: "Just to keep you informed on recent changes: would like to let you know that I was lucky to be given the opportunity to join the Family Office of Mr. Belyaev and [am] now dealing with the [family office's] legal matters." ECF No. 75 ¶ 9, Ex. G. at 0011947.[9] It is difficult to imagine a clearer expression of a privileged relationship on behalf of Mr. Wolfson.

Nor can the government credibly dismiss the communications as mere business advice. As noted, the Firm undertook to provide "legal services and advice" on issues of Cypriot and international law. ECF No. 75 ¶ 3, Ex. A at 00867. And that is precisely what it did. *See* ECF No. 76 at 6–7, 9–10. Although the Firm undoubtedly performed some non-privileged corporate services for Mr. Wolfson, the government paints with far too broad a brush in suggesting that the Firm therefore was incapable of advising as to legal issues that arose in the course of this work. As reflected in the documents attached to the motion, Mr. Wolfson, though his agents, looked to the Firm to opine on the legal propriety of proposed transactions, and he has a privilege associated with those communications that he has never waived.

Additionally, glaringly absent from the government's response is any indication that the prosecution team made even the most basic inquiries about whether the Firm's clients, including Mr. Wolfson, waived the attorney-client privilege or otherwise consented to the release of the documents, notwithstanding the clear language in the engagement letters, which were in the government's possession, that prohibited the Firm from unilaterally making productions in the absence of legal compulsion. Instead, the prosecution team, which has conceded that a subpoena

---

[9] Mr. Wolfson was previously known as Mr. Belyaev before he legally changed his surname.

to the Firm would be unenforceable, exerted pressure on Lawyer 1, over whom the U.S. government had significant leverage due to sanctions, to produce records. It is little wonder that Lawyer 1, who was actively seeking help from the U.S. government, made the self-interested determination not to claim privilege over any of the documents. But under the law, that was not his decision to make.

Given the circumstances, it was incumbent upon the government to take steps to ensure that it was not trampling on the privilege. It failed to do so, and suppression is therefore warranted. Indeed, there is no good reason why the government could not have expressly inquired about a waiver. The investigation was overt at the time, and Mr. Wolfson had already been served with a subpoena for his own records. The government nonetheless chose to go behind his back to seek his privileged materials from the Firm.

### C. Mr. Wolfson's privilege claims are appropriately tailored

Contrary to the government's suggestion, Mr. Wolfson is not making a "blanket claim of privilege." ECF No. 93 at 17. Rather, Mr. Wolfson has expressly acknowledged that the documents will need to be reviewed individually in order to make document-specific privilege claims. But given that the government ran roughshod over Mr. Wolfson's privilege to obtain the "voluntary" production of documents that it knew it was not entitled to receive even pursuant to compulsory process, it is appropriate for the government to shoulder the burden of unwinding the privilege mess it has created, either by issuing a subpoena to the Firm that would allow Mr. Wolfson to raise appropriate challenges or by running the production through the filter team process. Alternatively, at a minimum, the documents specifically identified in Mr. Wolfson's motion should be suppressed.

### D.    The government cannot make a blanket crime-fraud argument

Ironically, notwithstanding its contrary argument, the government is the party that is making blanket assertions.  In addressing the crime-fraud exception, the government does not even attempt to apply the doctrine to any particular documents and instead makes a categorical assertion that the Firm's legal advice is unprotected.  This is improper.  *See, e.g.*, *In re Richard Roe, Inc.*, 68 F.3d 38, 41 (2d Cir. 1995) ("The district court shall determine which, if any, of the documents or communications were in furtherance of a crime or fraud, as discussed above.  If production is ordered, the court shall specify the factual basis for the crime or fraud that the documents or communications are deemed to have furthered, which of the parties asserting claims of privilege possessed a criminal or fraudulent purpose with respect to those documents or communications, and, if appropriate, whether the crime-fraud exception applies to an innocent joint privilege-holder.").  Even under the most permissive approach, the government is still at a minimum required to identify "focused categories of evidence" to which the doctrine purportedly applies.  *See United States v. Costanzo*, No. 22-CR-281 (JPO), 2024 WL 2046053, at *4 (S.D.N.Y. May 8, 2024).  Here, the government has offered no evidence that any particular communications or categories of communications were in furtherance of a crime or fraud, let alone that the specific communications highlighted by Mr. Wolfson, which predate the alleged violation by several years, meet the standard.  As a result, its cursory invocation of the crime-fraud doctrine should be rejected.

