**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : |  |
|  | : |  |
| v. | : | No. 24 Cr. 091 (GHW) |
|  | : |  |
| **GANNON BOND,** | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

**REPLY IN FURTHER SUPPORT OF DEFENDANT GANNON BOND'S PRETRIAL MOTIONS**

James Kousouros, Esq.
The Law Offices of James Kousouros
260 Madison Avenue, 22nd Floor
New York, NY 10016
P: (212) 532-1934
james@kousouroslaw.com

Joseph Pace, Esq.
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
P: (917) 336-3948
jpace@jpacelaw.com

*Counsel for Defendant Gannon Bond*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .....................................................................................................................................2

    I.    THE FRUITS OF THE WARRANTS SHOULD BE SUPPRESSED ...............................2

        A.    The Email Warrant Affidavit................................................................................2

        i.    The Affidavit Supporting the Email Warrant Is Facially Defective................................2

        ii.    The Email Warrant Affidavit Contained Material Misrepresentations and Omissions...3

        B.    The Apple Warrant's Material Misrepresentations and Omissions................................8

        C.    The Cellphone Warrant ........................................................................................15

    II.    MOTION TO STRIKE THE INDICTMENT ......................................................................15

CONCLUSION ..................................................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Illinois v. Gates*,
   462 U.S. 213 (1983) .................................................................................................6, 13

*United States v. Brown*,
   No. 2:08-cr-299, 2011 U.S. Dist. LEXIS 93549 (W.D. Pa. Aug. 19, 2011) .............................16

*United States v. Canfield*,
   212 F.3d 713 (2d Cir. 2000) ...................................................................................................8

*United States v. Kurniawan*,
   12 Cr. 376 (RMB), 2013 WL 180412 (S.D.N.Y. Jan. 17, 2013) ..............................................6

*United States v. Lahey*,
   967 F. Supp. 2d 698 (S.D.N.Y. 2013) ....................................................................................7

*United States v. Lauria*,
   70 F.4th 106 (2d Cir. 2023) ...................................................................................................8

*United States v. Ramsey*,
   No. 19-268, 2020 U.S. Dist. LEXIS 80153 (E.D. Pa. May 4, 2020) .......................................16

*United States v. Ray*,
   541 F. Supp. 3d 355 (S.D.N.Y. 2021) ..................................................................................16

*United States v. Spears*,
   No. 2:08-CR-136 PS, 2010 U.S. Dist. LEXIS 63977 (N.D. Ind. June 28, 2010) ...................16

*United States v. Stewart*,
   No. 3:19-CR-151-TAV-DCP-2, 2021 U.S. Dist. LEXIS 92415 (E.D. Tenn. Jan. 12, 2021) ...16

*United States v. Wagner*,
   989 F.2d 69 (2d Cir. 1993) ....................................................................................................9

## **EXHIBIT LIST**

**Ex. A:**  ███████ FD-302 produced December 2, 2024

**Ex. B:**  ███████ FD-302, produced December 2, 2024

**Ex. C:**  ███████ FD-302

**Ex. D:**  ████████████████ Diagram

## **PRELIMINARY STATEMENT**

Defendant Gannon Bond respectfully submits this reply in further support of his motion to suppress evidence obtained through search warrants for his email accounts, iCloud account, and phone. *See* D.E. 87.

The Government's core theory of criminality in its warrant affidavits was that Bond facilitated Wolfson's $12 million purchase of the Aspen Home *from Kostin* in 2019. That theory hinges on the supposition, explicitly articulated throughout the affidavits, that Kostin actually owned the Aspen Home at the time of the 2019 Transaction. There is not a shred of direct evidence supporting that supposition. To the contrary, the documentary and testimonial evidence overwhelmingly shows that Wolfson made a *bona fide* purchase of the property in 2014 via Altamonte, that he used the property after that purchase, and that the 2019 Transaction merely involved Wolfson acquiring direct ownership of 40 North Star from Altamonte, an entity already under his control.

