UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

ANDREY KOSTIN et al.,

              Defendants.

Case No. 1:24-cr-00091 (GHW)

# DEFENDANT VADIM WOLFSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE GOVERNMENT'S PROPOSED EXPERT TESTIMONY

K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100

*Counsel for Defendant Vadim Wolfson*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................... 1

LEGAL STANDARD..................................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

    I.    Testimony from Dr. Shelley and Agent Hanratty Would Serve Multiple Improper Purposes and Would Not Be Helpful to the Jury ................................... 3

        A.    The Proposed Testimony Is Irrelevant and Improper ............................... 3

        B.    The Proposed Testimony Would Impermissibly Lead the Jury to Infer Guilt By Association .......................................................................... 7

        C.    The Proposed Testimony Is Prejudicial Because It Relies on Ethnic Generalizations ................................................................................ 10

        D.    The Proposed Testimony Is Prejudicial Because the Government Experts Attempt to Imply Criminality Despite Conceding Numerous Lawful Purposes ....................................................................... 12

    II.    Testimony from Mr. Santos Would Invade the Province of the Court ................ 14

    III.    Request for *Daubert* Hearing............................................................................... 15

CONCLUSION............................................................................................................................. 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Baker v. Urban Outfitters*,
   254 F. Supp. 2d 346 (S.D.N.Y. 2003)......................................................................................2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993).............................................................................................2, 3, 15

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)......................................................................................................3

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992)..........................................................................................14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)......................................................................................................2

*In re Pfizer Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016)............................................................................................3

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................................3

*Stern v. Shammas*,
   No. 12-CV-5210 (NGG), 2015 WL 4530473 (E.D.N.Y. July 27, 2015) ......................3

*United States v. Banki*,
   No. S1 10 CR. 08 (JFK), 2010 WL 1875690 (S.D.N.Y. May 10, 2010).................14, 15

*United States v. Castillo*,
   924 F.2d 1227 (2d Cir. 1991)................................................................................ *passim*

*United States v. Cruz*,
   981 F.2d 659 (2d Cir. 1992)................................................................................. *passim*

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003).............................................................................................3

*United States v. Gelzer*,
   50 F.3d 1133 (2d Cir. 1995)..........................................................................................2

*United States v. Miller*,
   No. 18-CR-202 (ARR), 2018 WL 5729738 (E.D.N.Y. Nov. 2, 2018)......................13

*United States v. Mulder*,
    273 F.3d 91 (2d Cir. 2001) ........................................................................................8

*United States v. Zhong*,
    26 F.4th 536 (2d Cir. 2022) .....................................................................................10

**Other Authorities**

Fed. R. Evid. 401 ..............................................................................................................1, 2

Fed. R. Evid. 402 .................................................................................................................1

Fed. R. Evid. 403 ..............................................................................................................1, 2

Fed. R. Evid. 702 ..............................................................................................................2, 8

NBC News (Apr. 6, 2022), https://www.nbcnews.com/politics/justice-department/doj-charges-russian-oligarch-sanctions-violations-disrupts-military-cy-rcna23219; ..............................................................................................9

Sarah N. Lynch, *US charges Russian TV contributor Dimitri Simes with sanctions violations*, Reuters (Sept. 5, 2024).................................................................................9

Tatyana Makeyeva, *DOJ charges Russian oligarch with sanctions violations, disrupts military cyberattack* ............................................................................................9

*U.S. Sanctions Charges*, NY Times (Sept. 29, 2022), https://www.nytimes.com/2022/09/29/us/politics/russian-oligarch-sanctions-citizenship.html ................................................................................................................9

Defendant Vadim Wolfson submits this memorandum of law in support of his motion *in limine* to exclude testimony from the government's three proposed experts. Defendant Gannon Bond respectfully joins in this motion of co-defendant Vadim Wolfson.

**PRELIMINARY STATEMENT**

The Court should exclude the government's proposed experts because the proffered testimony is clearly improper and inadmissible and because it would usurp the province of the Court. By letter dated February 28, 2025, the government informed Defendants that it expects to call at least three expert witnesses to testify at trial. *See* Declaration of David C. Rybicki ("Rybicki Decl.") ¶ 3, Ex. 1. The first two proposed experts—Dr. Louise Shelley, a professor at the George Mason University Schar School of Policy and Government, and FBI Supervisory Special Agent Robert Hanratty—would not offer any testimony on the facts of this case. Rather, their proposed testimony would solely serve to encourage the jury to find Mr. Wolfson guilty because the at-issue transactions purportedly share similarities with allegedly improper techniques employed by other wealthy Russians who have nothing to do with this matter. This is not permissible. Their testimony would not be helpful to the jury and it would improperly inject into the proceedings issues related to Mr. Wolfson's ethnicity. Meanwhile, the government's third proposed expert, Blake Santos, who works for the Office of Foreign Assets Control ("OFAC"), would testify about the meaning of sanctions laws and regulations, a matter that is squarely and exclusively the role of this Court.

