SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ILYA YUROV,

        Plaintiff,

—against—

OTKRITIE HOLDING JSC,
VADIM BELYAEV and
RUBEN AGANBEGYAN,

        Defendants.

Index No.: 656788/2016
Motion Seq.: 001

### AFFIRMATION OF VADIM BELYAEV

Vadim Belyaev, hereby affirms this 24th day of February 2017 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the following is true, and I understand that this document may be filed in an action or proceeding in a court of law.

1. I am the founder, President, Chairman of the Board of Directors and the largest shareholder of Otkritie Holding JSC ("Otkritie Holding"), a Russian legal entity.

2. I submit this affirmation in support of the defendants' motion to dismiss the case. The statements in this affirmation are based on my personal knowledge and the exhibits are true and correct copies of the originals.

**Otkritie Holding**

3. Otkritie Holding is incorporated and headquartered in Russia, and is the ultimate parent of a group of financial services companies. The Otkritie group of companies is engaged

in commercial banking, global markets and investment banking, brokerage services, asset management, and mergers and acquisitions. The primary business activities of the group are in Russia, where the Otkritie group banks have 600 branches.

4. Otkritie Holding itself does not have any employees in the United States, conduct any business activities in the United States, or have an address there of any kind. The firm has one, indirect subsidiary in the United States (discussed below), but that subsidiary employs only four people and is a very minor part of Otkritie's business.

**The Plaintiff's Allegations**

5. I have reviewed the complaint in this case, in which the plaintiff, Ilya Yurov, accuses me and others of failing to honor an oral promise to pay a $50 million fee for efforts by him and by two other shareholders of National Bank Trust ("NBT") to facilitate Otkritie Holding's takeover of NBT. These allegations are categorically false.

6. By way of background, an important part of Otkritie's business over the years has been taking over distressed banks in cooperation with the Central Bank's Deposit Insurance Agency. One of the banks Otkritie took over via this process was NBT, in December 2014.

7. At the time, NBT had massive liabilities; the capital had been eroded; it was essentially bankrupt; and its shares were thus worthless. It would make no business sense at all for Otkritie to offer $50 million (or indeed any sizeable sum) for the assistance of NBT's shareholders in helping Otkritie take over a bank that was about to collapse and had negative assets. We never made any such offer.

8. Following the takeover, Otkritie discovered widespread wrongdoing by Mr. Yurov and by the two former NBT Shareholders referenced in Mr. Yurov's complaint as having been part of the alleged agreement, Nikolay Fetisov and Sergey Belyaev (who is not related to

me) (collectively, the "NBT Shareholders"). They used NBT funds to make improper loans to companies they owned or controlled in amounts approaching $1 billion.

9. NBT has pursued the NBT Shareholders (and others) in litigation in England for this misconduct, and, in February 2016, obtained a worldwide freezing order on their assets, of up to approximately $830 million. The amount represents the balance owed by companies owned or controlled by the NBT Shareholders. In denying Mr. Yurov's application to discharge the freezing order, the judge in the English proceeding remarked that the NBT Shareholders' use of so-called "balance sheet management" was, in reality, a "Ponzi scheme with a fancy name."

10. Mr. Yurov has raised in those proceedings the same allegations that he raises here about an alleged promise of a $50 million fee (though these allegations are not raised as a formal claim in the case). I submitted a sworn statement in the case, attached hereto as Exhibit 1, in which I explain in further detail why the allegations are false.

11. Criminal proceedings have since been instituted in Russia against the NBT Shareholders over the misconduct referenced above. Mr. Yurov and Mr. Fetisov fled to London, and Sergey Belyaev fled to the United States, presumably to avoid these charges.

**Connections to New York**

12. While I am confident that Mr. Yurov's allegations would be proven false in court, I do not believe I should be forced to defend this lawsuit in New York, and have never agreed to do so.