### III.    THE FRUITS OF IMPROPERLY OBTAINED WARRANTS SHOULD BE SUPPRESSED, OR IN THE ALTERNATIVE, THE COURT SHOULD HOLD A *FRANKS* HEARING

To understand the blatantly false and misleading nature of the assertions that permeate the warrant applications, the Court need look no further than the inaccurate statement that the government continues to repeat over and over again in its briefing: that Mr. Kostin benefitted from the 2019 Transaction.  *See, e.g.*, ECF No. 93 at 45 ("None of the purported false statements or

omissions can overcome that the challenged warrants contained probable cause as to the September 2019 Transaction, in which approximately $12 million was transferred to a shell company Kostin controlled."); *id.* at 46 ("The affidavit set forth evidence that Kostin, a sanctioned individual, had indirectly received a transfer of approximately $12 million from Wolfson…."); *id.* at 47 ("As discussed above, the affidavit describes evidence that Bond and Wolfson participated in the indirect transfer of approximately $12 million Kostin in September 2019."); *id.* at 52 ("The affidavit in support of the iCloud Warrant describes Bond and Wolfson's transfer of approximately $12 million to Kostin in September 2019….").

The first of these statements, regarding control, is legally irrelevant. Federal law does not prohibit transactions with entities that are controlled by sanctioned individuals. Specifically, U.S. persons may not provide funds to a sanctioned person or to an entity that is owned at least fifty percent by a sanctioned person. *See Entities Owned by Blocked Persons (50% Rule), FAQ No. 398*, OFFICE OF FOREIGN ASSETS CONTROL (Aug. 11, 2020)*, https://ofac.treasury.gov/faqs/398#:~:text=OFAC's%2050%20Percent%20Rule%20speaks,to%20OFAC's%2050%20Percent%20Rule. This rule "speaks only to ownership and not to control. An entity that is controlled (but not owned 50 percent or more) by one or more blocked persons is not considered automatically blocked pursuant to OFAC's 50 Percent Rule." *Id.* As a result, even setting aside the absence of evidence of Mr. Kostin's control over the Capital Entities, no amount of control can be sufficient for an indictment in the absence of proof that Mr. Kostin received funds from the 2019 Transaction.

The rest of the statements, which refer to a transfer to Mr. Kostin, are completely unfounded. Mr. Wolfson has noted numerous times in these proceedings the utter absence of evidence of a payment to Mr. Kostin. *See, e.g.*, ECF No. 66 at 1 ("Although the crux of the

28

government's case is that Mr. Wolfson paid approximately $12 million in 2019 'for KOSTIN'S benefit,' the indictment does not allege payment of any funds by Mr. Wolfson to Mr. Kostin directly. Moreover, during a meeting with undersigned counsel, the government proffered that it has no evidence of a direct payment by Mr. Wolfson to Mr. Kostin.") (internal citation omitted); ECF No. 83 at 4 ("The government has no evidence that Mr. Wolfson paid Mr. Kostin as part of the 2019 Transaction."). Throughout all its filings, the government has never refuted this.

The affidavits in support of the search warrants never acknowledge this and instead repeat the inaccurate assertion from the government's briefing that Mr. Kostin received funds and the irrelevant contention that he controlled the entity that did get paid. Not once did any of the affidavits acknowledge that control is insufficient or that the government has no direct evidence demonstrating a transfer to Mr. Kostin. Instead, the government's case consists solely of evidence that CapitalInvest, an entity that was not sanctioned or owned by a sanctioned person, received funds. Had the government acknowledged in its affidavits that it lacked evidence of a sanctions violation, it is inconceivable that the warrants would have been issued. Only by obfuscating the central, glaring flaw in the case did the government succeed in procuring the at-issue records. At a minimum, Mr. Wolfson is entitled to examine the FBI agent who signed the affidavits to ascertain her knowledge as to the absence of evidence and the reasons why she repeatedly made the flimsy assertions.[10]

Although the government attempts to portray any issues as innocent omissions, the reality is that the affidavits suffer from numerous affirmative misstatements. *See, e.g.*, ECF No. 82, Ex. O at USAO_00000668–669 ("In September 2019, WOLFSON purchased the Aspen Home by wiring approximately $12 million to a Marshall Islands shell entity controlled by Kostin, in

---

[10] All of the affidavits were signed by ██████████████████████.

violation of IEEPA."); *id.*, Ex. P at USAO_00000357 ("Wolfson indirectly paid Kostin approximately $12 million for the ownership of the property."); *id.*, Ex. Q at USAO_00000604 (similar allegations).