The affidavits strategically omitted or misrepresented virtually all of this evidence. Among other deficiencies, the affidavit asserted that the LLC Manager "understood" that Kostin retained ownership of the home after his designation when, in fact, the LLC Manager explicitly stated the opposite; it claimed that Kostin's name on the insurance policy was proof of ownership when, in fact, the fuller correspondence shows that Wolfson replaced Kostin as the named insured after the 2014 purchase; and it omitted that the one person (the Property Manager) who opined that Kostin retained ownership of the home told the LLC Manager that Wolfson purchased the home and told investigators that she was unaware of the property's actual owner.

A corrected affidavit does not contain a scintilla of evidence of probable cause that Bond and Wolfson purchased the property from an OFAC-designated person. Faced with that

1

shortcoming, the Government retreats to two different theories. First, they argue that Bond and Wolfson violated IEEPA by maintaining and managing the Aspen Home for Kostin's benefit. But this theory presupposes that Kostin retained ownership of the home, particularly because he never used the home after his designation. No IEEPA offense can lie for Wolfson's management and maintenance of his own property. Second, the Government argues that Bond and Wolfson violated IEEPA by transferring $12 million to a Kostin-controlled entity. But this theory is independently defective: there is no evidence that Kostin exercised the level of control over that entity required to make out an IEEPA violation.

For these reasons, the fruits of the warrants should be suppressed. At a minimum, Bond has made a substantial preliminary showing that he is entitled to a *Franks* hearing.

## ARGUMENT

### I. THE FRUITS OF THE WARRANTS SHOULD BE SUPPRESSED

#### A. The Email Warrant Affidavit

##### i. *The Affidavit Supporting the Email Warrant Is Facially Defective*

The Government does not contest that the affidavit is devoid of any evidence that Bond or Wolfson knew that Kostin was involved in any capacity in the 2019 Transaction, much less that he was its ultimate beneficiary. As such we submit that it concedes an absence of probable cause to believe that either Bond or Wolfson had committed an IEEPA violation.

The Government argues that this absence is irrelevant because the affidavit furnished probable cause that evidence of *Kostin*'s IEEPA violation would be found in Bond's email accounts. (*See* D.E. 93, Govt Opp. 45-46). However, this argument fails for the same reason as above: even assuming, *arguendo*, that Kostin ultimately received the $12 million from the transaction in violation of IEEPA, the affidavit's averments do not establish a "fair probability"

2

that evidence of Kostin's involvement would be found in Bond's emails. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

To the contrary, the affidavit supplies good reason to believe that evidence of Kostin's involvement would be absent from Bond's email correspondence. The affidavit does not claim that Bond or Wolfson directly transferred any money to Kostin. It does not posit any relationship between Bond/Wolfson and Kostin, or even assert that the former were aware of the latter's existence.[1] And the affidavit explains that Kostin actively concealed his involvement with 40 North Star and the Aspen Property. (*See* D.E. 87, Bond Mot., Ex. B. ¶ 34(b) ("From 2010 to 2019, ███████████, and their associates ensured that Kostin's name was never associated with the property as the owner . . . .")). Given the absence of any direct ties between Bond/Wolfson and Kostin and the latter's assiduous efforts to hide his association with the property, a magistrate judge could not reasonably conclude a fair probability that Bond's emails would reveal evidence of Kostin's role in the transaction.

For this reason alone, the fruits of the Email Warrant should be suppressed.

    ii.    *The Email Warrant Affidavit Contained Material Misrepresentations and Omissions*

The Apple Warrant affidavit's material omissions and misrepresentations require suppression of its fruits, or, at a minimum, warrant a *Franks* hearing. A properly drafted affidavit would have revealed numerous critical facts undermining probable cause, including:

- That Altamonte purchased 40 North Star in 2014;

---

[1] While subsequent evidence revealed that Bond and Wolfson were aware of Kostin's one-time ownership of the property, that does not appear to have been known at the time of the Apple Affidavit's filing, nor—more importantly—was any such evidence summarized in the affidavit. *See United States v. Kurniawan*, 12 Cr. 376 (RMB), 2013 WL 180412, at *5 n.4 (S.D.N.Y. Jan. 17, 2013) (existence of probable cause limited to what was within the four corners of the warrant affidavit).