**LEGAL STANDARD**

Federal Rule of Evidence 401 permits the introduction at trial of "relevant evidence" and provides that "[e]vidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 402 precludes the introduction of irrelevant evidence. Rule 403 protects against the adverse

1

effect of otherwise relevant evidence that goes beyond tending to prove a fact or issue that would justify its admission. *See United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995). Rule 403 provides as follows:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee's Note to 1972 Proposed Rules.

With respect to expert testimony, such evidence can only be admitted if it satisfies Rule 702 and the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147–48 (1999). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the witness's testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Further, the party seeking to introduce expert testimony "bears the burden of establishing its admissibility by a preponderance of evidence." *Baker v. Urban Outfitters*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003).

Even where expert testimony meets the requirements of Rules 401 and 702, "that testimony is subject to Rule 403's balancing test, and can therefore be excluded if its probative value is

2

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury…or needlessly presenting cumulative evidence." *Stern v. Shammas*, No. 12-CV-5210 (NGG), 2015 WL 4530473, at *2 (E.D.N.Y. July 27, 2015) (internal citations and quotation marks omitted).

The trial judge acts a "gatekeeper" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Second Circuit has advised courts to "focus on the principles and methodology employed by the expert" and to exclude the testimony if those principles and methodology are unreliable, *In re Pfizer Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016); if the witness is not actually applying expert methodology, *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003); or if "there is simply too great an analytical gap between the data and the opinion proffered," leaving the testimony "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[M]ere *ipse dixit* is not appropriate expert testimony." *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (citing *Daubert*, 509 U.S. at 592–94). The Court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec.*, 522 U.S. at 139, 142.

**ARGUMENT**

**I.  Testimony from Dr. Shelley and Agent Hanratty Would Serve Multiple Improper Purposes and Would Not Be Helpful to the Jury**

**A.  The Proposed Testimony Is Irrelevant and Improper**

Testimony from Dr. Shelley and Agent Hanratty should be excluded because it is a naked attempt by the government, entirely divorced from any facts relevant to this case, to fill the

3

significant and critical evidentiary gaps in its case with expert testimony.[1] The government attempts to introduce their testimony even while making abundantly clear that neither proposed expert will offer any opinions as to Mr. Wolfson, Gannon Bond, Andrey Kostin, or any of the transactions or facts relevant to this case. *See, e.g.*, Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 3 ("Other than as specifically described above, Dr. Shelley will not be asked to opine about the specific facts of this case.").[2] Instead, both purport to be experts on "financial activities of Russian oligarchs and other wealthy Russian citizens" and "the ways that Russian oligarchs evade U.S. sanctions." *Id.* at 2; *see also* Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2 (intending to call Agent Hanratty as "an expert in…(1) the ways Russian oligarchs hide their financial assets, including through layers of offshore shell companies, intermediaries, trust and investment fund structures; and nominee owners; and (2) the ways Russian oligarchs maintain control over their assets…."). Under established case law, this testimony—which amounts to little more than the unsupported assertion that "Mr. Wolfson must be an unlawful purchaser because sometimes unrelated wealthy Russians use nominees"—is plainly improper. The Court should bar any such testimony of alleged criminal activity by others offered to imply Mr. Wolfson's guilt based on the behavior of unrelated persons in unrelated transactions.

The inadmissible purpose for which the government plans to use this testimony is not difficult to imagine. For instance, the evidence in this matter clearly shows that Mr. Wolfson

---

[1] The disclosures from Dr. Shelley and Agent Hanratty are almost verbatim identical, creating substantial questions about who drafted them and why a professor and a law enforcement agent would have such identical thoughts and language choices.