13. I am a Russian and Cypriot citizen and I live in London. I travel to New York from time to time for business or personal reasons, but not with any regularity. I do not have an office in the United States or a residence there. There is a work station at Otkritie Capital U.S. Inc. that is made available to me when I am in their offices. As mentioned in the complaint, my

ex-wife and children live in a house in Westchester County, and, through a trust, I am the beneficial owner of the house. When I travel to the New York area, I often stay there to spend time with my children, but I do not live there, nor do I stay there for any extended periods. It would be a substantial hardship to travel back and forth to the United States to attend court proceedings and otherwise to defend this lawsuit.

14. It would also appear to make little sense for the litigation to proceed in the United States. The events described in the complaint, and in my attached sworn statement, relating to NBT and Mr. Yurov have little or no connection to the United States. All of the meetings and discussions with Mr. Yurov took place elsewhere, with the exception of one brief meeting between us in January 2015 at a New York hotel. We met there because I happened to be vacationing in New York at the time.

15. My recollection of the meeting is set forth in the witness statement in the English case. (Ex. 1 ¶ 20.) The meeting was brief, and had no particular significance to the overall sequence of events. In sum, I repeated to Mr. Yurov at that meeting what I had told him before — namely, that it was premature to agree on any payment.

16. It would also appear to me to be very impractical to litigate the case in the United States. The documents relating to the financial rehabilitation of NBT, and our discussions (including text and email messages with Mr. Yurov relating to that transaction) were primarily in Russian, not English, and so, as I understand it, would have to be translated if used as evidence in this case. As far as I am aware, none of the witnesses to the events lives in the United States, with the possible exception of Sergey Belyaev. He lives in the United States, but, as far as I am aware, had little to do with the sequence of events alleged in this lawsuit.

17. I am aware of no reason why Mr. Yurov cannot bring his claims in Russia. I understand that he contends there are "baseless" criminal charges pending against him in Russia, but I do not understand why I should be forced to defend the case in a faraway jurisdiction simply because he has apparently chosen to flee justice in Russia.

18. He could also perhaps attempt to bring his claims in England, where at least he and I live, and where there is ongoing litigation in which he has already raised these same allegations. Presumably, he does not want to sue there because the judge's rulings so far would make it difficult for him to claim, as he does here, that the accusations against him are "baseless." I do not believe I should be forced to litigate in a faraway jurisdiction just because Mr. Yurov would prefer to avoid a jurisdiction in which he is already faring poorly.

**Otkritie Capital U.S. Inc.**

19. I understand that Mr. Yurov has attempted to serve this lawsuit by leaving copies with Jeffrey Weichsel of Otkritie Capital U.S. Inc. ("Otkritie Capital") in New York, even though Mr. Weichsel is not authorized to accept legal papers for Otkritie Holding or for me.

20. Otkritie Capital is an indirect subsidiary of Otkritie Holding, and it is in the business of executing trading orders on behalf of clients. It is an SEC-registered broker-dealer.

21. The day-to-day business of Otkritie Capital is run by Mr. Weichsel, the Chief Compliance Officer and the Director of Fixed Income, and by Patrick Dangelo, the Director of Equity Sales & Trading. Neither of them has any role with Otkritie Holding, and no one with Otkritie Holding directs or controls the business of Otkritie Capital. Otkritie Capital generates its own trading revenues and does not depend on Otkritie Holding to fund its day-to-day operations.

22. I serve as the Director of International Public Relations for Otkritie Capital, but this is a very secondary role for me within the Otkritie group and I perform that function almost exclusively from outside the United States. As mentioned, I do not work from New York with any regularity.

23. Mr. Yurov's complaint alleges that Otkritie Capital "pays salaries and expenses for persons nominally employed by other companies of the Group worldwide." That is false. Otkritie Capital pays the salaries of its employees, not others. In addition, Otkritie Capital maintains its own separate bank accounts, holds regular board meetings and otherwise observes proper corporate formalities.

_____
Vadim Belyaev