Not only is there no proof that Mr. Kostin benefitted from the 2019 Transaction, but there is also affirmative evidence that he did not. As outlined in Mr. Wolfson's motion, there is a voluminous record supporting Mr. Wolfson's purchase of the Aspen property from Mr. Kostin in 2014, which was years before Mr. Kostin was sanctioned. *See* ECF No. 83 at 2–6. Shockingly, the government contends that this information "would not have been necessary to the judge's probable cause finding" because, in the government's view, such information has no bearing on whether Mr. Kostin received funds in 2019. *See* ECF No. 93 at 49 (internal quotation marks omitted); *see also id.* at 47 (stating that "Defendants make no argument that that [sic] the May 2014 transfer of 40 North Star LLC from Ledridge to Altamonte, or any of the purported false statements or omissions regarding that topic, would affect the magistrate judge's probable cause determination as to whether evidence regarding that September 2019 prohibited transaction would be found in their email accounts"). This is wrong.

If, as all the evidence shows, Mr. Wolfson purchased the property from Mr. Kostin in 2014, there would be no reason whatsoever to pay Mr. Kostin for the house a second time in 2019. Instead, Mr. Wolfson would only have reason to repay the Capital Entities for the loan that he took out in 2014. It is irrational to assume that the Capital Entities, having received repayment on the loan, would turn around and give funds to Mr. Kostin, who had already received payment in full years earlier. But the government did not include this critical information in its affidavits, thereby creating the false impression that the 2019 Transaction was nefarious.

Under *Franks*, the Court must proceed by "deleting these misstatements from the…[w]arrant affidavits and then deciding whether facts remaining in the affidavits are sufficient to establish probable cause." *Lauria*, 70 F.4th at 126. The government may not add any bolstering facts to the hypothetical corrected affidavits, but the defendant may include material information that the government had omitted. *See id.* ("Thus, in the context of a criminal case, a warrant affidavit may be corrected by supplementation only when the supplemental information detracts from, rather than supports, probable cause."). Although the insufficiency of the corrected warrant affidavits is already briefed, Mr. Wolfson pauses to add a couple of additional observations.

First, the affidavit in support of the warrant for Mr. Wolfson's Gmail account contains only two statements regarding Mr. Wolfson in the probable cause section:

- "In 2019, after Kostin was sanctioned by OFAC, Vadim Wolfson ('Wolfson') effectively purchased the interest in 40 North Star LLC. Wolfson is a Russian national who currently resides in the U.S. on a visa. Wolfson was represented in this transaction by an individual named Gannon Bond ('Bond'). Bond is a U.S. citizen who owns homes in both Oregon and New York. Similar to [Eric] Whyte and [Christodolous] Vassiliades's role as Kostin's shell owners and facilitators, Bond handled all communications involving Wolfson's purchase of the ownership interest in 40 North Star LLC and, by extension, the property located at that address in Aspen, Colorado. Wolfson indirectly paid Kostin approximately $12 million for the ownership of the property."

- "The FBI served a subpoena on the managers of 40 North Star LLC for documents relevant to the ownership interest of the LLC, the transfer of that interest in 2019, and financial records after the date that Kostin was sanctioned. The subpoena returns corroborate what the managers initially told the FBI – Wolfson purchased the interest in the LLC, effectively purchasing the home, for approximately $12 million in 2019 after Kostin was sanctioned."

ECF No. 82, Ex. P at USAO_00000357–58. Both of these statements are materially inaccurate. Mr. Wolfson did not buy the property in 2019, and the government has no evidence of Mr. Kostin receiving any funds in 2019. If these assertions were omitted and replaced with the evidence that Mr. Wolfson purchased the property in 2014 and the fact that the government has no idea what

happened to the funds paid to the Capital Entities in 2019, there would be no conceivable probable cause.