3

- That federal agents either did not know who owned Altamonte (and, by extension, 40 North Star), or they knew but failed to disclose that Wolfson was the owner and, therefore, could not have "purchased' the property from Kostin in 2019; and

- That no witnesses claimed to know who owned Altamonte or the 40 North Star at the time of the 2019 Transaction. The Property Manager speculated that it might have been Kostin, based on his intermittent usage of the property, but professed ignorance as to the actual owner and acknowledged that Wolfson also began using the property more frequently. The LLC Manager heard from the Property Manager that Kostin purchased the home, but did not offer an opinion as to who owned it in 2019.

While the Government nitpicks the materiality of each individual misrepresentation and omission, the law is clear that courts must look to the "cumulative effect." *United States v. Lahey*, 967 F. Supp. 2d 698, 723 (S.D.N.Y. 2013). Here, the cumulative effect was to create illusory probable cause. Viewed in their totality, these omitted facts give lie to the affiant's assertion that "Kostin likely owned real property in the U.S. until at least 2019." At most, the evidence established that Kostin likely owned real property until 2014—long before his designation.

The Government responds that Kostin's ownership—and any misrepresentations and omissions related thereto—is ultimately irrelevant to the probable cause analysis because the affidavit "describes evidence that Bond and Wolfson participated in the indirect transfer of approximately $12 million Kostin in September 2019." (Govt Opp. 47). But the "indirect transfer" claim does not hold up absent proof that Kostin owned the property at the time of the 2019 Transaction. The affidavit did not claim that Bond and Wolfson sent money directly to Kostin, nor did it summarize any evidence that Kostin actually received those funds. Instead, the affiant invited the magistrate court to *infer* receipt based entirely on the supposition that the transaction involved the purchase of property from Kostin.[2] Kostin's ownership was thus an indispensable link in the

---

[2] The Government's did not develop its theory that Kostin controlled the company to which Wolfson sent the $12 million until the later-filed Apple Warrant application.

4

inferential chain establishing probable cause. *See United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (fact is material where it is "necessary to the [issuing] judge's probable cause finding").

The Government's attempt to dismiss the 2014 Altamonte transfer as immaterial similarly fails. The Government asserts that Kostin's documented use of shell companies suffices to show that the 2014 acquisition was just a paper transfer. (Govt. Opp. 49). But, while the affidavit shows that Kostin used shell companies to acquire the Aspen Home in the first place, it offers no evidence that the 2014 sale was just another ruse undertaken to obscure his continued ownership of the property. The Government's speculative assumption that Kostin might have been playing a shell game when he transferred the property in 2014 is not enough to support a finding of probable cause—especially when paired with the fact that Kostin's name was only removed from the insurance policy after the 2014 purchase. *See United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (probable cause cannot rest on a "hunch").

The Government's defenses of its reliance on statements by 40 North Star's "representatives" are equally unpersuasive. It concedes that the Property Manager—who supplied the primary support for the claim that Kostin "likely" owned the property until 2019—confessed that she did not know the Aspen Home's actual owner. Nonetheless, it argues that it was not obligated to disclose this admission because the affidavit (i) contained a proviso that its recitation of facts was not exhaustive and (ii) used "qualifying language" conveying the affiant's uncertainty about the property's owner. (Govt Opp. 49; *id.* at 49 n.30 (noting that the affidavit stated that Kostin "*likely owned* real property" and "Wolfson *effectively* purchase [the property]") (emphasis in original)). But the Fourth Amendment does not permit such easy workarounds. A boilerplate preface does not extinguish the obligation to disclose material information, and qualifying

5

language is little more than empty verbiage unless it is paired with the factual context allowing the magistrate to assess the nature and degree of the uncertainty. No such context was supplied here.

Next, the Government argues that the Property Manager's ignorance as to the property's "ultimate beneficial owner" was immaterial because she "knew that Kostin and his family were the main users of the home, and that Kostin allowed her to stay there and to have a family dog at the house." (Govt Opp. 50). But the Property Manager's observations about this usage were undated and, thus, shed no light on the key question—whether Kostin owned the Aspen Home *in 2019*.