[2] The "[o]ther than as specifically described above" proviso is meaningless, as none of the preceding text has anything to do with the facts of this case.

purchased the Aspen property from Mr. Kostin in 2014—years before any relevant sanctions—in a transaction in which Mr. Wolfson took out a loan and transferred the purchase price amount to Mr. Kostin. The government claims that the 2014 transaction was somehow a sham transaction, but the government lacks even a shred of evidence to support this theory. Cue the proposed testimony from Dr. Shelley and Agent Hanratty, both of whom would say that "Russian oligarchs generally conceal any change of ownership or sale of assets by using complex financial transactions," including "purported loans between various entities to disguise the true origin of and purposes for a transfer of money" and "[f]ake" documentation. Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 3; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 3. Because neither witness will offer any testimony about the 2014 loan, the only conceivable purpose of the proposed testimony is to improperly encourage the jury to infer, in the absence of any evidence, that the central tenant of the government's case—the alleged existence of a fake loan transaction—is true merely because the government's experts say that Russian oligarchs sometimes invent loans.

Other examples abound. Mr. Wolfson lawfully owned the Aspen property through a British Virgin Islands corporate entity, Altamonte, which had directors in accordance with local law. And transactions concerning the repayment of the loan involved a bank based in Cyprus. In response to these facts, the government offers the following anticipated testimony:

- "Russian oligarchs frequently use proxies or intermediaries to set up various shell companies in offshore jurisdictions, and arrange for bank accounts in the name of the shell companies to also be opened in foreign jurisdictions."

- "The shell entities are often located in jurisdictions that are tax or corporation formation havens, such as Cyprus, Malta, Luxemburg, the Cayman Islands, Belize, the Seychelles,

5

- Panama, or the British Virgin Islands. The assets are then acquired and held in the name of the shell companies."

- "To further conceal the identity of the true beneficial owner, the shell companies' ownership may be obscured through the use of nominee shareholders, nominee company directors, or other opaque corporate structures such as different shell companies 'nestled' or 'layered' on top of each other."

Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 2; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2.

Likewise, the government has no evidence that the loan repayment ever reached or benefitted Mr. Kostin—a critical gap that eviscerates their ability to prove an IEEPA violation. Again, in lieu of actual evidence, the government instead intends to rely on experts to testify that oligarchs frequently use an "intermediary or close associate" to be the face of a transaction. Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 2; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2. It takes little imagination to foresee the government's argument that this generalized testimony legitimizes its evidence-free theory that the owner of CapitalInvest, the entity that received the loan repayment from Mr. Wolfson in 2019, was acting as a front for Mr. Kostin. Throughout discussions in this matter, the prosecution team has repeatedly attempted to weaponize their lack of evidence with arguments that essentially amount to "the absence of proof is proof in itself because oligarchs cover their tracks." The Court should decline the invitation to smuggle in similar arguments at trial under the guise of "expert testimony."

Worse still, the proposed testimony does not purport to demonstrate that even generic indications of allegedly evasive transactions are consistent with an intention to violate U.S. sanctions law. Both proposed experts make the following crucial concession:

> Russian oligarchs and other high-wealth Russian citizens avoid owning assets in their own name for several reasons. They may wish to circumvent tax or disclosure obligations; avoid public connection between themselves and an asset (e.g., to avoid public reporting regarding wealth held abroad or to avoid having their name connected to an asset being used by a mistress); avoid issues relating to potential corporate raids, including the potential seizure of assets by the Russian government or politically-connected individuals should an oligarch fall out of favor; and, since at least in or about 2014, to evade sanctions that have been imposed by the United States, the European Union, and Canada.

Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 2–3; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2–3. Thus, even assuming that there were a proper basis to allow general testimony about alleged oligarch-type behaviors, there is no foundation to conclude that the transactions in this case have anything to do with sanctions non-compliance, as distinct from personal considerations, tax issues, or protecting assets from the Russian government. Many of these other purposes are not even unlawful and, in any event, none of them pertains to the charges against Mr. Wolfson and Mr. Bond at all.

### B. The Proposed Testimony Would Impermissibly Lead the Jury to Infer Guilt By Association

It is well established that expert testimony may not serve as a means to argue that a defendant is guilty because other unnamed, unindicted individuals arguably sharing characteristics with the defendant have committed crimes. *See, e.g.*, *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) ("[G]uilt may not be inferred from the conduct of unrelated persons."); *United States v. Castillo*, 924 F.2d 1227, 1233–34 (2d Cir. 1991) ("In fact, as became all too apparent in the government's summations, the purpose of the testimony was actually to corroborate Johnson's testimony and provide a foundation for what we conclude to be an improper guilt by alleged

7

association argument."); *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) ("What the government cannot do is to ask the jury to find that because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that behavior.").