The remaining statements in that affidavit related to the 2019 Transaction do not pertain to Mr. Wolfson and are also plainly insufficient. To the extent that the affidavit suggests that Mr. Kostin entered the United States after his 2018 sanctions, *id.* at USAO_00000356–57, that is a fanciful misstatement designed to mislead the magistrate into believing that Mr. Kostin retained an interest in the property following the sanctions. As a sanctioned individual, Mr. Kostin cannot engage in financial transactions that touch the United States, let alone get on a plane and fly to the United States. Had Mr. Kostin entered the country after the imposition of sanctions, he would have been arrested. There is zero basis to believe that this ever happened. Meanwhile, the fact that Mr. Kostin may have listed the Aspen property as a destination when traveling to the United States after Mr. Wolfson's 2014 purchase is not improper in any way and says nothing about his ownership of the property. People routinely visit properties that they do not own. Likewise, the fact that Mr. Kostin's supposed associates were involved in Mr. Kostin's 2010 purchase of the property is immaterial, as it is undisputed that Mr. Kostin lawfully owned the property between 2010 and 2014 and that his ownership during that period did not implicate any sanctions laws.

The final statement, that various individuals from 2010 to 2019 "ensured that Kostin's name was never associated with the property as the owner," *id.* at USAO_00000357, is flatly inaccurate. Numerous documents, ranging from insurance records to a letter sent to neighboring property owners, reflect Mr. Kostin's ownership of the property between 2010 and 2014, prior to Mr. Wolfson's purchase of the property. *See, e.g.*, ECF No. 13 ¶ 36; ECF No. 83 at 10. It is also irrelevant, as the affidavit does not point to any specific conduct by these individuals after Mr.

Kostin was sanctioned to ensure that he was not identified as the owner, which makes sense as he was, in fact, no longer the owner as of 2014.

At bottom, the corrected affidavit establishes no more than that various individuals knew each other and engaged in a real estate transaction in 2014, which in turn led to a loan from the Capital Entities that Mr. Wolfson repaid in 2019. That is not probable cause for anything. *Cf. Lauria*, 70 F.4th at 129 ("Upon correction, the challenged affidavits contain *no* facts linking Molina or his -2454 cell phone to the New Milford Robbery. Molina's Facebook friendship with Lauria does not do so. The mere fact that persons know each other does not make it probable that they are criminal confederates.") (emphasis in original).

Second, in addition to the issues with the Apple affidavit that have been previously briefed, another problem bears emphasizing. In particular, the affidavit states:

> According to ██████████████████████████████, the Property Manager once told him that the house was nominally sold to another Russian who acted as a strawman for Kostin. Based on my participation in this investigation, I believe this was a reference to Wolfson, who began serving as a nominee for Kostin with respect to the Aspen home in or around May 2014, when the nominal ownership of 40 North Star LLC was transferred to Altamonte.

ECF No. 82, Ex. Q at USAO_00000603–04. In reality, however, the witness described to FBI someone who could not possibly have been Mr. Wolfson. Specifically, the witness described the alleged straw purchaser as a "Russian individual who lived in Pennsylvania." Rybicki Decl. ¶ 6, Ex. D at 1. As the affiant surely knew, Mr. Wolfson has never lived in Pennsylvania. By omitting this key fact and substituting it with a representation that the affiant believed "this was a reference to Wolfson," the affidavit materially misled the magistrate.

Additionally, the affidavit did not disclose that the ██████████████████████████
████████████████████████████████████████████████████████████████

[█████████████████████████████████████████████]

[█████████████████████████████████████████████]

[█████████████████████████████████████████████]

[█████████████████████████████████████████████]

[█████████████████████████████████████████████]

[████████████████████████████████████] *Id.*

at 1–3; *id.* ¶ 7, Ex. E.   Although all of this occurred months before the affidavit, the affiant nonetheless omitted any reference to the obvious bias, opting instead to present the strawman statement with no context and without the key piece of information that made clear that the witness was not talking about Mr. Wolfson.

The balance of the claims in the Apple affidavit, as well as the affidavits for AT&T and the search of Mr. Wolfson's home, are addressed in detail in the original motions filed by Mr. Wolfson and Mr. Bond.   In short, once the types of misstatements discussed above are stripped out, no probable cause remains.   Mr. Wolfson is therefore entitled to suppression or, at a minimum, a *Franks* hearing.