Even if the Property Manager had expressed a belief that Kostin retained ownership of the property, the Government would still be obligated to disclose the fact that this belief amounted to nothing more than speculation—speculation which was contradicted by her own acknowledgment that Wolfson used the property with increasing frequency after 2014. (Bond Mot., Ex. D at 3). *See United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) (government must disclose enough information for the court to determine whether a witness statement is based on reliable sources, "such as first-hand observations or second-hand information from reliable sources, rather than on unreliable means such as rumor or innuendo.").

As for the LLC Manager, the Government does not dispute that it knew that he was mistaken in his recollection that Wolfson purchased Altamonte in 2019. Even so, the Government offers a scattershot defense of its reliance on the LLC Manager without disclosing this fact. First, it claims that it did not "directly rely on the LLC Manager's understanding" at all. (Govt Opp. 52). That is revisionism: the affidavit clearly states that "representatives" of 40 North Star told agents that Wolfson "purchase[d] . . . [an] ownership interest in 40 North Star" in 2019. (Bond Mot., Ex. B ¶ 34(c)). That can only refer to the LLC Manager's errant claim that Wolfson purchased 40

6

North Star's holding company, Altamonte. Next, the Government claims that the LLC Manager's "understanding that Kostin owned the home" derived from multiple sources, including conversations with the Property Manager and "personal interactions he had with Kostin." (Govt Opp. 51). This, too, is an inaccurate rendering of the interview notes. The LLC Manager never conveyed any "understanding" to investigators that Kostin owned the home in 2019; rather, he told investigators that the Property Manager told him that Kostin bought the home in 2010. (Bond Mot., Ex. C at 2). Furthermore, all of the "personal interactions" that the Government references occurred between 2011 and 2013. (*Id.* at 2-3). Thus, at most, the LLC Manager supplied evidence supporting the undisputed fact that Kostin owned the property *at some point*. That is not enough to establish probable cause that a sanctions violation occurred.

Finally, the Government argues that the LLC Manager's mistaken recollection need not have been disclosed because it was a "minor point of confusion" and because the LLC Manager accurately recalled that 40 North Star and Altamonte were "involved in a transaction transferring ownership of shares related to the Aspen Home." (Govt Opp. 51). But, as explained above, whether Wolfson purchased Altamonte in 2019 or whether he already owned it is hardly a minor point—it is the lynchpin of the Government's theory that the Defendants violated the sanctions regime by dealing in blocked property. Nor does the LLC Manager's faithful recounting of the cast of characters resuscitate his reliability, given his apparent inability to remember key facts about what those characters *did*.

For these reasons, Bond has made a substantial preliminary showing that key facts were either deliberately or recklessly omitted from the affidavit. Accordingly, Bond is entitled to a *Franks* hearing.

7

B.  <u>The Apple Warrant's Material Misrepresentations and Omissions</u>

The motion to suppress sets forth a litany of misrepresentations and omissions that go to the core of the Government's theory that Wolfson purchased the Aspen Home from Kostin after the latter's designation. These defects in the warrant application independently warrant a *Franks* hearing. However, the case for suppression has only strengthened since Bond filed his motion. The Government's subsequent production of additional FD-302s further demonstrates that the Special Agent mischaracterized the investigation's findings in the warrant application.

Most notably, one of these newly disclosed FD-302s directly contradicts the warrant application's characterization of the LLC Manager's testimony. The application affidavit claimed that the LLC Manager "understood Kostin to be the owner of the Aspen home" through at least 2018 (Bond Mot., Ex. F ¶ 34). However, the LLC Manager's actual statements to investigators, as revealed in the FD-302, tell a markedly different story. The LLC Manager told investigators the following:

<u>First, unlike the 40 North Star's transfer from Soltrop to Ledridge, Altamonte's acquisition of 40 North Star had the hallmarks of being a *bona fide* purchase</u>. The LLC Manager explained that ███████████████████████████████████████████████████████████████ ███████████████████████████████████ *See* Ex. A, ███ FD-302 produced on December 2, 2024, at 8.³ From 2010 to 2014, he observed no changes in 40 North Star's management or usage patterns; Kostin visited multiple times annually, he explained, and it ███████████████████████████████████████████████████████████████ ███████████████████████████ *Id.* at 7-8. However, the 2014 Altamonte acquisition represented

---

³ All FD-302s produced to date are designated "Attorney Possession Only" subject to the Protective Order and thus request is made for Ex. A-C to be filed under seal and are thus provided to the Court under separate cover.