In *Cruz*, the Second Circuit concluded that testimony about evasive maneuvers by drug traffickers did not meet the threshold requirement under Rule 702 that expert testimony must be beyond the jury's ken. *See* 981 F.2d at 662 ("That drug traffickers may seek to conceal their identities by using intermediaries would seem evident to the average juror from movies, television crime dramas, and news stories."). Instead of informing the jury on a technical issue, the *Cruz* testimony, as here too, serves a more pernicious purpose. *See id.* at 663 ("[T]he government elicited testimony from an officer as to various routine acts in drug transactions—for example, the use of guns and the forcing of customers to snort cocaine to weed out undercover officers—and then [impermissibly] argued that the defendants were guilty because the government's witnesses testified that the defendants used guns and forced an undercover officer to snort cocaine.").

Likewise, in *Castillo*, the government sought to smuggle in rudimentary information about the operation of narcotics transactions, even though such information was readily understandable by the jury without the need for expert testimony. *See* 924 F.2d at 1233 ("Simply stated, we are not convinced that New York jurors in today's climate, flush with daily news of the latest drug bust, need an expert to enlighten them as to such elementary issues as the function of a scale or index card in a drug deal."). As in *Cruz*, the testimony's true purpose was evident. *See id.* at 1234 ("The Government's summation and rebuttal summation are replete with undisguised exhortations to convict the appellants on the firearm charge on the basis of the following syllogism: 1) drug dealers use guns to force their customers to ingest cocaine so they can determine whether or not they are cops; 2) Castillo and Fernandez are drug dealers; 3) ergo, Castillo and Fernandez used a

8

gun to force Johnson to ingest cocaine."). The use of expert testimony in *Castillo* was particularly problematic because the government attempted to convince the jury that the defendant had a gun based on testimony that drug dealers typically have guns, notwithstanding the fact that the evidence on that count was "weak" because "no gun had ever been recovered." *Id.* at 1234–35.

Similarities to *Cruz* and *Castillo* abound here. At the outset, testimony that persons engaged in illicit behavior often try to mask their transactions is no more useful to the jury here than it was in those cases. Indeed, sanctions evasion is a high-profile, politically charged issue with which the average juror is expected to be familiar. There is a constant stream of public allegations that sanctioned individuals are engaging in evasion through complex transactions.[3] With news of the Russia-Ukraine war top of mind for many Americans, jurors will be readily familiar with the fact that certain Russians face sanctions and that the government believes that there are examples of evasive behaviors to defy those sanctions. Indeed, the question in this case is exceedingly simple: Did Defendants knowingly pay Mr. Kostin, or maintain the Aspen house for his benefit, following the imposition of sanctions against Mr. Kostin? This is the kind of subject matter that a normal jury can understand without gratuitous "expert testimony" regarding the habits of wealthy Russian individuals.

Moreover, as in *Cruz* and *Castillo*, the government's true motivation is apparent. The government plans to introduce evidence that a corporate entity was used to hold the Aspen

---

[3] *See, e.g.*, Sarah N. Lynch, *US charges Russian TV contributor Dimitri Simes with sanctions violations*, REUTERS (Sept. 5, 2024), https://www.reuters.com/legal/us-charges-russian-tv-contributor-dimitri-simes-with-sanctions-violations-2024-09-05/; Tatyana Makeyeva, *DOJ charges Russian oligarch with sanctions violations, disrupts military cyberattack*, NBC NEWS (Apr. 6, 2022), https://www.nbcnews.com/politics/justice-department/doj-charges-russian-oligarch-sanctions-violations-disrupts-military-cy-rcna23219; Kenneth P. Vogel and Benjamin Weiser, *Russian Oligarch and Associates Indicted on U.S. Sanctions Charges*, NY TIMES (Sept. 29, 2022), https://www.nytimes.com/2022/09/29/us/politics/russian-oligarch-sanctions-citizenship.html.

property, that Mr. Kostin and Mr. Wolfson acted through agents, and that Mr. Wolfson made a payment from a Cypriot bank account. The government then intends to make the inferential leap that these facts are indicative of sanctions evasion because unrelated "Russian oligarchs and other wealthy Russian citizens" have engaged in unlawful conduct in transactions involving corporate entities, intermediaries, and Cypriot banks. *See* Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 2; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2. As in *Castillo*, this is particularly inappropriate given the government's "weak" case here. Lacking any evidence of any post-sanctions payments to Mr. Kostin, the government cannot rely on generalizations about "wealthy Russians" or "Russian oligarchs" to compensate for its lack of proof regarding the specific transactions in this case.