## IV.        MR. WOLFSON IS ENTITLED TO A BILL OF PARTICULARS

Since the beginning of this case, Mr. Wolfson has repeatedly noted in filings that the government lacks even a shred of direct evidence that Mr. Kostin received funds from the 2019 Transaction.   Although the government has not expressly admitted this, it has not denied it either, notwithstanding many opportunities.   As Mr. Wolfson noted in a prior filing, the government's "silence is deafening."   ECF No. 89 at 2.

But strategic silence is not sufficient.   The indictment repeatedly alleges that Mr. Kostin controlled and received benefits from the Capital Entities.   *See* ECF No. 83 at 6.   If the government has evidence of this, it is incumbent that it be provided to Mr. Wolfson.   Or, in the more likely

scenario where such evidence is lacking, the government should be required to expressly advise Mr. Wolfson and the Court of this gaping hole in the case.[11]

In arguing otherwise, the government relies heavily on the fact that the indictment is long. True enough, but this ignores that much of the indictment relates to allegations pertaining to yachts that have nothing to do with Mr. Wolfson. And Mr. Wolfson has been surgical in making his request for a bill of particulars, focusing on just two allegations in the lengthy indictment. The fact that the indictment is larded with details regarding extraneous matters does not excuse its impermissible use of vague, confusing, and counterfactual allegations related to the central areas of the charges against Mr. Wolfson.

The government also notes that it has produced records that purportedly show that the owners of the Capital Entities "regularly acted as Kostin's agents" with respect to particular "entities and assets." ECF No. 93 at 66. Mr. Wolfson disputes that characterization, but more to the point, the government does not suggest that any of these records reflect a relationship between Mr. Kostin and the Capital Entities. Records related to other entities do not demonstrate that Mr. Kostin personally benefitted from payments to the Capital Entities, so the unrelated documents do nothing to negate the need for a bill of particulars.

Nor has the government justified its assertion that particular payments from the Capital Entities were "related to the maintenance of the Aspen House and Kostin's visits." ECF No. 93 at 61. To the extent that the government claims that Exhibits S and T to its opposition answer this question, that is incorrect. Exhibit S lists payments but does not purport to identify what they are for. Exhibit T is an untranslated email chain in Russian that deals with negotiation of a call

---

[11] The government's reference to Mr. Kostin's "control" of 40 North Star LLC, which in turn owned the Aspen property, is a red herring, as the statement was made in 2011, when Mr. Kostin indisputably exercised lawful ownership of the property. *See* ECF No. 93 at 4.

option.[12]  Paragraph 45 of the indictment refers to "regular[]" payments from the Capital Entities for particular purposes.  Mr. Wolfson is entitled to an itemization of such purported payments and evidence that they were for the purposes alleged by the government.

Finally, the government has not filed an opposition to Mr. Wolfson's motion for leave to request a bill of particulars more than 14 days after arraignment (ECF No. 84) and has not otherwise argued in its opposition brief that the request is untimely.  As a result, for the reasons discussed in Mr. Wolfson's motion, the Court should reach the issue on the merits.

## V.      THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE GRAND JURY MATERIALS

The government's opposition brief only reinforces the need for Mr. Wolfson to review the grand jury materials.  To this day, the government continues to nakedly assert that Mr. Kostin benefitted from the 2019 Transaction, even as it has repeatedly failed to substantiate this statement.  And it persists in its reliance on vague notions of control notwithstanding the lack of legal relevance.  These consistent missteps create a strong, non-speculative inference that the grand jury was never informed of the lack of direct evidence or the appropriate legal standard, just as the magistrates who issued the warrants were not properly informed by the government.

## CONCLUSION

Despite spanning 84 pages, the government's opposition vastly oversimplifies the pending issues by cherry-picking details and ignoring contrary or inconvenient facts.  Considered in the proper context, all of Mr. Wolfson's motions should be granted.  To the extent the Court believes

---

[12] Mr. Wolfson notes that Exhibit T reflects that Mr. Bond was engaged in correspondence related to the property as early as 2016, which refutes the government's persistent—and false—narrative that Mr. Bond's involvement was temporally related to the sanctions against Mr. Kostin.  *See, e.g.*, ECF No. 82 ¶ 21, Ex. P at USAO_00000357.

that factual issues need to be resolved, Mr. Wolfson requests evidentiary hearings as the Court deems appropriate.

Dated: January 13, 2025

Respectfully submitted,

/s/ David C. Rybicki
David C. Rybicki
Michael C. Harper
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
David.Rybicki@klgates.com
*Counsel for Defendant Vadim Wolfson*