8

a "clean break." *Id.* at 6. This transition brought concrete changes: specifically, Kostin's name—which had remained on the insurance policy through previous ownership transfers—was removed and replaced with Wolfson's, and Wolfson ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* at 8-9.

Second, the LLC Manager believed that Wolfson owned the property after 2014. The LLC Manager told investigators that his assistant informed him that Kostin's named needed to be removed from the insurance policy ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬;[4] he also stated that he heard from the Property Manager around 2014 that Kostin was ▬▬▬▬▬▬▬▬▬ *Id.* at 9; *id.* at 13 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ He told investigators that Kostin had neither "ownership o[r] control" of the property after the 2014 sale, *id.* at 13, and that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* at 10; *id.* ▬▬▬▬▬▬▬▬▬▬▬▬▬

Third, Wolfson permitted Kostin to continue using the Aspen Home after the 2014 sale. The LLC Manager told investigators that he ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* at 11-12.

Fourth, Kostin did not reserve any areas of the Aspen Home after 2014 for his exclusive usage. The LLC Manager told investigators that he was "not aware of specific areas" of the home

---

[4] The assistant, ▬▬▬▬, confirmed as much to investigators, whom she told she formed the belief, by April 2015, that Wolfson was the new owner of the Aspen Home. *See* Ex. B, ▬▬▬ FD-302, produced December 2, 2024, at 8.

9



████████████████████████████████████ nor any ████████████ or rooms that ████
████████████████ *Id.* at 10.

These statements directly contradict the affidavit's claims about Kostin's continued ownership. When properly supplemented with this additional information, a complete and accurate affidavit would have disclosed the following:

- There existed no documentary evidence demonstrating Kostin's continued ownership (as opposed to mere usage) of the Aspen Home after 2014.

- Wolfson and Kostin were close personal friends who reached an agreement, after the 2014 sale, permitting the latter to use the property.

- Wolfson's usage of the property increased significantly following his 2014 acquisition.

- After 2014, no portions of the property were set aside for Kostin's exclusive use.

- Unlike previous transfers of 40 North Star where Kostin's name remained on the insurance policy, the 2014 purchase resulted in his name's removal and replacement with Wolfson's.

- Although the Property Manager told investigators she assumed Kostin maintained ownership based on his continued use, she had separately informed the LLC Manager that Wolfson purchased the property in 2014. Moreover, she admitted to investigators that she had no knowledge of who owned the property when Kostin was designated.

- Every witness (save one) who suggested Kostin's post-2014 ownership based this belief entirely on the Property Manager's admittedly speculative assumption. The sole exception was the HOA president, whose credibility was severely compromised by his demonstrably false claim that Wolfson never acquired the property at all. (Bond Mot. 7).

Taken together, these facts eliminate even the "fair probability" required under *Illinois v. Gates*, 462 U.S. 213, 238 (1983), that evidence of an IEEPA-violating property sale would be found in Bond's emails. Their deliberate omission from the affidavit created a false and misleading impression upon which the magistrate decided probable cause.

The Government largely concedes these errors in its opposition, but attempts to minimize their significance. For example, they concede that numerous documents refer to Wolfson as the

"ultimate beneficial owner" of the Aspen Home, but defend their characterization of him as its "nominal" owner based on Kostin's documented use of shell companies to hold 40 North Star. But the fact that Kostin used shell companies to obscure his acquisition of the Aspen Home has no bearing on whether the 2014 transaction was a *bona fide* sale or a paper transfer. The Government's response also fails to contend with the mass of concealed evidence showing it was the latter—evidence that includes Wolfson's increasing use of the house after 2014, his substitution as the named insured on the homeowner's policy, the LLC Manager's statement that Wolfson allowed Kostin to use the house after the 2014 purchase, and the LLC Manager's characterization of the Altamonte purchase as a "clean break" unlike previous transfers.