### C. The Proposed Testimony Is Prejudicial Because It Relies on Ethnic Generalizations

The proposed testimony also improperly encourages the jury to conclude that Mr. Wolfson is guilty because he is a wealthy Russian businessman or because he has previously been associated with other wealthy Russian businessmen. *See, e.g.*, *United States v. Zhong*, 26 F.4th 536, 557 (2d Cir. 2022) (concluding that testimony about Chinese "social, political and economic factors" was not permissible because it "improperly risked prejudicing the jury against Zhong, a Chinese man who was associated with the Chinese government"); *Cruz*, 981 F.2d at 664 ("Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here.").

Ignoring these guardrails, the proposed expert testimony attempts to prove guilt-by-ethnic-association and is replete with gross ethnic generalizations. Examples include:

- "Russian oligarchs and other wealthy Russian citizens typically avoid owning assets in their own name."

- "Russian oligarchs frequently use proxies or intermediaries to set up various shell companies in offshore jurisdictions, and arrange for bank accounts in the name of the shell companies to also be opened in foreign jurisdictions."
- "To obscure their connection to and control of an asset, Russian oligarchs also often use legal structures such as trusts and foundations. The trust or foundation can be used as a nominal owner of an asset or of a shell entity, thereby adding another layer of separation between the asset and the Russian oligarch. Typically, the Russian oligarch or his family members would be named as the beneficiaries of such trusts and foundations."
- "Russian oligarchs and other high-wealth Russian citizens avoid owning assets in their own name for several reasons."
- "Russian oligarchs generally conceal any change of ownership or sale of assets by using complex financial transactions involving the shell entities and legal structures that are the nominal owners of the assets."

*See generally* Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty. The clear implication of these statements is that wealthy Russians tend to be dishonest, evasive, adulterous,[4] and corrupt. The use of words like "typically," "often," and "generally" to describe the actions of individuals from a country with more than 140 million people serves only to try to prove that Mr. Wolfson acted in accordance with these ethnic stereotypes. Doing so is plainly improper and should be disallowed.

---

[4] The expert disclosures include gratuitous references to mistresses. *See* Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 2; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2.

Although wrong in any context, the proposed testimony is even more pernicious in the current U.S. political environment in which there exists substantial and pervasive bias against Russian nationals. Specifically, the Russia-Ukraine war has led to hyper-polarized public sentiment. A jury presented with generic evidence about the activities of wealthy Russians could well be improperly induced to punish Mr. Wolfson based on irrelevant views about foreign policy matters that have dominated U.S. media coverage since 2022.

### D. The Proposed Testimony Is Prejudicial Because the Government Experts Attempt to Imply Criminality Despite Conceding Numerous Lawful Purposes

The proposed testimony is also unduly prejudicial because, notwithstanding the government's intention to use certain lawful behaviors as proof of illegal sanctions evasion, the experts concede that these very activities are frequently undertaken for myriad other reasons. There is nothing unlawful about conducting personal transactions like real estate deals through special-purpose corporate entities or having complex ownership structures. High-net-worth individuals do so all the time for lawful purposes like tax planning, asset protection, limitations on liability, privacy, and other reasons. Indeed, the government's proposed experts concede that every category of activity they describe can also be consistent with tax-motivated transactions, avoiding publicity "regarding wealth held abroad," or protecting against "issues relating to potential corporate raids, including the potential seizure of assets by the Russian government or politically-connected individuals should an oligarch fall out of favor." Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to Expert Witness Dr. Louise Shelley at 3; Attachment to Ex. 1: Disclosure as to Expert Witness Robert Hanratty at 2. Yet the entire purpose of the experts' proposed testimony is for the jury to select sanctions evasion as the basis for the activities in question or, at a minimum, to infer that certain activities are unseemly or suspicious despite all of the other wholly legitimate explanations for them. Given the exceptionally weak basis for the

government's proposed inference, the probative value of the expert testimony on this score is almost nonexistent. By contrast, the risk that the jury will draw negative and unsupported conclusions from the testimony is very high and creates a clear risk of undue prejudice to Mr. Wolfson.