Confronted with this roster of misrepresentations and omissions, the Government argues that one must resort to "improper hypertechnical reading of the affidavit" to find materiality in its mischaracterization of Wolfson as the property's "nominal" owner, and that probable cause exists regardless based on the affidavit's description of Kostin's "ownership and use of the Aspen House, his use of shell companies and trusted associates to hide his ownership, and Bond and Wolfson's transfer of $12 million to Kostin post-sanctions, among other things." (Govt Opp. 54). This dismissive response rings hollow, particularly given that the Government devoted four substantial paragraphs to developing the "nominal" owner allegation.[5] (Bond Mot., Ex. F ¶¶ 33, 40, 44, 47). More fundamentally, the evidence fails to support any of these claims: there is no evidence of Kostin's post-2014 ownership, no evidence of his use of shell companies to hide ownership during this period, and no evidence that he received the $12 million from the property's 2019 sale. Instead, the evidence overwhelmingly suggests Wolfson made a legitimate purchase in 2014.

---

[5] The Government curiously argues that the affidavit's description of Wolfson as "the owner of Almonte" undercuts the inference that it intended to mislead. (Govt Opp. 54 (citing Ex. F ¶¶ 33, 40)). But the two paragraphs that the Government cites refer to Wolfson as Altamonte's "nominal owner."

11

The Government's defense of its characterization of the LLC Manager's understanding that Kostin owned the property after his designation is especially problematic. Its claim that the LLC Manager believed in Kostin's continued ownership based on "meetings with Kostin, Kostin's associates and unindicted co-conspirators" (Govt Opp. 55) directly contradicts the LLC Manager's explicit statement that he did not believe Kostin retained ownership. *See* Ex. A at 9-10, 13. Moreover, the cited meetings occurred years before the 2014 sale. Equally unpersuasive is the Government's reliance on the January 2018 email that the LLC Manager received about the change in the property's authorized representative. (Govt Opp. 55). That email does not remotely suggest a change in *ownership*. The far more likely explanation is that, after he was sanctioned, Kostin ceased availing himself of Wolfson's offer to use the property, and once Wolfson became the exclusive user of the home, he began using his own representatives to manage the property. This common-sense explanation, however, was unavailable to the magistrate court because the Government concealed the existence of the agreement between Wolfson and Kostin permitting the latter to use the property.

Regarding the Aspen Home staff, the Government does not contest the falsity of the affidavit's averment that each believed that "Kostin owned the home until he was sanctioned." (Bond Mot, Ex. F. ¶ 43). The Government's response is telling in what it leaves unsaid—thus, while arguing the affidavit accurately reported staff members' "belief that Kostin owned the home," it conspicuously avoids addressing the timing of this believed ownership. The Government then seeks to sidestep the issue altogether by claiming the timeframe question is appropriately reserved for cross-examination. But, for the reasons explained above, the timeframe was essential to the Government's theory of criminality and the propriety of the warrants, *ab initio*.

The Government's argument that *Franks* hearings cannot proceed based on FD-302 discrepancies is equally unpersuasive. (Gov Opp. 55, n.34). Courts regularly conduct *Franks* hearings based on such inconsistencies. *See, e.g.*, *United States v. Brown*, No. 2:08-cr-299, 2011 U.S. Dist. LEXIS 93549, at *1 (W.D. Pa. Aug. 19, 2011); *United States v. Spears*, No. 2:08-CR-136 PS, 2010 U.S. Dist. LEXIS 63977, at *3 (N.D. Ind. June 28, 2010). The cases cited by the Government do not establish a blanket prohibition against such hearings. Rather, those courts denied *Franks* hearings only where discrepancies were minor or independent evidence supported the omitted claims. *See United States v. Ramsey*, No. 19-268, 2020 U.S. Dist. LEXIS 80153, at *13 n.4 (E.D. Pa. May 4, 2020) (rejecting *Franks* request based on FD-302's failure to record that texts were "backed up" because the record showed that they were "synced"); *United States v. Stewart*, No. 3:19-CR-151-TAV-DCP-2, 2021 U.S. Dist. LEXIS 92415, at *22 (E.D. Tenn. Jan. 12, 2021) (information omitted from FD-302 was confirmed by intercepted conversations and a subsequent seizure); *United States v. Ray*, 541 F. Supp. 3d 355, 406 (S.D.N.Y. 2021) (FD-302's failure to record that victim consented to search storage unit insufficient to hold *Franks* hearing because the FD-302 did not record any details about the victim's response to the search request, and because the defendant failed to present any evidence that the victim did not consent). Here, no independent evidence supports Kostin's ownership at the time of designation, and the Government notably does not claim investigators simply failed to record staff members' recollections of when Kostin owned the home.