Contrast the government's proposed expert testimony with the type of evidence that courts in this Circuit actually allow experts to testify about. For example, in narcotics cases, experts may testify that individuals apprehended with illicit drugs who are not carrying electronic devices might be couriers due to the clear nexus to unlawful conduct. *See, e.g.*, *United States v. Miller*, No. 18-CR-202 (ARR), 2018 WL 5729738, at *3 n.4 (E.D.N.Y. Nov. 2, 2018) ("However, if carrying no device is a method that couriers use to protect co-conspirators, and an individual caught with drugs is carrying no device, it is more likely that that individual is trying to protect a co-conspirator, which makes it more likely that that individual has knowledge of wrongdoing."). In contrast, it's improper to infer courier activity from normal, lawful characteristics, such as an individual's lack of criminal history or the legal right to travel within the United States. *See id.* at *2 ("In this case, the defendant has no criminal history and possesses a green card. Thus, it appears that the government intends to elicit expert testimony that drug couriers routinely have no criminal record and the legal right to travel, and then argue that the defendant is guilty because she has no criminal record and the legal right to travel. This is precisely the type of expert testimony that the Second Circuit prohibited in *Castillo* and *Cruz*.") (internal citations omitted). Given the abundance of lawful explanations for the conduct at issue in the proposed expert reports here, the government's approach in this case closely tracks the rejected attempt in *Miller* to use normal, non-sinister facts to create a prejudicial inference of illicit activity.

13

## II. Testimony from Mr. Santos Would Invade the Province of the Court

Mr. Santos should be prohibited from testifying because it is the province of the Court, not expert witnesses, to instruct the jury on the law. The government says that Mr. Santos would offer testimony about "how a sanction program works," including "prohibitions, exemptions, and licenses." Rybicki Decl. ¶ 3, Ex. 1, Attachment to Ex. 1: Disclosure as to OFAC Expert Witness at 2. He would also describe "trade sanctions laws and regulations," including IEEPA and related executive orders. *Id.* And he would "explain how the Russia sanction program includes prohibitions against transactions conducted by U.S. persons, or occurring in the United States, if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the property or interests in property of an entity or individual listed on the [sanctions] list." *Id.* at 3. This would include informing the jury that "[p]roperty and interests in property of an entity that is fifty percent or more owned, individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked are also blocked." *Id.* Finally, he would testify about the law regarding provision of goods and services to sanctioned individuals and about how sanctions evasion is unlawful. *Id.*

Each of these subjects is an unwarranted intrusion into the exclusive role of the Court to instruct the jury on legal matters. *See, e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) ("Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury."). Indeed, an expert's view regarding the "construal of the law OFAC enforces" is a classic example of impermissible testimony. *United States v. Banki*, No. S1 10 CR. 08 (JFK), 2010 WL 1875690, at *3 (S.D.N.Y. May 10, 2010). The "proper interpretation" of sanctions law is to be "decided solely by the Court," and testimony regarding such matters has "no bearing on any factual matter before the

14

jury." *Id.* ("It is not for the jury to decide what the [regulation] means and whether its language requires or simply permits transfers by U.S. banks; instead, the jury's task is only to determine whether Defendant's alleged conduct violates the law as laid out by the Court.").

The proposed testimony is particularly improper where, as here, there are key legal issues that are "hotly contested." *Id.* A portion of Mr. Wolfson's defense will turn on the proper interpretation of federal law as applied to entities that are not owned by sanctioned persons. The government's theory is that Mr. Wolfson is liable notwithstanding the fact that the owner of the entity he paid in 2019 was not sanctioned. However, the government concedes that it lacks any evidence that a sanctioned person even received any funds. Allowing an expert to weigh in on the proper interpretation of sanctions laws in this context would usurp the rule of the Court.

The only conceivable relevant testimony from Mr. Santos relates to the fact that Mr. Wolfson did not have an OFAC license to engage in a transaction with a sanctioned party, to which Mr. Wolfson would stipulate at the appropriate junction. To be sure, he did not engage in a transaction with a sanctioned party so there was no need for a license.

### III. Request for *Daubert* Hearing

If the Court is not inclined to preclude the government's proposed experts based on the arguments raised in this motion *in limine*, Mr. Wolfson respectfully requests a pre-trial *Daubert* hearing.

## CONCLUSION

For the foregoing reasons, Mr. Wolfson respectfully requests that the Court grant his motion *in limine* to exclude the testimony of the government's proposed expert witnesses.

Dated: March 28, 2025

Respectfully submitted,

*/s/ David C. Rybicki*
David C. Rybicki
Michael C. Harper
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100
David.Rybicki@klgates.com
*Counsel for Defendant Vadim Wolfson*