The Government also concedes that it misrepresented that Kostin's name was kept on the homeowner's policy after the 2014 sale. This fact is particularly significant when coupled with the concealed fact that Kostin's name had remained on the policy through all previous transfers, directly undermining the Government's theory that Wolfson was merely Kostin's nominee. The

13

Government attempts to spin this omission by arguing that Kostin's removal from the policy actually supports probable cause because it aligns with their theory that Kostin sought to hide his ownership. (Govt Opp. 57). Even if this Court were to accept such a "heads-I-win-tails-you-lose" approach to warrant affidavit omissions, this argument fails. At best, Kostin's removal from the insurance policy is an inconvenient fact that might be explained by a desire to avoid association with the property; it does not affirmatively support his ownership. Moreover, once the email insurance correspondence is properly contextualized, the only remaining ownership evidence consists of witness statements which, as explained above, do not actually support the Government's claim of Kostin's post-2014 ownership.[6]

Lacking probable cause for an IEEPA violation based on the property transfer, the Government falls back on a secondary theory—that CapitalInvest, the recipient of Wolfson's $12 million wire, was owned or controlled by Kostin. This alternative theory faces two significant problems. First, it relies on unsupportable assumptions that fail to meet probable cause requirements. The affidavit's claim of Kostin's ownership of CapitalInvest rests on records ostensibly showing it within a structure of shell companies ultimately owned by ▇▇▇▇ and ▇▇▇▇▇▇▇—both of whom acted at some point in time as Kostin's assistant or nominee. (Bond Mot. Ex. F ¶ 46). However, under the OFAC regulations, a sanctioned individual must have at least a 50% interest in an entity in order for a U.S. person to be prohibited from transacting with that entity. *See* Entities Owned by Blocked Persons (50% Rule), U.S. Dep't of Treasury, *available at* https://ofac.treasury.gov/faqs/398. But neither ▇▇▇▇ nor ▇▇▇▇▇▇▇ are blocked

---

[6] The Government's assertion that the affidavit contained other facts proving ownership does not withstand scrutiny. (Govt Opp. 58, n.35). The paragraphs in the affidavit to which the Government cites (Bond Mot., Ex. F ¶¶ 37-38, 41, 45-46) merely show that Kostin paid to use the property after 2014, not that he owned the property. Ownership cannot be inferred from usage given that Wolfson also used the property after 2014 (*see* Bond Mot. 18, n.10), and given ▇▇▇▇ statement that Wolfson permitted Kostin to make occasional use of the property after Wolfson purchased it. *See* Ex. A at 11.

14

individuals.[7] Second, the affidavit's theory assumes without any evidence that ▮ and ▮ acted exclusively as Kostin's nominees and that any money that was transferred to them would have been received by Kostin. The investigative record contradicts this supposition.



### C. The Cellphone Warrant

As set forth in Bond's opening papers, to the extent any evidence supporting probable cause for the Cellphone was derived from the unlawful searches of Bond's Yahoo, Gmail, and Apple accounts, anything seized from the phone is also subject to exclusion. (Bond Mot. 20-21).

## II. MOTION TO STRIKE THE INDICTMENT

For the reasons detailed in his opening brief, Bond maintains that his motion has merit. However, he agrees that these issues are most appropriately addressed after both parties have presented their cases-in-chief.

## CONCLUSION

For the foregoing reasons, the Court should (i) suppress the fruits of the Yahoo/Gmail, Apple, and Phone Warrants or, in the alternative, hold a *Franks* hearing, and (ii) defer consideration of the motion to strike from the Indictment the portions discussing the superyachts, the IEEPA framework, and the basis for Kostin's OFAC designation.

Dated: January 13, 2025
      New York, New York

_____

▮

*/s/ James Kousouros*
THE LAW OFFICES OF JAMES KOUSOUROS
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 532-1934
james@kousouroslaw.com


Joseph Pace
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
Tel: (917) 336-3948
jpace@jpacelaw.com