P63LKOSC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4             v.                        24 Cr. 91 (GHW)

5  VADIM WOLFSON and GANNON BOND,

6             Defendants.

7  ------------------------------x      Conference

8                                       New York, N.Y.
                                        June 3, 2025
9                                       10:00 a.m.

10
   Before:
11
                    HON. GREGORY H. WOODS,
12
                                        District Judge
13

14                      APPEARANCES

15  JAY CLAYTON
         United States Attorney for the
16       Southern District of New York
    EMILY S. DEININGER
17  DAVID R. FELTON
    ALEXANDRA ROTHMAN
18       Assistant United States Attorneys

19  K&L GATES, LLP
         Attorneys for Defendant Wolfson
20  DAVID RYBICKI
    ROBERT SILVERBLATT
21  MICHAEL HARPER
    ANNA L'HOMMEDIEU
22
    JAMES KOUSOUROS
23       Attorney for Defendant Bond

24

25

P63LKOSC

1      MS. DEININGER:  Good morning, your Honor.  Emily

2  Deininger on behalf of the government.  I am joined at counsel

3  table by my colleagues, David Felton and Alexandra Rothman, and

4  two paralegals from our office, Angelica Cotto and Connor

5  O'Rourke.

6      THE COURT:  Thank you.

7      MR. RYBICKI:  Good morning, your Honor.  David Rybicki

8  for Vadim Wolfson.  I am joined by my colleagues, Rob

9  Silverblatt, Michael Harper, and Anna L'Hommedieu.

10     THE COURT:  Good.  Thank you.

11     MR. KOUSOUROS:  Good morning, sir.  James Kousouros.

12 I am here on behalf of Gannon Bond with our paralegal, Emma

13 Cole.  Mr. Bond is present and seated to our left.

14     THE COURT:  Thank you.  First, thank you all for being

15 here.  We have an extended agenda for topics for discussion

16 during the course of today's proceeding.  Let me begin with an

17 overview of the topics that I would like to touch on during the

18 course of today's conference.  Please let me know if there is

19 anything else that you would like for me to add to the agenda.

20 Again, it's comprehensive, I hope, but I am happy to hear from

21 you if there is anything that you would like me to add.

22     Let me tell you what I hope to cover today.  First we

23 need to talk about scheduling issues.  Then I want to spend

24 some time talking about trial logistics.  We will talk about

25 the jury selection process, my process with respect to jury

P63LKOSC

charges and the charging process.  I want to give you some

instructions about trial practice generally.  I want to talk

about your witnesses and exhibits.  I want to discuss the

pending motions in limine.  We have the bail review hearing

with respect to Mr. Bond.  We also need to take up the Brady

issues.

　　　　　With respect to the motions in limine, just a brief

note.  I expect to engage in some argument regarding those

issues.  That, I expect, will take some substantial portion of

today's conference as we engage in a discussion to the extent

needed of those motions and as I provide the parties with my

views regarding them.  My proposal at this point is to take up

the decisions on the motions in limine last.  I will leave it

to the defendants and your counsel to let me know if you would

like to excuse the individual defendants for that portion of

the proceeding since I expect that it will be purely legal in

nature.  If the defendants wanted to make an application to

that effect, I would be happy to entertain it.  So that's my

agenda for today's conference.

　　　　　Counsel, is there anything that any of you would like

to add to that agenda before we proceed?  First, counsel for

the government.

　　　　　MS. DEININGER:  Your Honor, I think at some point we

just wanted to put on the record where the status of plea

discussions was.  We can do that now or at a later time of your

1    liking.

2            THE COURT:  Thank you.  Fine.

3            Counsel for each defendant.  First, counsel for

4    Mr. Wolfson.

5            MR. RYBICKI:  Yes, your Honor.  Our assumption is that

6    the scheduling portion of the agenda will address the flagrant

7    disregard hearing in addition to trial adjournment.

8            THE COURT:  Thank you.  Yes.

9            Counsel for Mr. Bond.

10           MR. KOUSOUROS:  Thank you, your Honor.  James

11   Kousouros.  The only outstanding issue, and I think that that

12   will be subsumed by your agenda, but we have Rule 15

13   depositions that were taken, so we will also need to establish

14   a schedule for motions concerning the designations that the

15   parties have made.

16           THE COURT:  Good.  Thank you.  I appreciate that.

17           So I will take up the question of scheduling for the

18   suppression hearing.  That's part of my agenda.  I do want to

19   talk about deposition designations, counter-designations, and

20   the like.  That was not on my agenda, so I will take that up

21   when we talk about the parties' witnesses.

22           Let me hear from counsel for the government if there

23   is anything that you would like to put on the record regarding

24   the status of any discussions before we proceed.

25           MS. DEININGER:  You are referencing plea discussions,

1    your Honor; is that correct?

2              THE COURT:  I am referring to your comment.

3              MS. DEININGER:  OK.  Yes.  So we have had some

4    discussions with defense counsel.  There have been -- we want

5    to put on the record that there have been no plea offers

6    formally extended.  Earlier last month, on May 8, 2025, we did

7    send out *Pimentel* letters to both attorneys -- sorry, to both

8    defendants that set out the government's position as to what

9    their sentencing guidelines range would be, but there have been

10   no plea offers submitted.

11             We just wanted to confirm on the record that the

12   defendants have received those *Pimentel* letters and have

13   discussed them with their counsel.

14             THE COURT:  OK.  Counsel for each of the defendants,

15   any response?

16             I just note that discussions regarding pleas are

17   entirely matters for the parties, not the Court.  I take no

18   position regarding whether and the extent to which the parties

19   wish to engage in plea discussions and whether parties wish to

20   reach one.  That's outside of my province.  But counsel for the

21   United States has asked that each of the defendant's counsel

22   confirm that they have received those letters.  I will hear

23   from each of the defendant's lawyers if you have a response

24   that you would like to volunteer.  Counsel.

25             MR. RYBICKI:  Yes, your Honor.  Mr. Wolfson's counsel

P63LKOSC

1    has received the letter and we have discussed it with

2    Mr. Wolfson.

3                THE COURT:  Thank you.

4                Counsel for Mr. Bond.

5                MR. KOUSOUROS:  Likewise, your Honor.  We have

6    received the government's letter and discussed it with our

7    client.

8                THE COURT:  Very good.  Thank you.  So with that,

9    let's begin.

10               So I think the principal thing that we need to discuss

11   are scheduling matters.  There are two things that we need to

12   talk about:  First, suppression hearing regarding the issue of

13   assertive flagrant disregard of the requirements of the

14   warrants.  That was the subject of the parties' earlier

15   correspondence and my order earlier or, I should say, late last

16   month.

17               I have received the parties' May 30 letter with

18   respect to the scheduling of an evidentiary hearing on the

19   issue of whether the government flagrantly disregarded the

20   terms of certain search warrants in the case, which is at

21   Docket No. 201.  I understand that the parties are jointly

22   requesting that I conduct the hearing during the week of

23   June 9, so I am happy to do that.

24               I will be happy to schedule a hearing during the

25   course of that week.  I am on trial that week in a civil case.

P63LKOSC

1  As a result, my inclination is to propose that we conduct it on

2  Friday of that week.  That would be the least disruptive for my

3  trial because it will allow me to simply tell those parties

4  that I am not going to sit at trial on the Friday.  So that's

5  my proposal with respect to scheduling that hearing.

6          Let me hear from the parties.  What do you think?

7  Does that work for you?

8          MS. DEININGER:  Your Honor, we obviously want to

9  accommodate the Court's schedule, but unfortunately one of the

10  witnesses that we think would need to testify at this hearing

11  is not available on Thursday or Friday of next week, as we put

12  out in our May 30 letter.  So if earlier in the week does not

13  work, I think, as we said in our letter, we would request that

14  it be scheduled instead for the week of June 16, when trial was

15  going to begin, and we do know that all the parties and

16  witnesses will be available.

17          THE COURT:  Thank you.  I can accommodate that.

18  Assuming that we are going to need to adjourn the trial itself,

19  that week is free.  I would propose that we do it as promptly

20  as practicable, which would put us on the 16th.

21          Counsel for the government, does that work for you?

22          MS. DEININGER:  That does work for us.

23          THE COURT:  Thank you.

24          Counsel for each of the defendants?

25          MR. RYBICKI:  Yes, your Honor.

P63LKOSC

1        THE COURT:  Thank you.

2        Counsel?

3        MR. KOUSOUROS:  Yes, sir.

4        THE COURT:  Very good.  So we are going to conduct a

5   suppression hearing with respect to the issue of alleged

6   flagrant disregard on the 16th of June.  Thank you, counsel,

7   for working to work that through.  If my other trial is not

8   completed by that date, I will do the same thing.  I will just

9   tell them that we will have to adjourn a day and start up on

10  Tuesday.

11       Go ahead, counsel for the government.

12       MS. DEININGER:  I just wanted to note in the context

13  of this that as we are preparing for this evidentiary hearing,

14  the government is also doing a comprehensive review of its

15  compliance with other search warrants in the case, and we

16  expect to be able to provide information to the Court about

17  that in advance of the hearing.

18       THE COURT:  Thank you.  Let me just ask, can you

19  expand on that?  Is there concern that the government is

20  following up on?

21       MS. DEININGER:  We are -- in light of the issues that

22  have been raised, we just -- we are double-checking our

23  compliance with everything.  We do believe -- we are looking

24  into issues regarding whether, among other things, whether

25  there was production of accounts without responsive sets.

P63LKOSC

1          THE COURT:  Thank you.

2          What do you mean by that?

3          MS. DEININGER:  That there were certain e-mail

4  accounts that were obtained pursuant to search warrants that

5  were produced but for which a subset of responsive materials

6  was not specifically identified and produced.

7          THE COURT:  Thank you.  So I appreciate the

8  government's diligence in checking on that.  I very much

9  appreciate that the government is working conscientiously to

10  audit its work, and I applaud those efforts.

11          Let me ask, counsel for the government, to what extent

12  does that affect the schedule that I have just set regarding

13  this issue?

14          So to the extent that that's a process that's ongoing,

15  I want to be mindful of the prospect that the defendants will

16  have other issues that they want to raise with the Court with

17  respect to those issues that may affect how we proceed with

18  this upcoming conference.  Any views?

19          MS. ROTHMAN:  Your Honor, good morning.  This is my

20  first time appearing in this case, but it's nice to see your

21  Honor again.  I can provide a little bit of context as I have,

22  sort of, been taking the lead in reviewing some of the

23  government's prior search warrants that it obtained and

24  reviewed in this case.

25          So to answer the Court's question, how does this

P63LKOSC

1    comprehensive review affect scheduling, I think our intention

2    is to present a fulsome picture of how search warrants were

3    reviewed by various individuals, some of whom were involved, in

4    fact, most of whom were involved in the review of the 2024

5    devices.  So as part of our presentation to the Court as to how

6    that review was conducted, we think it's helpful to provide the

7    Court with broader information about more general review

8    practices.

9         Candidly, having additional time to make sure that we

10   are as fulsome as possible with the Court would be helpful.  I

11   think the date of June 16 is feasible for us to have all of the

12   information to the Court and to defense counsel.  We have made

13   some promises in our letter about date for the production of

14   exhibits and 3500 material.  We can comply with that.  We do

15   want to do a fulsome review and make sure the Court has all the

16   information.  And so that does take some time, but we can

17   accommodate the Court's request to proceed on the 16th of June.

18        THE COURT:  Thank you.  I appreciate that.  Thank you,

19   counsel.

20        I want to make sure that now that we are doing this

21   hearing, that it is productive and efficient.  The parties know

22   that that entire week is free.  My inclination, this being a

23   criminal case, is to proceed with expedition, but from my

24   perspective, if we do it on the Monday versus the Friday, if

25   that would make it better for the parties to be able to present

P63LKOSC

 1    their evidence to the Court in an efficient way, the days don't

 2    make a difference for me.  So if the parties wanted to suggest

 3    that I do it on the following Friday, I would certainly

 4    consider and probably approve that request, but I would want to

 5    hear the parties' views.

 6         So counsel for the government, what's your view?

 7    Should I be looking at the 20th rather than the 16th?  Would

 8    that make a difference?

 9         MS. ROTHMAN:  If the Court can accommodate the 20th, I

10    think the government would appreciate a few additional days to

11    make sure that our review is as fulsome as possible.

12         THE COURT:  And would that change affect in any way

13    the government's commitments to provide the materials in

14    advance of the hearing to the defense?

15         MS. ROTHMAN:  Your Honor, no.  I think we would abide

16    by the dates that we put forth in our letter.  So that would be

17    identifying witnesses, I believe it was a week in advance, and

18    providing 3500 material five days in advance.

19         THE COURT:  Thank you.  Let me hear from --

20         MS. ROTHMAN:  I'm sorry, your Honor; three days in

21    advance.

22         THE COURT:  Thank you.

23         Let me hear from each of the defendant's counsel about

24    that proposed schedule, that is, scheduling the hearing for the

25    20th.  Counsel for Mr. Wolfson.

1      MR. RYBICKI:  Your Honor, we would appreciate, of

2 course, as much lead time as we can to receive whatever audit

3 or report the government is working on right now, and so we

4 don't have an objection in principle to pushing the flagrant

5 disregard hearing to the 20th.

6      I would add that there is also the question of the

7 adjournment of the trial date.

8      THE COURT:  Thank you.  Yes, we will talk about that

9 in just a moment.

10      Counsel for Mr. Bond.

11      MR. KOUSOUROS:  Your Honor, we all have an abiding

12 interest to make sure that this hearing is conducted on -- at

13 that time and without any further delay, so I have no problem

14 with the 20th.

15      What I would respectfully request, though, is that the

16 government either agree or perhaps be directed to turn over

17 these materials.  We had asked for five days, and I think that

18 given what we have heard today, that there is some additional

19 audit that is transpiring that seems to go beyond, I think, if

20 I heard it right, the parameters of the hearing being just that

21 the warrants that are being challenged and the way that they

22 were evaluated, I think that it would be appropriate for us to

23 have those materials earlier than three days so that we can

24 evaluate whether or not there are any issues concerning the

25 admissibility of the presentation, the relevance of the

P63LKOSC

1    presentation.  So that's my only issue.  I have no other

2    problem with the 20th.

3              THE COURT:  Thank you.

4              Counsel for the government, can you give the

5    defendants that information a little bit sooner, given the

6    adjournment?

7              MS. DEININGER:  Your Honor, I think we had already

8    agreed to provide exhibits five days before.  It's only 3500

9    that we were going to produce three days in advance.

10             THE COURT:  Fine.  Thank you.

11             MS. DEININGER:  I expect we will be providing

12   information to the Court more than -- regarding our findings

13   more than three days in advance.

14             THE COURT:  Very good.  Thank you.  Again, I

15   appreciate the government's conscientious review of those

16   materials.  That work is important.  And, again, thank you for

17   doing it.

18             So the hearing with respect to the suppression motion

19   will be held on the 20th of June.

20             Let's talk about the other issue that also affects

21   scheduling.  So there are two issues that affect scheduling

22   here:  One is the need for the Court to resolve this

23   supplemental suppression motion regarding assertive flagrant

24   disregard with the terms of those warrants.  The other issue

25   that I think affects scheduling for trial is the Brady issue

1  that was brought to the Court's attention on the 29th.  The

2  government submitted a response late last night, which I have

3  read.  So I would like to talk a little bit about how I can go

4  about resolving those issues.  So let me hear from the parties.

5          I will say a couple of words first to introduce the

6  conversation.  First, I have not seen the underlying materials,

7  so I expect that I will need to see those materials in order to

8  be able to evaluate whether they constitute *Brady* materials.

9  At this point, I also only have letters from the parties

10 containing the parties' proffers.  I don't have what I will

11 describe as facts.  I accept and have no reason to discredit

12 the parties' proffers regarding the underlying facts, but no

13 party has presented affidavits that contain the facts upon

14 which you would like me to rely on ruling on this set of

15 issues.

16         So my questions for you relate to the process that I

17 should engage in in order to resolve this dispute.  In other

18 words, can I resolve it on the basis of the parties' letters

19 and your proffered facts?  How do you want to get me the

20 underlying materials so that I can make a determination with

21 respect to whether they constitute Brady materials or not?

22         And that leads to the next procedural question, which

23 is, how do we schedule a reply from the defense to the

24 government's submission from last night?

25         Let me hear from each of the parties what you think.

1    I will start with counsel for Mr. Wolfson.  What do you think

2    about those procedural questions?

3              MR. RYBICKI:  Your Honor, as a threshold matter, we

4    would respectfully point out to the Court that we e-mailed

5    chambers a copy of my declaration and the underlying Brady

6    materials under seal.

7              THE COURT:  Thank you.

8              MR. RYBICKI:  So those materials are before the Court.

9              We have also reviewed the government's submission from

10   last night, your Honor.  And in terms of the factual analysis

11   that we believe the Court should undertake here, we believe the

12   letter creates more questions than it answers, candidly.  There

13   is very little factual basis for the Court to analyze, under

14   the *U.S. v. Miranda* rubric, the issues of culpability and

15   prejudice to Mr. Wolfson.  The prejudice side of that analysis

16   is something we believe is the province of the Court, however,

17   the culpability side of that analysis, we do not believe there

18   is a sufficient factual record for the Court to make a

19   determination at this point.

20             We leave it to the discretion of the Court with

21   respect to fact-gathering, whether that would entail a hearing

22   or additional submissions from the government, but the

23   unsupported representations made by the government in the

24   letter we believe create numerous fact issues that the Court

25   needs to explore in order to make a determination in terms of

P63LKOSC

1    the culpability portion of the analysis under *Miranda*.

2              THE COURT:  Thank you.

3              Counsel for Mr. Bond, anything else before I turn to

4    the United States?

5              MR. KOUSOUROS:  No, your Honor.  I agree that there is

6    additional information that does need to be set forth.

7              THE COURT:  Thank you.

8              Counsel for the government, how do you respond?

9              MS. DEININGER:  Your Honor, my understanding going

10   into this today is that there were not any disputes of fact

11   regarding how the materials were received or produced that

12   would require an evidentiary hearing.

13             THE COURT:  Let me just pause you.  I apologize.  I

14   don't know that the question now is whether or not there needs

15   to be an evidentiary hearing.  I think the question in the

16   first instance -- and the defense, I am sure, will reserve

17   their rights to request one.  The first-level question is

18   whether I can accept just on face value the proffers in the

19   government's letter without a factual background through a

20   declaration from one or more people involved.

21             MS. DEININGER:  And I'm sorry.  What I was getting to

22   was that prior to hearing defense counsel speak, my

23   understanding was that we did not have any disputes of fact, in

24   which case I was going to submit that the proffered submissions

25   were more than sufficient for your Honor to rule, especially

P63LKOSC

 1   because our understanding is also that you have the underlying

 2   materials under seal.

 3        I hear from defense counsel that they have factual

 4   questions.  I think it would help if we had some clarity as to

 5   what those are because the government is certainly prepared to

 6   put in an affidavit that sets forth the facts proffered in our

 7   letter and is consistent with that.  If there are other issues

 8   that an affidavit should address, it would be helpful to have

 9   some clarity on those in advance so that we can make sure we

10   are adequately putting the necessary information in front of

11   your Honor for a decision.

12        THE COURT:  Fine.  Let me propose this:  I think I

13   would like to give the parties the opportunity to talk about

14   the issues that counsel for Defendant has just raised regarding

15   the letter.  It came to us relatively late in the evening last

16   night, so I appreciate that the parties may not have had the

17   opportunity to meet and confer to discuss it and the issues

18   that the government has presented.  So in other words, this may

19   be the first time that the parties have had the opportunity to

20   talk about these issues.

21        My inclination is to ask the parties to discuss this

22   topic, to set a date by which any supplemental submissions that

23   the government wishes to present to the Court in support of

24   their opposition be provided to the Court, and then to set a

25   date for any potential reply with respect to these issues.

1   That would give the parties the opportunity to ventilate any

2   issues, allow the government to present the factual record upon

3   which they want the Court to rely, and then give the defense

4   the opportunity to submit a reply to that supplemental

5   submission.

6           That's my proposal.  Let me hear from each of the

7   parties about what you think regarding that potential approach,

8   starting here with counsel for the government.

9           MS. DEININGER:  Yes, your Honor.  We are happy to meet

10  and confer with defense counsel regarding those issues.

11          THE COURT:  Thank you.  And assuming that a

12  supplemental submission is warranted here, by when would the

13  government be able to present it to the Court?

14          MS. DEININGER:  Since we do need to meet and confer

15  with Defendants first, at this point I would propose submitting

16  it to the Court in a week, which would give us, probably, you

17  know, three to five days after meeting and conferring with them

18  to prepare it and submit it.

19          THE COURT:  That's fine.  So your supplemental -- any

20  supplemental submission by the United States in opposition to

21  this Brady request by the defendants is due a week from today.

22  To the extent that there is a reply from the defense, it would

23  be due the subsequent Monday.

24          So let's talk about the schedule of the trial.  Now, I

25  don't know whether or not these materials are *Brady* or if there

1    is a Brady violation that requires the imposition of a

2    sanction.  The potential cure for any Brady violation, to the

3    extent that there is one, however, or a potential cure for any

4    potential *Brady* violation, however, is an adjournment of the

5    trial.

6            So we have two factors that weigh on me as we talk

7    about the trial schedule.  First is the extent to which an

8    adjournment would permit the parties to prepare for trial with

9    the consequences of my decision on the suppression hearing in

10   hand, and two is the possibility, the prospect that an

11   adjournment will also work to cure potential prejudice as a

12   result of a potential finding of a *Brady* violation.  So those

13   are the two things that weigh on me.  The parties have agreed

14   that a 30-day adjournment is appropriate.  The government has

15   suggested an adjournment to August 11, 2025.  I am happy to set

16   a schedule that works well for all of the parties.  So let's

17   begin a discussion of this.

18           I appreciate that the government has a scheduling

19   issue that would have us adjourn until August 11.  I have

20   schedule issues, but I will change them in order to accommodate

21   a trial during the course of August, as my scheduling issues

22   just take a back seat to the needs of the parties.  So I am

23   happy to try to set a trial date starting in mid August.  I

24   also have, basically, the month of September free.

25           As I get into this, let me just confirm, counsel.  I

P63LKOSC

1   have set aside five weeks for this trial.  In the proposed voir

2   dire questions, the parties have suggested that less time is

3   needed.  Can I just first confirm your views about the

4   anticipated duration of trial, as that will help us work to set

5   an appropriate date for the rescheduled trial.

6          Counsel for the government, do you have a more, I will

7   call it, focused view of how long the trial will last that I

8   should take into account here?

9          MS. DEININGER:  I think our position remains that,

10  especially given the anticipated length of cross-examination of

11  the two defendants, we expect the government's case in chief to

12  be two weeks.  I think we had previously held five weeks in

13  part because there were several holidays that could have fallen

14  within the trial schedule, including July 4 and Juneteenth.  So

15  if we are in a period with less court holidays -- obviously, we

16  have to hear from defense counsel, and I do understand they are

17  both planning on putting on a defense case and have submitted

18  witness lists, but I think in our view, four weeks would be

19  sufficient to hold.

20         THE COURT:  Thank you.  So I will work with four weeks

21  as our schedule.

22         So I think that the real question for me here is,

23  because of the government's unavailability until August 11, I

24  would not propose to start until then.  I am willing to start

25  then.  I would prefer to start in September, but again, I will

P63LKOSC

1    put my personal schedule on the back seat to give the parties

2    the opportunity to try this case sooner.  That will also

3    require that I adjourn a civil trial, but this takes precedence

4    over a civil matter.

5           So let me hear the parties' views.  I think that I

6    will say that the bidding is August 11 or September 2.  I will

7    hear from each of the parties about your views about each of

8    those alternative dates, starting with the government.

9           MS. DEININGER:  Your Honor, we are available at the

10   Court's convenience starting on August 11.

11          THE COURT:  Thank you.

12          Counsel for each of the defendants, let me hear from

13   each of you.

14          MR. RYBICKI:  Your Honor, we would prefer to begin the

15   trial as soon as possible.  We prefer a 30-day adjournment.  We

16   understand the Court's position to begin on August 11.  I defer

17   to Mr. Kousouros here because I have conferred with him.  I

18   know he has scheduling issues.  I think those are more

19   important.

20          THE COURT:  Thank you.

21          Counsel for Mr. Bond.

22          MR. KOUSOUROS:  Thank you very much.  I agree with

23   counsel, as early as practicable is when we would like to

24   commence the trial, but we understand.  I have a homicide trial

25   that is scheduled for September 8, and I would be remiss to

P63LKOSC

1   schedule something on top of that.  I have given my word to the

2   Court.  I will say this, though:  If we are on trial here, do

3   not think that it will be a problem, you know, to push that

4   trial a week or two until we are done here.

5           And the only other scheduling issue that I have that I

6   would ask the Court's indulgence, if we are on trial on

7   September 4, I have a hearing that is on a 440 motion where the

8   defendant has been in prison for many, many years, and he is

9   being brought down from his facility.  That was scheduled a

10  long time ago.  It's a one-day hearing, but I would only ask

11  that if we are still on trial on the 4th, that I be permitted

12  to conduct that hearing.

13          THE COURT:  Thank you.  That's fine.  I think that is

14  consensus.  This is something that I can make work, which would

15  be that we would start on the 11th and run through beginning of

16  September.  And I am happy to accommodate the hearing on the

17  4th.  That will straddle the Labor Day holiday, potentially,

18  should we take up that much time with the trial.  But I think

19  that we have little choice here.  So let's plan to start for

20  August 11.

21          Counsel, does that work for each of you?  Counsel

22  first for the government.

23          MS. DEININGER:  Yes, your Honor.

24          THE COURT:  Thank you.

25          Counsel for Mr. Wolfson?

1          MR. RYBICKI:  Yes, your Honor.

2          THE COURT:  Thank you.

3          Counsel for Mr. Bond?

4          MR. KOUSOUROS:  Yes, sir.

5          THE COURT:  Very good.  So we will adjourn the trial

6     date through August 11.

7          Counsel, is there any objection to the exclusion of

8     time through that date?  Counsel first for Mr. Wolfson.

9          MR. RYBICKI:  No objection, your Honor.

10         THE COURT:  Thank you.

11         Counsel for Mr. Bond?

12         MR. KOUSOUROS:  Nor from us.

13         THE COURT:  I am going to exclude time from today

14    until August 11, 2025, after balancing the factors specified in

15    18 U.S.C. Section 3161(h)(7).  I find that the ends of justice

16    served by excluding such time outweigh the best interest of the

17    public and each of the defendants in a speedy trial because it

18    allows time for the parties to continue to litigate these

19    anticipated motions, to allow the parties to prepare for trial.

20         Good.  So let's talk about trial scheduling.  We now

21    have a date for each of these matters.  Let's talk about each

22    of the trial days.  I am going to spend a little bit of time

23    talking now about logistics just so that you know how each of

24    the trial days is going to be scheduled.  The trial day is

25    going to start at 9:00 a.m. each day, including the first day.

1    I don't know when our panel is going to arrive.  I have done a

2    few trials in August.  There isn't usually much competition,

3    but even so, our panel may not arrive until 10:00 o'clock or so

4    on the first day.  We will use the time early in the day to

5    discuss any outstanding issues before the venire arrives.

6         Every day, we are going to begin at 9:00 a.m.  You

7    should be here before that so that we can begin on time.  I

8    will take the bench at 9:00 a.m. or as close to it as I can

9    get.  We will use the window from 9:00 a.m. to 9:15 a.m. or so

10   to discuss any outstanding issues that you anticipate for the

11   day ahead.  Testimony will begin as soon as we can after

12   9:15 a.m., but you should expect that in no event will we start

13   any later than 9:30.  My plan is to ask the jury to arrive at

14   9:00 a.m.  I will tell them that I expect for the testimony to

15   begin at approximately 9:15 a.m.  I will tell them that if we

16   are ready to go before that, then we will start before that.

17        We take a short lunch break in this courtroom

18   relatively early, so around 11:30, sometime around noon.  It's

19   an early lunch break.  It is a short lunch break.  If we stop

20   at 11:30, I will try to recommence testimony promptly at noon.

21   You should make arrangements so that you can eat during that

22   half hour window.  The trial day will continue until no later

23   than 4:00 p.m. every day after the first day.  Expect that we

24   will work until at least 5:00 p.m. on the first day as we

25   select our jury.  I expect to tell the jury that I will try to

1    excuse them by 3:45 on days after the first day, but in any

2    event, that they won't be excused later than 4:00 p.m.  We will

3    take a short lunch break in the afternoon.

4          Now, as I said earlier, during that window between

5    9:00 a.m. and 9:15 when testimony begins, we should use the

6    opportunity to discuss any evidentiary issues that you

7    anticipate coming up during the course of the trial day.  You

8    should confer regarding the exhibits that you anticipate you

9    will be introducing into evidence on any trial day, and try to

10   anticipate, to the extent possible, any objections.  You should

11   raise any such objections with me before the jury is brought in

12   for the day.  My hope and expectation is that we will discuss

13   any such issues, to the extent that we can, outside of the

14   hearing of the jury so that we can use their time as

15   efficiently as possible.

16         I know that all of you are aware of the process to

17   obtain electronic device orders.  You have been doing it

18   already.  Please just keep in mind that that is required and

19   that you should make applications promptly prior to the trial.

20         You can see what audiovisual equipment is available

21   here in this courtroom.  You should make arrangements with

22   Ms. Adolphe to make any additional equipment that you may need

23   available at trial.  I don't know what that might be, but if

24   there is, you should make arrangements with Ms. Adolphe to make

25   it available before the trial.  I also recommend strongly that

P63LKOSC

1    you or a member of your team who is going to be running the hot

2    seat come in to test the technology before the trial date.  I

3    don't want the jury to see you struggling with the technology.

4    Ms. Adolphe can help arrange for a technology walk-through to

5    practice using the courtroom's systems.

6              Counsel, let me hear from each of you.  Do any of the

7    witnesses here require the services of an interpreter?

8              Counsel first for the government.

9              MS. DEININGER:  No, your Honor.  We are not expecting

10   any witnesses that require an interpreter at this time.

11             THE COURT:  Thank you.

12             Counsel for each of the defendants.

13             MR. RYBICKI:  The same for Mr. Wolfson, your Honor.

14             THE COURT:  Thank you.

15             Counsel.

16             MR. KOUSOUROS:  The same for us as well, sir.

17             THE COURT:  Thank you.  If that should change, please

18   work with -- let the interpreter's office know promptly.  It

19   can take time to arrange for an interpreter, especially in the

20   languages for which I understand that we may potentially

21   anticipate foreign language testimony, Russian or Greek.  That

22   can just take some time.  And so if your position changes and

23   you think that we need foreign language interpretation in one

24   of those languages, please make arrangements early so that the

25   interpreter's office can obtain an interpreter promptly.

1        So let me talk a little bit about the jury selection

2   process here.  I use the struck panel method.  Let me just

3   briefly describe how that works, although you likely all know.

4   We are going to select 32 people at random for the box.  We

5   will fit as many of them as we can in the jury box, in order,

6   starting with Juror No. 1, who will be seated in the first seat

7   in the jury box.

8        What I am going to do then is I am going to ask the

9   jurors the voir dire questions.  We are going to hand them to

10  you in a moment.  You will see that each of the questions has

11  been formulated such that if a question requires some follow-up

12  from the prospective juror, they will respond "Yes" to that

13  question.  That's the way I have tried to formulate the

14  questions.  I am going to read all of the questions to Juror

15  No. 1 out loud.  After Juror No. 1, I am simply going to ask

16  each subsequent juror whether they had a yes answer to any of

17  the questions.  They will have a physical copy of the voir dire

18  questions and will be directed to simply circle the number of

19  any question for which their answer is yes.

20       So my process is to determine whether or not there is

21  a good faith basis to strike a juror for cause during the

22  course of that process.  If a particular juror is struck for

23  cause, I will immediately call somebody from the panel to

24  replace her, and then I will ask her if she had any yes answers

25  to any of the questions.  My hope is that by the time we get to

P63LKOSC

1    the jury questionnaire, which asks personal information about

2    the prospective jurors, you will know the group of 32

3    prospective jurors against whom you will be exercising your

4    peremptory challenges so that you can do that with full

5    knowledge, the full composition of the panel.

6            Now, when the venire arrives, I am going to give them

7    a short introduction to the jury selection process.  That

8    overview will include a very short description of the case to

9    give them a sense of the nature of the case.  My goal is to

10   provide the members of the venire with a neutral description of

11   the case that no party finds at all objectionable.  I have

12   prepared a proposed case squib, which is based in part on what

13   the parties presented to me.  I am going to have that provided

14   to you now.  That, you should give me any comments on that no

15   later than, let's call it, a week from today.

16           I have also drafted a set of voir dire questions that

17   I would intend to ask at jury selection.  We will also hand

18   that to you now.  You should give me comments on these voir

19   dire questions as well.  Understand, as you do, that I have

20   already made conscious decisions about all of your proposed

21   questions.  Any such comments should also be submitted to me in

22   a joint letter no later than a week from today.  Now, you will

23   see that the information in this set of voir dire questions is

24   formulated with the expectation that the trial would be

25   starting on -- when scheduled.  That question we will obviously

P63LKOSC

1   need to rewrite.  You will see my other brackets where I have

2   asked -- I am asking the parties for specific responses.

3          Now, while I will be asking the questions during the

4   course of voir dire, each of the parties will have the

5   opportunity to suggest additional questions of me from

6   prospective jurors.  If I don't affirmatively ask for any

7   additional questions, you should please let me just know that

8   you have follow-up questions.  If you do have follow-up

9   questions, please just let me know.  The thing that I ask you

10  to do, however, is that you let me know privately.  So come to

11  me at sidebar or otherwise so that we can make an assessment of

12  the proposed question and so that I can ask it, if appropriate.

13  Don't blurt it out in front of the entire venire or the

14  prospective juror.  I will give you the opportunity, if you

15  wish, to request additional questions, but please do so in a

16  way that the prospective juror cannot hear it until after I and

17  your adversary has had the opportunity to hear and comment on

18  the prospective additional question.

19         Now, after the jury selection process has been

20  completed, during my introductory remarks about the trial

21  process, I expect to provide the jurors with some basic

22  instructions about the trial process, the role of the Court,

23  the parties, and the jury, as well as a brief description of

24  the burden of proof.  As part of those introductory remarks, I

25  am going to read the prospective jurors an overview of the law.

1    I have reviewed the parties' joint proposal, and based on it, I

2    have prepared a proposed description of the law, which I also

3    am going to have handed to you.  Also, give me any comments on

4    this no later than a week from today.

5         Now, I expect to have the charging conference during

6    the trial.  My goal is to have a working draft of the charges

7    that I will have considered prior to trial.  I adjust them as

8    appropriate during the course of the trial.  Then we will hold

9    a charging conference, as you know, sometime prior to closing

10   statements.  My goal is to send you all a draft of the proposed

11   charges basically as soon as I have a draft ready for your

12   review.  Given the adjournment of the trial, that may be well

13   before the trial at this point.

14        So my goal is going to be to provide you with a draft

15   of the charges as soon as I have a draft ready for your review.

16   Again, at this point I hope that that will be before the trial

17   begins.  What that means for you is that you should be prepared

18   at any point after the first day of trial for us to have our

19   charging conference.  If you have the charges before trial, I

20   will take advantage of any afternoon that we have free to try

21   to get that work done, as much as we can.  There are going to

22   be things that will have to be undetermined; whether the

23   defendants testify or not.  Those are questions that will have

24   to remain open until the defendants choose whether or not to do

25   so.  But I will include alternative charges for each of those

P63LKOSC

1    options in the proposed charge.  You can look at the language

2    and make comments on it for each alternative.  From my

3    perspective, it's just easier to cut things that are

4    preapproved rather than draft things in the midst of trial.  So

5    be ready for a charging conference at any point after the first

6    day of trial.

7            So I am not going to talk in depth about the charges

8    now.  I do have a couple of questions about the charges just

9    briefly.  Don't take from the fact that I am talking about

10   these issues that I think that they are the most important

11   issues.  They are just things that I thought I could benefit

12   from hearing from you about since we are here.

13           So let me start with the overt act requirement for the

14   conspiracy offense.  Defendants, in your proposed charge, you

15   have included an overt act requirement for the conspiracy

16   charge.  You will see in the little description of the law that

17   I handed to you, I did not include one.  Can I hear from you?

18   Why do you think that an overt act is required in this context,

19   given that the statute contains specific language regarding a

20   conspiracy offense?

21           MR. SILVERBLATT:  Good morning, your Honor.  Rob

22   Silverblatt on behalf of Mr. Wolfson.  There does not appear to

23   be settled case law on this specific question as to whether an

24   overt act is required in this context.  We are happy to submit

25   supplemental briefing after we review the Court's proposals to

P63LKOSC

1   determine whether we will continue to request the overt act be

2   included in the instructions.

3           THE COURT:  Thank you.  Your response to the short

4   squib that I sent you -- just had handed to you would be a good

5   opportunity to do so.  I would point you to *United States v.*

6   *Roy* at 783 F. 3d 418, which speaks to this issue.  I also note

7   that the *Atilla* jury instruction that you cite to in support of

8   the overt act requirement expressly states that no overt act is

9   required for the IEEPA conspiracy count, so I would refer you

10  to that.

11          Let me hear from Defendants about the proposal that I

12  include a charge regarding the U.S. nexus requirement for the

13  substantive offenses.  I understand that each of the defendants

14  agree that that element, to the extent that it's a required

15  element, is satisfied here.  Given that, is there any reason

16  why I should include a charge with respect to it?  In other

17  words, since it's agreed that that has been satisfied here, can

18  I omit that, as the government proposes, counsel for

19  Defendants?  First, Mr. Wolfson.

20          MR. SILVERBLATT:  Your Honor, we would be comfortable

21  removing the U.S. nexus.

22          THE COURT:  Thank you.

23          Counsel for Mr. Bond.

24          MR. KOUSOUROS:  Yes, Judge, as would we.

25          THE COURT:  Thank you.  Fine.

1    So counsel for the government, I would like to spend a

2    little bit of time talking with you about the -- I will call it

3    CapitalInvest, and also your construction of the regulation.

4    First, in the defendants' proposed request, in particular

5    Request 11, the defendants contend that the government admits

6    that CapitalInvest was not owned by Kostin or any other blocked

7    person.

8        How do you respond to that characterization of the

9    government's theory?  Is that a fact that is admitted, in other

10   words, that CapitalInvest was not itself a blocked entity?

11   Counsel for the government, just to help me understand what to

12   do with the charge.

13       MS. DEININGER:  Your Honor, I don't think that is

14   wholly accurate, in that we are not asserting that

15   CapitalInvest was itself a blocked entity, but our theory is

16   that CapitalInvest was indirectly controlled, at least in part,

17   by Andrey Kostin, and is nominally owned by Natalia

18   Solozhentseva through other entities.  There is a chain of

19   entities between CapitalInvest and Natalia Solozhentseva, but I

20   don't think that her nominal ownership necessarily ends the

21   question of whether -- of who owns and controls the entity or

22   whether a payment to that entity could have been made

23   indirectly for Kostin's benefit.

24       THE COURT:  Can we talk about the distinction between

25   ownership and control?  Maybe this is the focus of the

P63LKOSC

1  defendants' argument.  OFAC has a FAQ about the issue of

2  control versus ownership, and their FAQ says that OFAC's

3  50 percent rule speaks only to ownership and not to control.

4  What's your view?  If Mr. Kostin does not own but has control

5  over CapitalInvest, can it be blocked?

6          MS. DEININGER:  Your Honor, that's why we are not

7  taking a position that it was a blocked entity.  We are taking

8  the position that he had some control over it and, therefore,

9  payments to CapitalInvest, because they were made indirectly

10  for his benefit, would have violated IEEPA.

11          THE COURT:  Thank you.  So it's for the benefit of him

12  is the proof that the government is going to be trying to

13  establish; in other words, that the payment was for his benefit

14  funneled through CapitalInvest?

15          MS. DEININGER:  Yes, your Honor.

16          THE COURT:  Thank you.  Good.  Understood.

17          So your proposed charge, counsel for the United

18  States, at Request 11 is something I would just like to hear

19  your views on just briefly to help me understand your proposal.

20  The request charge at 11 states, quote, "Any property that

21  Kostin owned, directly or indirectly, or held an interest of at

22  least 50 percent in, qualified as blocked property subject to

23  the prohibitions I just discussed," closed quote.

24          The thing I want to just ask you to do, if you could,

25  is to line that up, to the extent you are prepared to do so

P63LKOSC

1   now -- and if you are not, feel free to demur -- is just to

2   line that language up with the text of the regulation, which I

3   assume you are pointing to 589.303.

4          Is that what you are referring to?  And, if so, how

5   does your proposal tether to the reg?

6          MS. DEININGER:  Your Honor, I think it might help us

7   to take a closer look at this in light of the discussion we are

8   having.  I think our focus in that proposal was on the Aspen

9   house itself, not CapitalInvest.  But regardless, I think -- I

10  have to admit, I don't have a copy of our jury instructions

11  here in front of me, so I think you are right that we were

12  referring to that regulation.  But we can take a look at that,

13  and we can submit that to you with our comments to, like you

14  said, overview of the law.

15         THE COURT:  Thank you.  That would be helpful, if you

16  don't mind.  I would appreciate that, and particularly lining

17  it up with the regulation, and thinking about how it applies in

18  the context of each of the two substantive offenses charged,

19  CapitalInvest and the direct.  Fine.

20         So another part of Request 11 as to which I had a

21  question, counsel for the government, is the language where you

22  say this:  Quote, "Ownership may be established in different

23  ways...Merely holding title to a property absent any of the

24  other factors that indicate ownership, such as possession,

25  dominion, control, or management may not be sufficient to

P63LKOSC

1    establish ownership," closed quote.

2         And on that, the thing that I wanted to ask your

3    position on is about the comment that control -- in particular,

4    the comment that control may not be sufficient to establish

5    ownership in light of the 50 percent role.  In other words, I

6    read that to suggest that control may be sufficient to

7    establish ownership, where it looks as if the regulation may be

8    suggesting that control does not by itself establish ownership.

9    Counsel for the government.

10        MS. DEININGER:  Your Honor, I think I need to take

11   another look back at the sentence.  I think, having heard you

12   read it, I think that the negative "not" that's in that

13   sentence may actually have been inadvertently included.  But

14   again, I think we would appreciate an opportunity to take a

15   careful look back at the sentence.

16        My understanding is that the case law is consistent

17   with -- this is the idea that there can be nominal owners and

18   shell owners that hold assets, kind of, on behalf of other

19   people.  And my understanding is that the case law provides,

20   basically, that regardless of a nominal name on paper, it can

21   be established via indicia of control and dominion and other

22   indicia that someone else is an actual owner.

23        THE COURT:  Thank you.  Good.  I look forward to

24   seeing your additional thoughts.  That would be helpful to me.

25        And one other brief question for the government.  In

1    your venue charge, you have a proposal with respect to

2    Count One that, quote, "You need to find that it is more likely

3    than not that an act in furtherance of the charged conspiracy

4    was committed or caused to be committed in the Southern

5    District of New York by the defendant or coconspirator during

6    the life of the conspiracy," closed quote.

7            Can you comment on that, quote, "caused to be

8    committed," closed quote?

9            MS. DEININGER:  Yes, your Honor.  My understanding is

10   that that is fairly standard in the context of conspiracy case

11   law.  If the -- one of the defendants, for example, instructed

12   someone to do something or to take some act in the Southern

13   District of New York that was in furtherance of the conspiracy,

14   that that would be sufficient for venue purposes.

15           THE COURT:  Thank you.  Good.  So I don't have

16   anything else.

17           Counsel for either defendant, any comment on the

18   questions that I just asked the government before we move on?

19           MR. SILVERBLATT:  Yes, your Honor, just briefly.  Our

20   position is that, particularly in the context of the capital

21   entity's control is not sufficient, we are not entirely sure

22   what the government means by "for the benefit of," but our

23   position is that the government needs to prove receipt of funds

24   by a blocked party Mr. Kostin.

25           THE COURT:  Thank you.

1          Counsel for Mr. Bond.

2          MR. KOUSOUROS:  Your Honor, that has always been our

3     position.  And what I would like the opportunity is, once we

4     get further clarification from the government on the Court's

5     questions, I think that the parties should be able to submit

6     something to you as to this language.

7          THE COURT:  Thank you.  Good.

8          So let's talk a little bit about trial practice.  This

9     is a series of thoughts about trial practice before me in this

10    courtroom.  So first off, with respect to objections, no what I

11    will call speaking or talking objections.  Of course, you need

12    to speak your objection.  You need to talk to do so, but you

13    should do no more than state that you have an objection and the

14    basis for it briefly.  Example:  "Objection; hearsay."  If I

15    need additional information, I am happy to hear from you.  We

16    will have a sidebar about it or discuss the issue in the break

17    of the testimony.

18         The principal piece of guidance that I am giving you

19    is that objections are the opportunity of a party to obtain a

20    ruling of law from the Court.  It is not an opportunity for you

21    to communicate with the witness or the jury about other things.

22    I won't conscience long, discoursive objections in front of the

23    jury.  I will let you know if I think I need more information

24    in order to rule on an objection, in which case I will ask for

25    it, and we will take it up at sidebar.  If you think I am

wrong, and you think I do need more information in order to

rule on an objection, if you would like to make a proffer to

support your objection, please feel free to let me know that.

I am happy to hear from you, but I just want to hear from you

out of the hearing of the jury.  If you want to request a

sidebar to discuss an issue because you think I need more

information in order to rule on the objection appropriately,

don't hesitate to request that time if needed, but don't think

that you can engage in, I will call it, speaking objections in

front of the jury.  Issues can be brought to the Court's

attention, and I welcome it, but I do not permit it in front of

the jury.  If you do, I will make it plain that you are doing

something that's not permitted.

So my practice here is to request that the parties ask

for leave to approach any witness or to provide him or her with

any document or exhibit.  That's custom in many courtrooms.  We

will just make that request and my response a matter of

routine.

This comment should not be needed, but I just remind

you to please prepare all necessary foundational questions in

advance for the introduction of each exhibit.  That's true in

all circumstances.  You need to script that.  Look at treatise

on foundations for evidence in advance.  You need to prepare

those questions in advance so that the process is as efficient

as possible for the jury's sake and for ours.

1          My practice is to ask the opposing party if they have

2     any objections to the introduction of any exhibit.  If you

3     don't have an objection when a party offers an exhibit into

4     evidence, you should feel free to spontaneously rise and say

5     that you have no objection.  The default is that if you say

6     nothing, there is no objection, but because my practice is

7     typically to ask if a party has an objection, if you would like

8     to state that you have no objection in advance, you are welcome

9     to do so.  Again, if you don't object, the default is that you

10    have not objected, but because it's my practice to ask if there

11    are objections, I invite you to say so without prompting.

12         Counsel, do you have a sense of how long you

13    anticipate opening statements to last here?  Counsel first for

14    the government.

15         MS. DEININGER:  I would expect it to be less than 30

16    minutes.  Likely significantly less than that.

17         THE COURT:  Thank you.

18         Counsel for Mr. Wolfson?

19         MR. RYBICKI:  Your Honor, we anticipate significantly

20    less than 30.  Probably 15 to 20 minutes.

21         THE COURT:  Thank you.

22         Mr. Bond.

23         MR. KOUSOUROS:  I put an outside limit of 30, but I

24    would anticipate less than 30 minutes.

25         THE COURT:  Good.  Thank you.

1          So just a couple comments about opening statements and

2     closing arguments.  My basic request is that you keep your

3     statements in line.  You should review where those lines are.

4     Opening statements are not argument.  For example, you should

5     keep in mind that you can't vouch for witnesses, and the like.

6     Just remember what the rules are, and make conscious decisions

7     about the statements that you want to make in your opening

8     statements and closing arguments.  If you stray outside of the

9     lines, you risk objections by your adversary or interruption by

10    the Court.  I prefer not to interrupt counsel during their

11    opening statements and closing arguments, but I will if you

12    stray.

13         So the best guidance that I can give you is to think

14    conscientiously about where the lines are and make

15    conscientious decisions about where you want to paint.  If you

16    stray outside of the lines, you risk the prospect of

17    interruption from the Court or an instruction which may

18    potentially undermine your position with the jury.  So just be

19    mindful of where the lines are, and take this caution to heart.

20         Let's talk about witnesses.  Each of the parties is

21    obviously responsible for having your witness available

22    immediately at the conclusion of the preceding witness's

23    testimony.  Our jury's time is very important.  Each of you are

24    responsible for ensuring your witness's appearance.  If you

25    need to subpoena any witness to appear, you should do so in a

P63LKOSC

1    manner that ensures their appearance at the time when their

2    testimony is required.

3             Counsel, is there a request to sequester any of the

4    witnesses here?  Counsel for the United States?

5             MS. DEININGER:  No, your Honor.

6             THE COURT:  Thank you.

7             Counsel for Mr. Wolfson?

8             MR. RYBICKI:  Your Honor, to clarify, is the Court

9    inquiring about the rule against witnesses?

10            THE COURT:  Yes.

11            MR. RYBICKI:  Yes, we would request that, your Honor.

12            THE COURT:  Thank you.

13            MR. RYBICKI:  With the exception of experts.

14            THE COURT:  Thank you.  I am directing that all fact

15   witnesses, except for the parties, and perhaps, at the

16   government's request, a representative of the investigative

17   team, be present -- sorry, I am excluding all such people,

18   other than the parties and potentially a representative.

19   Experts may remain present in the courtroom.

20            I won't be able to enforce this rule because I don't

21   know what the fact witnesses look like, so I just ask the

22   parties to help me enforce this rule.  If you see somebody come

23   into the courtroom that shouldn't be here, tell me, and we

24   will -- or tell Ms. Adolphe, and we will deal with it.

25            So let's talk about the deposition designations.

P63LKOSC

1        MS. DEININGER:  Sorry, your Honor, if I may go back.

2        THE COURT:  You may.

3        MS. DEININGER:  I believe you said except for -- you

4    mentioned an exception for experts and also potentially a

5    representative of the -- the reason I am asking for clarity is,

6    I think there are times where we have sometimes used -- called

7    paralegals as summary witnesses.  And if we do so, I just want

8    to be keeping in mind whether we have to make sure we have

9    available someone other than someone who's been helping on the

10   case team and been sitting through other witnesses in the

11   trial.

12       THE COURT:  Thank you.  That's fine.

13       So counsel for each of the defendants, let me hear

14   from you.  I understand that the government's request is that

15   they have the option for a paralegal assisting them in the case

16   to also potentially serve as a -- what they described as a

17   summary witness.  Any objections to carving that out from the

18   rule?

19       MR. RYBICKI:  No, your Honor.

20       THE COURT:  Thank you.

21       Counsel?

22       MR. KOUSOUROS:  If I can be given an opportunity to

23   just think that through.  We are talking about a paralegal who

24   is participating in the trial then being called as a witness.

25   If you could just give me a few minutes to think that through,

P63LKOSC

1    I would appreciate it.

2          THE COURT:  That's fine.  We will come back to you.

3    Very good.

4          So let's talk about deposition designations and the

5    schedule for providing designations and potential

6    counter-designations.  The parties have conducted a series of

7    Rule 15 depositions in this case, and counsel for Mr. Bond has

8    asked about the schedule for providing those designations.  I

9    am happy to set a schedule for that now.

10         Let me just talk a little bit about the process for

11   this.  It's relatively infrequent for parties to use deposition

12   testimony in a criminal case at trial.  It's very frequent in

13   civil cases.  My individual rules of practice in civil cases

14   contain rules about deposition designations, which I am

15   inclined to ask the parties to follow for purposes of providing

16   me with your deposition designations.  Let me tell you what my

17   rules provide for.  I have a template spreadsheet.  Each of the

18   parties imports into the spreadsheet those deposition --

19   components of depositions that they wish to introduce into

20   evidence.  There are columns in the spreadsheets that allow the

21   adversary to note whether or not they have an objection to the

22   designation and the reason for the objection, if any.  It has a

23   column for counter-designations and objections to

24   counter-designations.

25         So what I expect to do is to direct the parties to

1    complete that so that I can rule in advance of trial as to the

2    admissibility of any proposed deposition designations.  I

3    provide you with that outline of the process that I expect the

4    parties to follow because I hope that it will inform our

5    discussion of the schedule for presentation of those materials

6    to the Court at base.  It takes some work because the party

7    offering the designations needs to populate the spreadsheet,

8    needs to provide it to their adversary for comment and

9    inclusion of counter-designations before it is presented to the

10   Court.

11         So let me hear from the parties about your views

12   regarding the process for the parties to present that

13   information to the Court.  I will hear your views, and then I

14   will set some deadlines.

15         Counsel, I will start with the United States.  Counsel

16   for the government.

17         MS. DEININGER:  Your Honor, we have no objection to

18   following that process.

19         Does your Honor typically request any briefing to

20   accompany that spreadsheet and explain the reason for

21   objections or designations, or is it -- or what would our

22   expectation be?

23         THE COURT:  Thank you.  I don't ask for briefing.

24   There is a column in the spreadsheet that allows a party the

25   opportunity to provide comments to explain the basis for their

P63LKOSC

1    objection.  Oftentimes parties in civil cases will use things

2    like codes.  So H would signal hearsay.  403 would signal 403.

3    And sometimes parties will expand on the argument, but it's not

4    a legal brief.  But it's an opportunity for the parties to

5    signal to me what I should be thinking about as I am looking at

6    the objection.  It still is time-consuming.

7            MS. DEININGER:  Understanding that this might take

8    some time to put together, but that also we want to get it to

9    the Court sufficiently before the scheduled trial date of

10   August 11, our initial proposal would be to have the parties

11   provide this to the Court on July 1.  We can meet and confer

12   between ourselves about the necessary exchange in order to get

13   that done.

14           THE COURT:  Thank you.  That's acceptable to the

15   Court.

16           Counsel for Mr. Wolfson.

17           MR. SILVERBLATT:  That timeline is agreeable to us.

18   The only issue that I would like to raise briefly with the

19   Court is that the government's two witnesses have testimony

20   pertaining to what we have described as yacht-related issues.

21   It's the position of the defendants that the testimony is

22   inadmissible in its entirety.  Perhaps after our discussion of

23   the motions in limine we might have some further guidance on

24   that issue, but we will have individual objections in the event

25   that the testimony is allowed in part, but would like to find

1    the most efficient way to explore our view, which is that none

2    of the testimony is appropriate.

3         THE COURT:  Thank you.  I expect to provide the

4    parties with guidance as to the admissibility of the

5    yacht-related testimony later during today's proceeding.

6         Mr. Bond's counsel, how do you respond?

7         MR. KOUSOUROS:  Your Honor, that was my only other

8    comment, that I have been preparing just a very brief letter

9    regarding just the general nature of that testimony.  So I

10   would have also requested an opportunity for a short brief

11   supplemental submission that encompasses the entirety of those

12   two witnesses' testimony.  But I will await the Court's further

13   guidance on that issue.

14        THE COURT:  Fine.  Thank you.  So your deposition

15   designations and counter-designations and the objections to

16   them are -- when I say yours, I mean all parties -- are due by

17   July 1.  I refer the parties to my individual rules of practice

18   in civil cases which describe the process for deposition

19   designations.  A member of my staff will e-mail the parties the

20   template Excel spreadsheet that I described, which the parties

21   can use as a -- to prepare those designations for the Court.

22        So we are going to talk about the experts.  To the

23   extent that any expert is permitted to testify at trial, you

24   should not ask me to designate that witness as an expert before

25   the jury.  You should ask your foundational questions to

1    establish that she is an expert, and then you should proceed to

2    treat the witness as an expert, barring objections.  In other

3    words, don't ask me to say in front of the jury, I qualify this

4    person as an expert.  Ask the foundational questions.  Unless

5    there is an objection, you should proceed and treat the witness

6    as an expert.  We will talk about the experts later during

7    today's proceeding.

8            Briefly on exhibits.  During the trial, for the sake

9    of clarity, you should use colored exhibit stickers, if you

10   can.  Any exhibits will be sent to the jury room at the outset

11   of deliberations.  So let me just say what that should mean for

12   you, the parties.  You should make sure that every exhibit that

13   is going to be sent back is the exhibit that should be sent

14   back.  Ms. Adolphe will keep a list of the exhibits that we

15   think are in.  You, obviously, should look at the transcript

16   and your own notes to confirm that exhibits are in evidence.

17   You should confirm that ideally before your closing arguments

18   because you can't fix that.  And then you should look

19   collectively at all of the exhibits that we are going to place

20   before the jury and confirm that they are the correct versions

21   of those exhibits.

22           If there are redactions to the exhibits, you need to

23   make sure that the redactions that are in the versions of the

24   documents that are going back to the jury.  The parties in the

25   least cost avoider sense are the best people to make sure that

P63LKOSC

1      there are no errors in those documents that go back.  So please

2      confer with Ms. Adolphe.  My goal is to send back to the jury

3      all of the exhibits at the beginning of their deliberations.

4      And so you should figure out what the package of exhibits is

5      ideally before closing so that Ms. Adolphe can send it back to

6      them right after they are sent off to begin their

7      deliberations.  So I think that's it.

8              I want to do a couple of pieces of additional work.  I

9      want to take up the issue regarding Mr. Bond's bail.  I want to

10     talk about the motions in limine and *Daubert* issues.  I expect

11     that the discussion of the motions in limine and *Daubert* issues

12     will take some time, and the parties have been here already for

13     an hour and a half, so my inclination is to take a short break

14     between a discussion of the bond issues and the motions in

15     limine.

16             So my proposal now would be to take up the issues

17     related to the conditions of Mr. Bond's bail, and then to take

18     a break, and then to return to work through the motions in

19     limine.  That's my inclination.  I will hear from the parties

20     about your views about that process.

21             Counsel, what do you think?  First counsel for the

22     government.

23             MS. DEININGER:  That's fine for the government, your

24     Honor.

25             THE COURT:  Thank you.

P63LKOSC

1          Counsel for Mr. Wolfson?

2          MR. RYBICKI:  Likewise, your Honor.

3          THE COURT:  Counsel?

4          MR. KOUSOUROS:  Yes, sir.

5          THE COURT:  Good.  So let's talk about the issues

6   pertaining to Mr. Bond's bail.  I have seen the letter that was

7   submitted by the government and then the responsive letter that

8   was submitted by counsel for Defendant regarding that text

9   message.  Let me hear first from the government.  What's your

10  view now in light of the defendant's explanation of the events

11  that led to that text message?

12         MR. FELTON:  Yes, your Honor.  Having read the defense

13  submission and conferring with defense counsel, our position

14  is, provided that defense counsel puts on the record in court

15  right now the materials proffered in the letter and proffered

16  to the government in private conversations, the government will

17  not seek any modification of Bond's conditions, but the

18  government would like to hear from counsel for Mr. Bond and

19  represent that information in open court.

20         THE COURT:  Thank you.

21         Counsel for Mr. Bond, what happened here?

22         MR. KOUSOUROS:  Your Honor, as indicated in my

23  submission, to be clear, I had left.  I was not present.  We

24  had been meeting in my office every day, reviewing discovery.

25  Mr. Bond came in in the morning and was reviewing discovery

1    that we had downloaded on a server that is -- that we were

2    using to compartmentalize and review it.  We were looking for

3    one particular subject matter with respect to this witness, and

4    apparently Mr. Bond -- we couldn't find it.  They couldn't find

5    it.  I wasn't there.  Ms. Cole was there.  And he did a search,

6    what he thought was a search in his phone.  And immediately

7    upon realizing that it was not in the search bar, he

8    immediately tried to delete it and thought that he did.

9         He's been in full compliance with all of his

10   conditions, Judge.  He's not reached out to anybody.  He's had

11   no contact with this witness for years, even before the

12   inception of this case.  And it truly was an unintended error.

13   He did not -- not using his phone to reach out to this witness.

14   He really was searching for what ultimately, over the next few

15   days, we did find certain messages relating to what he was

16   looking for, as described in my letter.

17        THE COURT:  Thank you.  Fine.  On the basis of that

18   proffer, I am not going to take any action to change the

19   conditions of Mr. Bond's pretrial release.  I understand that

20   that was an error, and to err is human.

21        So with that, let's take a break.  My expectation is

22   that when we return, we are going to discuss the motions in

23   limine and the *Daubert* motions.  I expect that those

24   discussions will be limited to legal issues, that is,

25   discussion of the motions in limine, the substantive legal

1    issues raised by them, and the *Daubert* motions.  As a result,

2    if either defendant wishes to make a request to be excused for

3    that portion of the conference, I think that the rules allow

4    them to do that.  Of course, they are very welcome to be here,

5    but I just wanted to remind the parties that you may choose, if

6    you believe appropriate, to waive that.

7         Good.  So it's about -- it is exactly 11:30.  My

8    inclination is to take a half hour and to return at noon.

9    Counsel, let me hear from each of you.  Any objections to

10   proceeding in that way?

11        First, counsel for the government.

12        MS. DEININGER:  No objections.

13        THE COURT:  Thank you.

14        Counsel?

15        MR. RYBICKI:  None, your Honor.

16        THE COURT:  Thank you.

17        Counsel?

18        MR. KOUSOUROS:  No, sir.  Thank you.

19        THE COURT:  Thank you very much.  I will see you all

20   back here in 30 minutes.

21        (Recess)

22        THE COURT:  So thank you.  Welcome back.

23        We are back on the record after an extended recess to

24   let the parties have lunch and stretch their legs.

25        So the next thing that I want to do is to talk about

the motions in limine and *Daubert* motions.  I would propose to

begin with the motions in limine and then to turn to the

*Daubert* motions.

Let me just say, I have reviewed all of the parties'

submissions with respect to the motions in limine and the

*Daubert* motions.  I have some, I will call it, comments about

the motions that I am happy to share with the parties.  I don't

have any particular questions for you at this point.  If either

side wants to add anything to their written submissions to the

Court, I will give you the opportunity to do so now, but if you

don't want to add anything, I would propose to proceed and to

provide the parties some feedback with respect to first the

motions in limine and then the *Daubert* motions.  I have some

comments and, I will call it, questions, but mostly comments

that I would like to make about them.  But first let me give

each of the parties the opportunity, if you like, to add

anything to your written submissions.

First, let me just note, it looks as though

Ms. Rothman has left.  Thank you.

Anything that either side would like to add?  First,

counsel for the government?

MS. DEININGER:  No, your Honor.  Again, not unless you

want us to address specific questions.

THE COURT:  Thank you.

Counsel for Mr. Wolfson?

1    MR. RYBICKI:  Nothing to add to the written

2    submissions, your Honor.

3         THE COURT:  Thank you.

4         Counsel for Mr. Bond?

5         MR. KOUSOUROS:  Your Honor, very briefly.  The only

6    thing I wanted to add was that I believe that to the extent the

7    evidentiary hearings that we have conducted in this case

8    certainly assist us, and the Court will establish the

9    evidentiary contours of the trial, I think that also the

10   evidence adduced at those hearings should be considered by the

11   Court in at least the motions in limine with respect to the

12   expert testimony and the yacht evidence.

13        I think that what the Court, hopefully, has seen is

14   that the issues in this case are really very, very confined to

15   whether or not certainly my client violated sanctions with

16   respect to Mr. Kostin.  And I think that given the evidence

17   that's been adduced and the information the Court has, as a

18   supplement to our written submissions, that the relevance has

19   decreased and the prejudice has increased, and that that should

20   be considered in the Court's 403 analysis as to whether or not

21   a jury really needs to hear about hundred-million-dollar yachts

22   and expanded evidence about a sanctions regime which, as far as

23   we are concerned, we are willing to stipulate that there were

24   sanctions.  They were imposed, and you are not allowed to

25   violate them.  I don't think that national emergencies and

1   everything in the context of what you have already heard about

2   this case and what you have written in terms of framing the

3   issues is necessary.  And so I am only adding that to our

4   written submissions because I think that the Court now has

5   additional information to consider in the 403 balancing

6   structure.

7               THE COURT:  Thank you.

8               Counsel for the United States, any response to those

9   additional remarks from counsel for Mr. Bond?

10              MS. DEININGER:  Your Honor, I think these issues have

11  been fully briefed.  I respectfully disagree with Mr. Kousouros

12  that the evidence adduced and the nature of the hearing that

13  was already conducted has any real bearing on the relevance and

14  the issues at trial.  Your Honor ruled that their motion to

15  suppress certain e-mail evidence was granted.  We are not going

16  to seek to rely on any of that evidence.  The substance of the

17  hearing was whether certain evidence should be suppressed or

18  not.  The Court has ruled on those issues.  Whether evidence

19  should be suppressed because of how it was obtained has no

20  bearing on the actual relevance of evidence that has been

21  properly obtained to the issues at trial.

22              THE COURT:  Thank you.

23              MR. KOUSOUROS:  Judge, I just want to be clear.  So I

24  was clear with the Court, I am not asking that the fact of

25  suppression or that there is a difference in the evidence being

1    presented is what I was alluding to; just that the Court was

2    made aware of the facts that need to be established at this

3    trial through the evidentiary hearing, and that, understanding

4    those, that the level of prejudice is very clear and the

5    relevance of the proposed testimony is less.  That's all.

6            THE COURT:  Thank you.  Good.  Understood.

7            So thank you, counsel, for your briefing.  Thank you

8    for your brief remarks.

9            I am going to work to resolve, to the extent I can,

10   these motions now.  I am going to do so orally, so please bear

11   with me.  I have substantial analysis of the motions in limine

12   and *Daubert* motions that I would like to provide to the

13   parties.  What I am going to do at the end of my discussion of

14   the motions in limine is just to flag a couple of high-level

15   issues for discussion, which I propose that we discuss after I

16   complete this labor.  Again, let me thank you for your

17   indulgence as I work through my reasoning with respect to each

18   of these sets of motions.

19           I am going to begin with 1, Introduction.

20           I will now deliver my decisions on the parties'

21   motions in limine.  I will do so orally.

22           By way of background, the United States filed its

23   motions in limine on March 28, 2025.  Those motions asked the

24   Court to (1) admit evidence of Mr. Kostin's ownership of the

25   Aspen home prior to April 2018; (2) admit evidence of

Mr. Kostin's ownership of certain yachts; (3) admit evidence of
defendants' alleged preparation to purchase the Aspen Home; (4)
admit evidence of 40 North Star's tax filings; (5) admit
statements by alleged co-conspirators in furtherance of the
conspiracy; (6) admit Defendants' statements under Rule
801(D)(2)(A); (7) admit statements by third parties regarding
the ownership of the Aspen home for what the Government asserts
are nonhearsay purposes; (8) admit certain business records
under Rules 803(6) and 902(11); (9) to permit the
cross-examination of Mr. Wolfson regarding alleged prior
fraudulent acts; and (10) to preclude Defendants from offering
evidence that might support a claim of jury nullification. Dkt.
No. 144 ("Gov. Mem."). Defendants' oppositions to that motion
were filed on April 11, 2025. Dkt. Nos. 157 ("Wolfson Opp."),
159 ("Bond Opp."). The United States filed its reply on April
18, 2025.  Dkt. No. 166 ("Gov't Reply").

         Each of the defendants also filed motions in limine.
Mr. Wolfson filed his motions in limine on March 28, 2025.
Mr. Wolfson's motions asked the Court to (1) exclude the use of
certain arguably inflammatory terms to describe the defendants'
transactions; (2) exclude evidence of Mr. Kostin's other
alleged sanctions violations—in particular those related to his
alleged ownership of certain yachts; (3) exclude evidence
regarding Individual-1, whose first name only is identified;
(4) exclude evidence regarding national security and

P63LKOSC

1    geopolitical issues; (5) suppress evidence from outside of the

2    timeframes of the warrants; (6) preclude the government from

3    using an overview witness; and (7) to mandate the production of

4    witness and exhibit lists well in advance of trial. Dkt. No.

5    139 ("Wolfson Mem."). Mr. Bond also moved in limine on the same

6    day. In his motion, he seeks similar relief as Mr. Wolfson,

7    seeking the exclusion of evidence about IEEPA, the basis for

8    the sanction of Mr. Kostin and evidence regarding his yachts.

9    Dkt. No. 143 ("Bond Mem."). Mr. Bond's motion also seeks (1)

10   the exclusion of the testimony of the Government's expert

11   witnesses and (2) a court order requiring the Government to

12   provide the defense with out-of-court statements for

13   evaluation.  Mr. Wolfson also filed a motion to exclude the

14   testimony of the Government's expert witnesses.  Dkt. No. 141

15   ("Wolfson Expert Mem."). The Government filed its oppositions

16   to the defendants' motions on April 11, 2025. Dkt. No. 160

17   ("Gov't MIL Opp."); 161 ("Gov't Expert Opp."). The motions were

18   fully briefed with the defendants' replies, which were filed on

19   April 18, 2025. Dkt. Nos. 166, 167.

20          The parties are familiar with the underlying facts.

21   Therefore, I will not recite those in detail.  To the extent

22   that any facts in this case are particularly pertinent to my

23   decision, those facts are embedded in my analysis.

24          2. Legal Standard.

25          I begin with an overview of some guiding legal

principles that inform my evaluation of the parties' motions in

limine. "The purpose of an in limine motion is to aid the trial

process by enabling the Court to rule in advance of trial on

the relevance of certain forecasted evidence, as to issues that

are definitely set for trial, without lengthy argument at, or

interruption of, the trial." *Hart v. RCI Hosp. Holdings, Inc.,*

90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (quoting *Highland Cap.*

*Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173, 176 (S.D.N.Y.

2008)). "Evidence should not be excluded on a motion in limine

unless such evidence is 'clearly inadmissible on all potential

grounds.'" *Id.* (quoting *Nat'l Union Fire Ins. Co. of*

*Pittsburgh, Pa. v. L.E. Myers Co. Grp.,* 937 F. Supp. 276, 287

(S.D.N.Y. 1996)). Courts considering a motion in limine may

reserve judgment until trial, so that the motion is placed in

the "appropriate factual context." See *Natl Union Fire Ins.*

*Co.,* 937 F. Supp. at 287.  Further, "[a] ruling [on a motion in

limine] is subject to change when the case unfolds,

particularly if the actual testimony differs from what was

contained in the [party's] proffer." *Luce v. United States*, 469

U.S. 38, 41 (1984).

The Federal Rules of Evidence govern the admissibility

of evidence at trial. Under Rule 402 evidence must be relevant

to be admissible. Fed. R. Evid. 402. The "standard of relevance

established by the Federal Rules of Evidence is not high."

*United States v. Southland Corp.,* 760 F.2d 1366, 1375 (2d Cir.

1  1985) (quoting *Carter v. Hewitt,* 617 F.2d 961, 966 (3d Cir.

2  1980)). If the evidence has "any tendency to make a fact more

3  or less probable than it would be without the evidence" and

4  "the fact is of consequence in determining the action," it is

5  relevant. Fed. R. Evid. 401.  Nonetheless, under Rule 403,

6  relevant evidence may be excluded if "its probative value is

7  substantially outweighed by a danger of one or more of the

8  following: unfair prejudice, confusing the issues, misleading

9  the jury, undue delay, wasting time, or needlessly presenting

10 cumulative evidence." Fed R. Evid. 403.

11        The Second Circuit has instructed that "[d]istrict

12 courts have broad discretion to balance probative value against

13 possible prejudice" under Rule 403. *United States v. Bermudez,*

14 529 F.3d 158, 161 (2d Cir. 2008). Because "[v]irtually all

15 evidence is prejudicial to one party or another," "[t]o justify

16 exclusion under Rule 403, the prejudice must be unfair."

17 Weinstein's Federal Evidence § 403.04[1][a] (2019) (citing

18 cases). "The unfairness contemplated involves some adverse

19 effect beyond tending to prove a fact or issue that justifies

20 admission." *Costantino v. David M. Herzog, M.D., P.C.,* 203 F.3d

21 164, 174-75 (2d Cir. 2000). Further, as the advisory committee

22 notes to Federal Rule Of Evidence 403 explain, "'[u]nfair

23 prejudice' within its context means an undue tendency to

24 suggest decision on an improper basis, commonly, though not

25 necessarily, an emotional one." Fed. R. Evid.  403 advisory

1    committee notes.

2          Federal Rule of Evidence 404(b) provides that

3    "[e]vidence of a crime, wrong, or other act is not admissible

4    to prove a person's character in order to show that on a

5    particular occasion the person acted in accordance with the

6    character." Fed. R. Evid. 404(b)(1). However, the "evidence may

7    be admissible for another purpose, such as proving motive,

8    opportunity, intent, preparation, plan, knowledge, identity,

9    absence of mistake, or lack of accident." *Id*. at 404(b)(2).

10   "The Second Circuit's 'inclusionary' rule allows the admission

11   of such evidence 'for any purpose other than to show a

12   defendant's criminal propensity, as long as the evidence is

13   relevant and satisfies the probative-prejudice balancing test

14   of Rule 403 of the Federal Rules of Evidence.'" *United States*

15   *v. Greer,* 631 F.3d 608, 614 (2d Cir. 2011) (quoting *United*

16   *States v. Inserra,* 34 F.3d 83, 89 (2d Cir. 1994)). "The

17   district court has wide discretion in making this determination

18   . . . ." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir.

19   2000).

20          In order to assess the admissibility of "other acts"

21   evidence under Rule 404(b), a district court follows a

22   multi-step process:

23          "First, the district court must determine if the

24   evidence is offered for a proper purpose, one other than to

25   prove the defendant's bad character or criminal propensity. If

P63LKOSC

1    the evidence is offered for a proper purpose, the district

2    court must next determine if the evidence is relevant to an

3    issue in the case, and, if relevant whether its probative value

4    is substantially outweighed by the danger of unfair prejudice.

5    Finally, upon request, the district court must give an

6    appropriate limiting instruction to the jury."

7        *United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.

8    1992); accord *United States v. Schlussel,* No. 08-cr-694 (JFK),

9    2008 WL 5329969, at *2 (S.D.N.Y. Dec. 15, 2008).

10       "However, evidence of uncharged criminal activity is

11   not considered 'other crimes' evidence if it arose out of the

12   same transaction or series of transactions as the charged

13   offense, if it is inextricably intertwined with the evidence

14   regarding the charged offense, or if it is necessary to

15   complete the story of the crime on trial." *United States v.*

16   *Kaiser,* 609 F.3d 556, 570 (2d Cir. 2010)(citations and internal

17   quotation marks omitted); accord *Carboni*, 204 F.3d at 44

18   ("[E]vidence of uncharged criminal activity is not considered

19   other crimes evidence under Fed. R. Evid. 404(b) if it arose

20   out of the same transaction or series of transactions as the

21   charged offense, if it is inextricably intertwined with the

22   evidence regarding the charged offense, or if it is necessary

23   to complete the story of the crime on trial.") (citation

24   omitted). Such evidence is instead considered "direct" evidence

25   of the charged crime. *United States v. Herron,* No. 10-cr-0615

(NGG), 2014 WL 1894313, at *4 (E.D.N.Y. May 12, 2014) (citing

*United States v. Nektalov,* 325 F. Supp. 2d 367, 370 (S.D.N.Y.

2004)).

"If evidence is determined to be admissible as

intrinsic or direct proof of the charged crimes as

distinguished from 'other acts' under Rule 404(b) . . . the

Court is not required to instruct the jury against making an

improper inference of criminal propensity." *United States v.*

*Townsend,* No. 06-cr-34 (JFK), 2007 WL 1288597, at *1 (S.D.N.Y.

May 1, 2007). "However, 'where it is not manifestly clear that

the evidence in question is intrinsic proof of the charged

crime, the proper course is to proceed under Rule 404(b).'" *Id.*

(quoting *Nektalov*, 325 F. Supp. 2d at 372).

The Court must decide preliminary or predicate

questions of fact regarding the admissibility of evidence.

Under Rule 104(a) of the Federal Rules of Evidence, the court

"must decide any preliminary question about whether a witness

is qualified, a privilege exists, or evidence is admissible.

In so deciding, the court is not bound by evidence rules,

except those on privilege." Fed. R. Evid. 104(a). When

preliminary facts related to the admissibility of evidence are

disputed, the party offering the evidence must prove its

admissibility by a preponderance of the evidence. *Bourjaily v.*

*United States,* 483 U.S. 171, 175 (1987). Rule 104(b) provides

that "[w]hen the relevance of evidence depends on whether a

1  fact exists, proof must be introduced sufficient to support a

2  finding that the fact does exist. The court may admit the

3  proposed evidence on the condition that the proof be introduced

4  later." Fed. R. Evid. 104(b). This rule permits the

5  introduction of evidence at trial "subject to connection" when

6  other evidence is proffered to be offered later in the trial.

7  Under certain circumstances, a court must conduct a hearing

8  regarding a preliminary question outside of the hearing of the

9  jury, particularly if the defendant in a criminal case is a

10  witness and requests such a hearing, or if "justice so

11  requires." Fed. R. Evid. 104(c).

12          3. The Government's Motions in Limine

13          A. Evidence of Mr. Kostin's Ownership of the Aspen

14  Home Prior to April 2018

15          I will first address the Government's motions in

16  limine, beginning with the Government's motion to admit

17  evidence of Mr. Kostin's ownership of the Aspen Home prior to

18  April 2018.  Neither Mr. Wolfson nor Mr. Bond dispute that

19  evidence regarding Mr. Kostin's ownership of the home during

20  that period may be admitted. Mr. Wolfson presents only a

21  targeted objection to evidence that Mr. Kostin used a straw

22  owner to own the property between 2010 and 2013. Wolfson Opp.

23  at 2.

24          Evidence of Mr. Kostin's ownership of the Aspen Home

25  prior to the imposition of sanctions on him is relevant to this

1    action. Evidence regarding Mr. Kostin's use of "Straw Owner 1"

2    is no less relevant than the other facts that the Government

3    will introduce to establish his ownership of the property. The

4    Government proffers that the evidence will show Mr. Kostin's

5    indirect ownership of the home and establish the connection

6    between CC-1, CC-3 and Mr. Kostin and the Aspen Home. Gov't

7    Reply at 2-3.

8            This evidence is highly probative. This course of

9    conduct does not have to do with Mr. Wolfson or Mr. Bond, but

10   it is an important part of the story of the alleged crime. It

11   shows that Mr. Kostin owned the house—the Government must

12   establish that in order to make its case that the Aspen Home

13   was blocked property. This is direct evidence of the crime. Its

14   probative value is not outweighed by the risk of prejudice.

15   Mr. Wolfson argues that the course of conduct will be

16   "confusing, unfairly prejudicial, and unnecessary." Wolfson

17   Opp. at 2. The Court has considered those arguments but does

18   not conclude that the evidence suffers from such faults in a

19   manner that justifies the exclusion of the evidence. It is

20   necessary; it is no more confusing than any other part of the

21   narrative, which involves the discussion of multi-layered

22   corporate transactions. And there is not substantial prejudice

23   because the jury will be instructed that they are to consider

24   the criminal conduct of the defendants. (As an aside, because

25   the conduct that we are discussing pre-dated the imposition of

1  sanctions, I do not understand the Government to be contending

2  that the conduct was criminal.)

3       Moreover, any potential prejudicial effect can be

4  mitigated by appropriate limiting instructions that clarify how

5  those materials may be used by the jury. "[D]istrict courts

6  analyzing evidence under Rule 403 should consider whether a

7  limiting instruction will reduce the unduly prejudicial effect

8  of the evidence so that it may be admitted." *Benzinger v.*

9  *Lukoil Pan Americas, LLC* 2021 WL 431169, at *3 (S.D.N.Y. Feb.

10  8, 2021) (quoting *United States v. Ferguson,* 246 F.R.D. 107,

11  117 (D. Conn. 2007)); see also *United States v. Downing,* 297

12  F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary,

13  we must presume that juries understand and abide by a district

14  court's limiting instructions."). "As the Supreme Court has

15  recognized, limiting instructions are often sufficient to cure

16  any risk of prejudice." *United States v. Walker,* 142 F.3d 103,

17  110 (2d Cir. 1998) (citing *Zafiro v. United States,* 506 U.S.

18  534, 539 (1993)). If Defendants believe that it would be

19  warranted, the Court invites Defendants and the Government to

20  work together, or separately, to propose appropriate limiting

21  instructions. I do not believe that a limiting instruction is

22  necessary to cure any issues here because the establishment of

23  Mr. Kostin's ownership of the Aspen Home is direct evidence of

24  the charged offenses, but I will entertain any request by any

25  party to address any concern regarding potential prejudice

1  resulting from the introduction of this evidence.

2       As a result, the Government's motion to permit the

3  introduction of evidence related to Mr. Kostin's ownership of

4  the Aspen Home prior to April 2018 is granted, including with

5  respect to evidence related to "Straw Owner 1."

6       B. Evidence Regarding Mr. Kostin's Ownership of

7  Certain Yachts

8       The Government seeks to introduce evidence that "shows

9  how Kostin owned and maintained his assets . . . . including

10  Kostin's ownership of certain yachts . . . ." Govt' Mot. 21.

11  Both defendants object to the introduction of this evidence,

12  arguing that it is "highly prejudicial." Bond Opp. at 1. The

13  defendants characterize the evidence as 404(b) evidence against

14  Mr. Kostin that could be used by the jury to infer that they,

15  that is the defendants, acted in manner similar to Mr. Kostin's

16  conduct. In the alternative, the defendants seek to preclude

17  evidence about the yachts themselves—their value, luxury and

18  the like, which, they argue, could inflame the jury "by drawing

19  attention to Kostin's extravagance." *Id*. at 2.

20       I am granting the Government's motion and denying the

21  defendants' motions to exclude such evidence for the reasons

22  that follow. Before I begin, I highlight the fact that the

23  Government has stated that it "does not intend to admit

24  evidence that Kostin violated sanctions in connection with his

25  ownership of those yachts . . . ." *Id*. at 21 n. 13. Because the

P63LKOSC

1    Government does not intend to prove or argue that Mr. Kostin

2    violated IEEPA through his ownership of the yachts, the Court

3    denies that aspect of Mr. Bond's motion in limine.

4            Evidence of the means by which Mr. Kostin owned assets

5    abroad is relevant, direct evidence of the charged crimes here.

6    The Government is seeking to introduce this evidence to show

7    how Mr. Kostin owned foreign assets and to establish his

8    connection to the Aspen Home by using evidence of the people,

9    and structures, he used to own the yachts. This is direct

10   evidence of the charged offenses, and it is highly probative of

11   the crimes at issue here. I understand that the Government

12   seeks to prove that Mr. Kostin used the same agents in

13   connection with his ownership of the yachts as with the home,

14   such that this evidence helps to prove Mr. Kostin's ownership

15   of the Aspen Home. This is not being offered as 404(b)

16   evidence—and because it is direct evidence of the charged

17   offenses, I need not consider whether it should be introduced

18   as such.

19           I do not believe that the evidence is so prejudicial

20   as to justify the exclusion of this category of evidence in its

21   entirety, as the defendants argue. It has very high probative

22   value—to establish Mr. Kostin's ownership of the Aspen Home, by

23   establishing his means of ownership of foreign assets and his

24   connection to individuals involved in transactions related to

25   the Aspen Home. The Government is not going to argue that Mr.

1    Kostin violated sanctions as a result of his ownership of the

2    yacht, so the defendants' concerns about this being viewed as

3    evidence of other criminal conduct by him, with which the

4    defendants are tarred, is exaggerated. The Court believes that

5    the concern regarding the spillover prejudice resulting from

6    evidence of Mr. Kostin's "extravagance" is not so great that it

7    cannot be overcome through the adoption of the simple

8    guardrails proposed by the Government. First, this is a case

9    about a $15M ski home—that we are litigating a case about the

10   lifestyles of the rich, if not famous, cannot be wholly

11   avoided. Evidence of additional extravagant assets is not

12   disproportionate to the nature of the crimes charged. Second,

13   the Government has agreed that it will admit the evidence in a

14   streamlined way. The Court expects that the Government will

15   live up to its commitment, such that the evidence presented

16   will not include unnecessary information regarding the size or

17   amenities of the yachts. I am not precluding evidence regarding

18   the value of the yachts to the extent that information appears

19   in the documentation that the Government expects to present

20   regarding the ownership of the assets.

21        So, in sum, for substantially the reasons argued by

22   the United States, its motion to admit evidence regarding Mr.

23   Kostin's ownership of certain yachts is granted—subject to the

24   guardrails proposed by the United States.  Namely, they will

25   not be admitting unnecessary information regarding the size,

1   amenities or value of the yachts.  The parallel motions in

2   limine by the defendants to exclude this evidence in its

3   entirety are denied.

4           C. Evidence Regarding Defendants' Preparation to

5   Purchase the Aspen Home

6           The Government has moved to introduce evidence to

7   establish the defendants' preparation for the purchase of the

8   Aspen Home—in particular in the months preceding the imposition

9   of sanctions on Mr. Kostin. Evidence that demonstrates their

10  efforts to purchase the home is relevant.  It is direct

11  evidence of the alleged crimes in this case, which stem from

12  those alleged efforts, in part.  In addition to being direct

13  evidence, it is properly admissible under Rule 404(b) for

14  proper purposes—namely to show the defendants' plan and lack of

15  mistake, for all the reasons explained in the Government's

16  motion and reply brief.

17          The defendants' arguments regarding the admissibility

18  of certain of the pieces of evidence identified as falling

19  within this category are not persuasive—they argue that a

20  reference to "K" does not prove by itself that Mr. Wolfson met

21  with Mr. Kostin; and that evidence of a meeting with "Straw

22  Owner 1" is irrelevant because that individual is a Cypriot

23  banker with whom Mr. Wolfson works on other legal matters.

24  These arguments are misplaced because they go to the weight of

25  the evidence—a question for the jury. Put simply, the question

P63LKOSC

1  whether the evidence proves the point for which the Government

2  will introduce it is for the jury to decide at trial, rather

3  than for me to resolve beforehand. The question for the Court

4  is whether the evidence is relevant and admissible.  I conclude

5  that it is. Therefore, the Government's motion is granted.

6      D. Evidence from Mr. Wolfson's and 40, I'll call it,

7  NS's Tax Records

8      The Government's motion to permit the introduction of

9  certain of Mr. Wolfson's and 40 NS's Tax Records is granted.

10 The Government obtained those records pursuant to a court order

11 obtained under 26 U.S.C. § 6103. The Court made a finding that

12 the records were "or may be relevant" to a criminal act. The

13 submissions by the Government adequately supported that

14 conclusion. The defendants' arguments that the tax records

15 should not be permitted for the reasons for which suppression

16 of a search warrant in this case was sought under *Franks* are

17 not persuasive here. First, at the time that the request was

18 made, an indictment had been issued, so as I have ruled in my

19 suppression decision, the issue of probable cause regarding the

20 commission of a crime was independently established. Second,

21 the statute does not require a finding of probable cause. And

22 third, as the Government has pointed out, the Second Circuit

23 has held that: "The courts should be loath to imply an

24 exclusionary sanction in this context, especially since none

25 appears in the Tax Reform Act itself and since civil and

1   criminal penalties have been expressly provided." *U.S. v.*

2   *Barnes,* 604 F.2d 121, 146 (2d Cir. 1979). So even if there was

3   an absence of evidence supporting the use of the returns—which

4   there is not—exclusion of the evidence would not be an

5   appropriate remedy.

6           The tax records are relevant to prove the Government's

7   charges against these defendants.  They are being offered to

8   show, among other things, that the returns did not identify Mr.

9   Wolfson as the foreign beneficial owner of the property until

10  after Mr. Kostin was sanctioned. That decision does make the

11  Government's theory of the case more likely to be true.  It is

12  therefore relevant. The returns contain direct evidence of the

13  charged offenses—they provide evidence of the narrative

14  regarding how the crime was allegedly committed.

15          The evidence contained in the returns is also properly

16  admitted under Rule 404(b) because it provides evidence of

17  Mr. Wolfson's intent, plan, knowledge and absence of mistake.

18  The evidence is not being introduced to show that Mr. Wolfson

19  was evading taxes, and that the information reflected in the

20  tax returns shows a bad character or propensity to commit

21  similar offenses.  Therefore, the defendants' arguments that

22  the evidence should be excluded under Rule 404(b) or 404 are

23  unpersuasive. The tax records have substantial probative value

24  as direct evidence of alleged obfuscation of Mr. Kostin's

25  ownership interest in the Aspen Home, and that probative value

is not outweighed by any of the adverse effects against which

Rule 403 guards.

E. Evidence of Statements by Alleged Co-Conspirators

The government is seeking to introduce several

statements made by out-of-court declarants.  Gov. Mot. at

31-38. The Government offers that these statements should be

admitted as coconspirator statements under Rule 801(d). I am

denying the Government's motion at this time because I cannot

determine whether the Government is going to meet the

preconditions to the introduction of such statements in the

abstract based on the very general proffer contained in the

Government's motion.

I. Hearsay Generally

"Hearsay evidence is any statement made by an

out-of-court declarant and introduced to prove the truth of the

matter asserted." *United States v. Cardascia,* 951 F.2d 474, 486

(2d Cir. 1991)(citing Fed. R. Evid. 802). "Of course, every

out-of-court statement is not hearsay, and all hearsay is not

automatically inadmissible at trial. Instead, the purpose for

which the statement is being introduced must be examined and

the trial judge must determine whether—if that purpose is to

prove the truth of its assertion—the proffered statement fits

within any of the categories excepted from the rule's

prohibition." *Id.*

ii. Co-Conspirator Statements.

P63LKOSC

1    "Under Rule 801(d), an out-of-court statement offered

2    for the truth of its contents is not hearsay if '[t]he

3    statement is offered against an opposing party' and it 'was

4    made by the party's coconspirator during and in furtherance of

5    the conspiracy.'" *United States v. Brown,* 2017 WL 2493140, at

6    *1 (S.D.N.Y. June 9, 2017) (quoting Fed. R. Evid.

7    801(d)(2)(E)). "In order to admit a statement under this Rule,

8    the court must find: '(a) that there was a conspiracy, (b) that

9    its members included the declarant and the party against whom

10   the statement is offered, and (c) that the statement was made

11   during the course of and in furtherance of the conspiracy.'"

12   *Id.* (quoting *Gupta* 747 F.3d at 123). "Evidence may be admitted

13   under Rule 801(d)(2)(E) only if a court finds, by a

14   preponderance of the evidence, that the defendant and the

15   declarant joined a conspiracy, and the challenged out-of-court

16   statements may themselves be considered in making this

17   determination." *United States v. Lumiere,* 2017 WL 1391126, at

18   *5 (S.D.N.Y. Apr. 18, 2017) (citing *Bourjaily*, 483 U.S. at

19   175-76, 178-79). There is no requirement that the person to

20   whom the statement is made must also be a member of the

21   conspiracy. *Gupta*, 747 F.3d at 125 (citation omitted). "In

22   determining the existence and membership of the alleged

23   conspiracy, the court must consider the circumstances

24   surrounding the statement, as well as the contents of the

25   alleged coconspirator's statement itself." *Id.* at 123.

P63LKOSC

"The existence of a conspiracy" and the declarant's involvement in that conspiracy are "preliminary questions of fact that, under Rule 104, must be resolved by the court" and should be "established by a preponderance of proof." *Bourjaily*, 483 U.S. at 175. "An essential element of the crime of conspiracy is an agreement." *United States v. Bicaksiz,* 194 F.3d 390, 398 (2d Cir. 1999). "A fact-finder may properly find the existence of a criminal conspiracy where the evidence is sufficient to establish, by a preponderance of the evidence, that 'the . . . alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent.'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.,* 552 F.3d 93, 137-38 (2d Cir. 2008) (quoting *United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1191 (2d Cir. 1989). "[T]he government 'need not present evidence of a formal or express agreement,' and may instead rely on proof the parties had a 'tacit understanding to engage in the offense.'" *United States v. Scott,* 979 F.3d 986, 990 (2d Cir. 2020) (quoting *United States v. Amato*, 15 F.3d 230, 235 (2d Cir. 1994)).

As an initial matter, I cannot conclude that any particular statements are admissible at this point. The Government has not provided me with a list of the statements that it seeks to introduce.  It has provided an illustrative list of some statements that it may seek to introduce in this

1    category. I obviously cannot provide blanket guidance about all

2    statements by the alleged co-conspirators. I must deny this

3    motion without prejudice at this time.

4         I would like to make a few brief remarks about the

5    Government's proposed evidence. The Government has not

6    proffered facts that would permit me to conclude at this point

7    that the conspiracy existed and that the speakers were all

8    members of it or that their statements were in furtherance of

9    the conspiracy. The Government will have to provide a

10   foundation for the introduction of each such statement at

11   trial.

12        I want to raise one substantive issue with the premise

13   of the Government's pitch to admit certain portions of this

14   evidence. The series of statements that the Government has

15   provided as illustrations of its request include statements

16   made in 2015 and 2016. Gov't Mem. at 37. The Government asserts

17   that all of the statements were "made during the conspiracy

18   which began by at least May 2014 and in furtherance of its

19   objective of concealing Kostin's true ownership of the

20   home . . . ." *Id*.  The issue with the Government's theory that

21   I want to flag is that I do not understand that it was illegal

22   for Mr. Kostin to own the home in 2015 and 2016—the time of

23   those statements. The Government does not argue that it was.

24   Instead, the Government proffers that it expects to introduce

25   evidence that Russian oligarchs took actions to conceal their

assets with a connection to the U.S. "in anticipation of potential U.S. sanctions," Gov't Mem. at 36, not in violation of actual sanctions. As a result, I do not understand how the Government is going to prove by a preponderance of the evidence that there was a conspiracy to commit any offense that predated the sanction order against Mr. Kostin.

There are any number of reasons why a rich person would want to obscure his ownership of a piece of expensive property—as the lawyers for the parties well know. The lawyers here likely know people who own their apartments here in New York City through LLCs. The Government knows from their expert's report that Russian oligarchs obscure their ownership of assets for lots of reasons other than to evade non-Russian sanctions regimes. I do not know what federal law these alleged conspirators were alleged to have been breaking in 2015 or 2016. If there was no criminal object of their agreement—only a legal object—I do not know how the Government will prove that there was a conspiracy and that these statements were made to further it. I do not take a position on the issue now, but I am flagging what may be a profound issue with the Government's assertion that people acting to hide Mr. Kostin's ownership of the home before he was sanctioned were engaged in a criminal conspiracy: namely, that it was not illegal for him to own the house before then.

f. Evidence of Defendants' Prior Statements

1    The Government seeks to introduce out-of-court

2  statements made by Mr. Wolfson and Mr. Bond. Mr. Wolfson's

3  prior statements are properly admitted as non-hearsay under

4  Rule 801(d)(2)(A). Mr. Wolfson argues that the statement should

5  be excluded because the meaning of his statement about the

6  place of his residence is ambiguous, and therefore irrelevant.

7  The statements by Mr. Wolfson that have been identified are

8  relevant. Mr. Wolfson did not disclose that he had a residence

9  in Colorado, which supports the Government's contention that he

10  was a straw owner of the Aspen Home. Whether the statement

11  should be interpreted in the way that Mr. Wolfson advocates is

12  a question for the jury, not the Court. The evidence has

13  probative value that is not outweighed by the risk of juror

14  confusion or other issues identified in Rule 403.

15    Mr. Bond's post-arrest statements are properly

16  admissible against him as non-hearsay. Mr. Wolfson is correct

17  that if unedited, the admission of these statements would

18  likely violate *Bruton* if Mr. Bond does not testify at trial.

19  However, I believe that they can be edited so that, in

20  conjunction with the administration of an appropriate limiting

21  instruction, they may be introduced at trial regardless of

22  whether Mr. Bond testifies.

23    "The Confrontation Clause provides, 'In all criminal

24  prosecutions, the accused shall enjoy the right . . . to be

25  confronted with the witnesses against him. . . .' *U.S. Const.*

P63LKOSC

amend. *VI.* The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." *Ryan v. Miller,* 303 F.3d 231, 247 (2d Cir. 2002).

"A defendant's right to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him." *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir. 1994) (citing *Bruton*, 391 U.S. at 137 (1968)). In *Bruton* The Supreme Court explained that limiting instructions are insufficient to cure inculpatory statements of co-defendants in certain circumstances:

"[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented [when] the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial."

*Bruton*, 391 U.S. at 135-36. The Supreme Court held "that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is

introduced at their joint trial, even if the jury is instructed

to consider that confession only against the codefendant."

*Richardson v. Marsh,* 481 U.S. 200, 201-202 (1987).

"Not every statement of a co-defendant is barred by

*Bruton*," *United States v. Tropiano,* 418 F.2d 1069, 1081 (2d

Cir. 1969). In keeping with the animating concern behind

*Bruton*, that in the face of powerful out of court accusations

from a co-defendant, the jury would be unable to follow

limiting instructions, "[t]he Second Circuit has "held that

cautionary instructions will avoid a *Bruton* confrontation issue

unless the admitted evidence is 'clearly inculpatory' as to the

complaining codefendant and is 'vitally important to the

government's case.'" *United States v. Rubio,* 709 F.2d 146, 155

(2d Cir. 1983). In *Tropiano*, for example, the Circuit endorsed

the admission of a co-defendant's statement where it did not

contain an accusation against his co-defendants and was not

offered for that purpose. *Tropiano*, at 1081.

The Second Circuit has held that redactions to a

co-defendant's statement to remove references to the other's

name may be admitted without violating a co-defendant's rights

under *Bruton*, *United States v. Tutino*, 883 F.2d 1125, 1135 (2d

Cir. 1989).

"To be clearly inculpatory, the redacted statement,

standing alone, must connect a codefendant with the crime."

*United States v. Burke,* 700 F.2d 70, 85 (2d Cir. 1983).

1    However, "[t]estimony need not contain an explicit accusation

2    in order to be excluded as a violation of the Confrontation

3    Clause. To implicate the defendant's confrontation right, the

4    statement need not have accused the defendant explicitly but

5    may contain an accusation that is only implicit." *Ryan v.*

6    *Miller,* 303 F.3d 231, 248 (2d Cir. 2002) (quotation marks

7    omitted). "Thus, testimony that indirectly includes an

8    accusation against the defendant may violate the Confrontation

9    Clause even if the testimony is not a direct reiteration of the

10   accusatory assertion." *Id.*

11       Here, the Government has proposed to redact the

12   references to Mr. Wolfson's name from Mr. Bond's statements.

13   Gov't Reply at 21. Those redactions remove all references to

14   Mr. Wolfson from Mr. Bond's statements.  With those changes,

15   Mr. Bond's testimony may be admitted at trial even if he does

16   not testify, subject to a limiting instruction. I ask that the

17   parties present a proposed limiting instruction on this issue

18   no later than a week from today.

19       g. Evidence of Statements Regarding Ownership of the

20   Aspen Home for Non-Hearsay Purposes

21       The Government has moved in limine for the Court to

22   permit the introduction of several out of court statements,

23   which, the Government asserts, are offered not for the truth of

24   the matter asserted, but rather to show the state of mind of

25   the speaker, or the effect on the listener. The Government's

1   motion does not provide me sufficient information to grant the

2   motion because it is categorical in nature and does not

3   identify all of the statements or proffer evidence that will be

4   introduced as a foundation for the introduction of each. I can

5   comment on certain of the statements that have been identified

6   with more specificity, however.

7           First, I agree with the Government's position that

8   Employee-1's allegedly false exculpatory statements may be

9   admissible. The Government will need to demonstrate the

10  foundation for the statement at trial—namely, that Employee-1

11  was a co-conspirator of Mr. Wolfson and that the other

12  conditions for the admission of such a statement have been

13  established. But assuming that they can do that, false

14  exculpatory statements of a co-conspirator are relevant

15  information. They can show the intent of the conspirators to

16  obscure their improper conduct. If the Government establishes

17  that the Employee was a co-conspirator, the evidence of her

18  state of mind will likely be relevant for the jury's assessment

19  of the conduct of her alleged co-conspirators. The probative

20  value of such evidence is not categorically outweighed by a

21  danger of unfair prejudice or the other concerns articulated in

22  Rule 403. But again, I cannot conclude that the statement can

23  be admitted yet—the Government will have to prove the premises

24  of its position. But I disagree with the defendant's arguments

25  that the introduction of a false exculpatory statement by a

co-conspirator is categorically irrelevant or otherwise
necessarily so prejudicial that its admission should be
precluded.

Second, while the defendants have not raised specific
objections to the other statements identified by the
Government, I agree with their argument that I should be
"extremely wary of the government's proffered justification"
for the introduction of the evidence for non-hearsay purposes.
Wolfson Opp. at 12. The Government's proposition is that the
statements are introduced to show that people understood
Mr. Kostin to be the owner of the home, rather than as
affirmative statements of his ownership, to prove his dominion
and control over the home. But the risk of prejudice with
respect to some of these statements appears to be substantial.
The Second Circuit has held that "the mere identification of a
relevant non-hearsay use of such evidence is insufficient to
justify its admission if the jury is likely to consider the
statement for the truth of what was stated with significant
resultant prejudice. The greater the likelihood of prejudice
resulting from the jury's misuse of the statement, the greater
the justification needed to introduce the 'background' evidence
for its non-hearsay uses. *U.S. v. Reyes,* 18 F.3d 65, 70 (2d
Cir. 1994).

I am not able to resolve this dispute now, but I will
comment on some issues with respect to certain of the

statements that the Government seeks to introduce. First, the

Government wants to introduce a statement by Mr. Kostin in

which he introduces himself and states that "an entity I

control purchased [the Aspen Home] last year." Gov't Mem. at

44. On its face, accepted for the truth of the matter this is a

statement that he indeed purchased the house. The Government

asserts that its value is about the state of mind of Mr. Kostin

or on the listeners, but recognized that there is a high risk

that the jury will understand this statement to mean what it

says—that Mr. Kostin indeed purchased the home rather than just

that he thinks he purchased the home. And the Government has

not established what the probative value for this case is of

the impact of the letter on its recipients—presumably the

neighbors to whom it was addressed. So, the balance of the

probative value of this evidence as nonhearsay against the

prejudicial impact of its misapprehension by the jury as an

improper hearsay statement seems to be questionable.  I am

going to have to engage in a similar balancing test with

respect to the statements of the Property Manager that are

identified in the Government's motion. The Government's motion

seems to be predicated on the assumption that identification of

a non-hearsay purpose for the statement by itself is sufficient

to authorize its admission. The Circuit told me in *Reyes* that

more is required. So, I must deny this motion on the record

before me.  I need more to know why it is that the non-hearsay

P63LKOSC

value of these statements is such that they are admissible,

given the rule articulated in *Reyes*.

h. Evidence of Statements by Alleged Agents of
Defendants

The Government has moved in limine for the Court to
permit it to "introduce communications by certain individuals
who worked for Wolfson and/or Kostin and acted as their agents
and representatives regarding the Aspen Home." Gov't Mem. at
46. The Government has identified four categories of statements
that they wish to admit. *Id*. But they have not specified the
nature of the actual statements. I must deny this motion
because I will need to evaluate whether the Government has laid
a proper foundation for the introduction of each given
statements at trial. The Government has not told me what the
statements are, or in what context they were made. So, I cannot
grant the motion. I will have to evaluate the evidence when it
is presented at trial based on the statement itself.
Fundamentally, because the Government's offer of proof is so
vague, its motion amounts to little more than a request that I
reaffirm the general rules that apply to vicarious statements.

Rule 801(d)(2)(D) provides that a statement is not
hearsay if the statement "is offered against an opposing party
and . . . was made by the party's agent or employee on a matter
within the scope of that relationship and while it existed." "A
sufficient foundation to support the introduction of vicarious

1  admissions therefore requires only that a party establish (1)

2  the existence of the agency relationship, (2) that the

3  statement was made during the course of the relationship, and

4  (3) that it relates to a matter within the scope of the

5  agency." *Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d

6  534, 537 (2d Cir. 1992).

7       The Government has proffered that "the evidence will

8  establish an agency relationship between Wolfson, Kostin, and

9  various individuals." Gov't Mem. at 48. In particular, they

10  identify Wolfson Employee-2, as having provided tax and

11  accounting services to Mr. Wolfson. If the Government can

12  establish that he did and that the statements that are offered

13  against Mr. Wolfson were made in the course of the

14  relationship, the rule will apply and I expect they would be

15  admissible.  But I cannot determine whether they will be on

16  this record.

17       Here too, I want to flag a substantial question

18  regarding the Government's motion. The Government points to

19  potential statements by Lawyer-1, Lawyer-1 Assistant, and

20  Property Manager.  In its proffer, the Government asserts that

21  they worked on behalf of 40 North Star starting in 2010.  I do

22  not know how the Government is going to prove that any

23  statements made by any of those people were made as

24  representatives of Mr. Wolfson before he purchased an interest

25  in the home.  The rule says that the declarant must be the

P63LKOSC

agent of the person against whom the statement is offered. The

Government's motion seems to be based on the premise that a

statement by an agent of Mr. Kostin can be introduced against

Mr. Wolfson, but they have provided no legal basis to support

that conclusion in their briefing.  And, as I said earlier, I

struggle somewhat to understand how the Government expects to

establish that a criminal conspiracy existed before Mr. Kostin

was sanctioned. So again, I cannot resolve these issues in the

context of this motion in limine—the Government's motion is far

too general.  But to the extent that the Government seeks to

use 801(d)(2)(D) to introduce declarations made outside of

court against the defendants here, they are reminded that the

rule requires that the statement be made by "the party's agent

or employee"—not any person's agent or employee. If the

Government takes the position that statements by Mr. Kostin's

agents can be introduced against Mr. Wolfson, or that a

conspiracy existed or can have existed prior to the date on

which Mr. Kostin was sanctioned, such that statements by others

prior to that date can be introduced as evidence of statements

by co-conspirators in furtherance of the conspiracy, I would

ask that the government provide me with supplemental briefing

on those issues no later than a week from today.

        i. Cross-Examination of Mr. Wolfson Regarding Fraud

Claims

        The Government has moved in limine to permit it to

1  cross-examine Mr. Wolfson regarding prior allegedly fraudulent

2  conduct. I expect that should Mr. Wolfson testify, I would

3  permit cross-examination on that topic. The Government has

4  proffered that Mr. Wolfson was engaged in a complex fraudulent

5  scheme. As proffered, that conduct is not merely a theft, but

6  rather conduct that is probative of Mr. Wolfson's truthfulness

7  or untruthfulness under Rule 608(b).

8           j. Advice or Presence of Counsel Defense

9           The defendants have disclaimed any intention to

10  present evidence in support of an advice or presence of counsel

11  defense. Wolfson Opp. at 18. As a result, I understand that a

12  ruling on this aspect of the Government's motions in limine is

13  not required.

14           k. Jury Nullification

15           Finally, the Government has asked that the Court

16  exclude evidence that tends to support jury nullification.

17  Largely, the defendants agree that they will not be introducing

18  such evidence. The one caveat offered by Mr. Wolfson is that he

19  intends to present evidence that he has advocated against the

20  Putin regime. Wolfson Opp. at 18. I do not know in what form

21  this evidence will be presented, so I cannot rule on this

22  motion definitively now. However, I agree with Mr. Wolfson that

23  evidence of that type would have substantial probative value in

24  the case. Evidence of Mr. Wolfson's opposition to the Putin

25  regime would help to demonstrate why he is an unlikely straw

1  man for Mr. Kostin—an oligarch sufficiently associated with

2  President Putin that he has been sanctioned by the United

3  States. I do not believe that the probative value of such

4  evidence, that is of Mr. Wolfson's advocacy, will be outweighed

5  by undue prejudice—in particular because of a risk of jury

6  nullification.

7           4. Defendants Motions in Limine

8           a. Evidence of Mr. Kostin's Ownership of Certain

9  Yachts and of Mr. Kostin's Other Sanctions

10          I have already ruled regarding the admissibility of

11  evidence regarding Mr. Kostin's ownership of certain yachts.

12  Since I granted the Government's motion on this issue,

13  Defendants' motions related to this issue are denied. And

14  because the Government has stated that it will not admit

15  evidence of Mr. Kostin's other sanctions, Mr. Wolfson's motion

16  to exclude such evidence is also denied.

17          b. Use of "Inflammatory" Terms by the Government

18          Defendants have moved for me to exclude the use of

19  certain "loaded, inflammatory, and pejorative terms such as:

20  'shell,' 'front,' 'sham,' 'straw,' 'tax haven,' and similar

21  unfairly prejudicial terms. Wolfson Mem. at 1; Bond Mem. at 19.

22  Defendants' argument that these terms are unfairly prejudicial

23  rests on Judge Matsumoto's opinion in *United States v. Watts*,

24  934 F. Supp. 2d 451, 482 (E.D.N.Y. 2013). But the opinion in

25  *Watts* made that finding without reasoning or analysis, and I do

not find it persuasive. Instead, I join in the view of my colleague, Judge Torres, who recently wrote that "to the extent that the terms accurately describe entities and individuals at issue, the Court cannot agree that they are unfairly prejudicial." *United States v. Guo,* 2024 WL 1862022, at *4 (S.D.N.Y. 2024). As in *Guo,* in this case the "Government shall not be precluded from using the challenged terms at trial, provided that it lays a sufficient factual predicate beforehand showing that the terms are appropriate." *Id*.

> c. Evidence Regarding People with a Particular First Name, Which I Refer to as "X"

> The defendants have moved to preclude the Government from offering evidence related to "Russian women named [X] with unknown surnames who are purportedly in Mr. Kostin's orbit." Wolfson Mem. at 7. They argue that the evidence is irrelevant because X is a common first name and the Government has not demonstrated that the person named X is the person referenced in the indictment as CC-3. This motion is denied for the reasons described in the Government's reply. At base, this evidence is relevant—it tends to prove a fact in dispute. Whether the Government can ultimately prove that the references to X are to the same person is a question for the jury to resolve.  This is an issue that goes to the weight of the evidence, not its relevance. The probative value of the evidence is not outweighed by the risk of unfair prejudice or

P63LKOSC

1    juror confusion. If the defense believes that the Government's

2    proof is weak, it can make that argument to the jury. The

3    motion is denied.

4           d. Testimony and Arguments Regarding National Security

5    and Geopolitical Considerations

6           The defendants have moved to exclude evidence or

7    arguments "about the national security considerations that can

8    motivate sanctions, about any national emergencies that have

9    been declared and about the nexus between the sanctions at

10   issue in this case and the Russia-Ukraine war." Wolfson Mem. at

11   10. I am going to grant this motion in part and deny it in

12   part.

13          Evidence of the existence of the sanctions regime, the

14   fact of the sanction against Mr. Kostin, and the circumstances

15   that led to the sanction are relevant evidence of the crime.

16   The defendants have stated that they are willing to stipulate

17   to the fact of the sanction, which is a concession that these

18   facts are relevant, and I cannot force the Government to agree

19   to a fact. More importantly, the geopolitical developments

20   leading up to the imposition of sanctions on Mr. Kostin provide

21   necessary context for the alleged crimes. It explains the

22   timing of the defendants' alleged actions—as they allegedly

23   worked to set up a structure to hide Mr. Kostin's ownership as

24   sanctions against him looked to be increasingly likely because

25   of the kind of geopolitical considerations that Defendants'

1    motion would exclude. So, this evidence is relevant and has

2    substantial probative value.

3            The importance of the sanctions statute, and the

4    significance of the sanction decision to the United States,

5    however, has very little probative value. The jury is not

6    supposed to evaluate the wisdom of the laws passed by

7    Congress—or, in this case, the judgment of the President to

8    impose sanctions. Those are facts that they are required to

9    accept. So, there is very little probative value in explaining

10   to the jury the significance of the sanctions regime on U.S.

11   security or policy. Any modest probative value of such evidence

12   is substantially outweighed by the risk of unfair prejudice.

13   If the jury is led to understand that these laws are of such

14   significance to the national security of the United States, it

15   is more likely to find in favor of the Government for an

16   improper purpose—a sense of patriotism. As a result, I do not

17   expect to permit the United State to introduce evidence or

18   argument about the significance of the laws or the sanctions

19   regime to the national security of the United States. For the

20   sake of clarity, I am not precluding the government from

21   referring to the word "Emergency" as it is used in the title of

22   the statute, or insofar as the word is used in any document

23   that implements the sanction against Mr. Kostin. Outside of

24   that context, however, I do not expect the Government to argue

25   that this case—and by implication a conviction—is of particular

1   significance to the national security of the United States.

2              e. Suppression Motion Regarding Evidence Outside of

3   Date Ranges

4              The defendants initially moved to exclude evidence

5   falling outside of the date ranges of several warrants. Wolfson

6   Mem. at 12; Bond Mem. at 19. Because the Government has agreed

7   not to use evidence outside of the scope of the date ranges

8   authorized in those warrants, Gov't Opp. at 15, the issue, as

9   initially raised in the defendants' motions in limine no longer

10  requires a ruling by the Court. The defendants have separately

11  sought the suppression of evidence obtained pursuant to a later

12  warrant, which was not the subject of their initial motions in

13  limine. I will address that issue separately, as the parties

14  know.

15             f. Government Overview Witnesses

16             Finally, I am denying the defendants' motion to

17  preclude the Government from using overview witnesses. The

18  Government has stated that it does not intend to do so, so the

19  motion does not require a ruling from the Court at this time.

20             So counsel, thank you for your patience as I got

21  through those decisions on the motions in limine.  I just want

22  to take a moment just to highlight the couple of things that I

23  wanted to highlight.  First, I do really need information about

24  particular statements in order for me to make decisions about

25  their admissibility.  I denied, I think it was, Mr. Bond's

1    motion to require the government to produce each statement

2    because I agreed with the government that there was not a

3    particular foundation in law for me to require that they do so.

4    But notwithstanding that, it certainly would be helpful to have

5    information about -- more information about the specific

6    statements in advance of trial so that the process of

7    litigating their admissibility can be streamlined.  It will

8    make the trial more efficient.  And the government may benefit

9    from having some sense in advance of whether the statements

10   that they seek to introduce will be introduced into evidence as

11   admissible evidence.  So I just make that observation.  I am

12   not providing any -- making any request.

13           Second, as I have said, many of the government's

14   arguments about the admissibility of alleged coconspirator

15   statements relate to statements that were made before

16   Mr. Kostin was sanctioned.  I again want to invite the

17   government's views on this question whether a conspiracy can

18   have existed such that statements can have been made in

19   furtherance of it prior to the date on which Mr. Kostin was

20   actually sanctioned.  I struggle with the basis for this

21   argument.

22           Counsel for the government, if you have any comments

23   that you would like to share now, to the extent I am

24   misunderstanding your view or if there is some law that you

25   want to point me to, I will welcome it.  And, of course, as I

P63LKOSC

said, I have invited further briefing on this topic.  But if

there is anything that you would like to say now to introduce

the conversation, I am happy to hear from you.  You can demur,

if you like.

MR. FELTON:  Not to prejudice our written submission,

I would note the case *United States v. Russo* on pages 33 to 34

of ECF Docket No. 144 as well as the footnote that immediately

follows, footnote 21.  It is good law in the Second Circuit

that for purposes of the coconspirator hearsay exception, a

conspiracy's objective, quote, "need not be criminal at all"

and a "joint venture" among the parties counts as a conspiracy

for purposes of the Rule.

I note also last year, in 2024, the Eleventh Circuit

in a case *U.S. v. Holland*, I believe it's 117 F. 4th 1352,

notably at 1357-58 n. 2 cites at least eight circuits where

that's also the law, and numerous treatises, including Wright &

Miller, that make this point.  Those cases generally cite in

civil cases where this exception applies.  So a criminal

conspiracy is not required under the law.  That's one of the

bases.

We also cite throughout a number of hearsay

exceptions -- sorry, other provisions.  I note Federal Rule of

Evidence 803(3).  The then-existing mental, emotional, or

physical condition is also a basis for several statements.  And

I think for a lot of the statements -- obviously, we haven't

1  given you a full list, and we hear you loud and clear about

2  that.  But for certain statements that we -- in this category,

3  we would note they be admissible for the effect on the

4  listener.  We note that a lot of them are not even factual

5  statements at all, so the idea that they would be being

6  admitted for their truth does not apply.  The fact that they

7  are commands or rules directed to a witness from someone like

8  CC-1, 2, or 3 is significant because during that time period

9  when Wolfson claims he owns the house, it would show, in fact,

10  Kostin's key representatives and trusted associates are the

11  ones really running the show at the house.

12       THE COURT:  With respect to *Holland* and the other

13  cases, are those looking at (d)(2)(D) or (E)?  I will look at

14  them after seeing your briefing.

15       MR. KOUSOUROS:  (d)(2)(E).

16       MR. FELTON: E, as in Edward.

17       THE COURT:  Thank you.

18       MR. FELTON:  I would also note a case, *U.S. v. Hwa*

19  from the Eastern District, 2022 WL 901796.

20       THE COURT:  Thank you.

21       MS. DEININGER:  Your Honor, the only other thing I

22  would add on that is your Honor invited supplemental briefing.

23  I think we would like to take you up on that.  You asked for

24  within a week.  In light of the fact that we have now adjourned

25  the trial date until August and the parties are going to be

P63LKOSC

1    dealing with submissions related to the evidentiary hearing,

2    and Defendants' *Brady* claim, I wonder if we might get some

3    additional time before we are required to submit that to you on

4    this issue.

5        THE COURT:  Thank you.  I don't have a problem with

6    that.  If you need additional time, I am happy to give it to

7    you.  We have reasonable time.  If you would like two weeks,

8    you can have that.

9        Bear with me for just a moment.

10       MS. DEININGER:  Thank you.

11       THE COURT:  You are welcome.

12       I just looked at *Hwa*.  Counsel, what's the citation

13   for *Holland*?

14       MR. FELTON:  117 F. 4th 1352, and the pin cite I have

15   is 1357-58, as well as note 2.

16       THE COURT:  Thank you.

17       MR. FELTON:  Again, your Honor, we would also point to

18   *Russo* and note 21 in our filing at 144.

19       THE COURT:  Thank you.  So I look forward to seeing

20   your submissions.

21       Anything from the defense before I move to the

22   *Dauberts*?

23       MR. RYBICKI:  No, your Honor.

24       MR. KOUSOUROS:  No, sir.

25       THE COURT:  Good.  Thank you.  So let's turn to those.

P63LKOSC

1      Now, I intend to address Defendants' motions in limine

2  to exclude the testimony of the Government's expert witnesses,

3  Dr. Louise Shelley, Supervisory Special Agent Robert J.

4  Hanratty and Alan Santos with the Office of Foreign Assets

5  Control ("OFAC"). I am also going to resolve the Government's

6  motion to exclude the testimony of Mr. Wolfson's proposed

7  expert, William McCausland. I will do so orally. The parties

8  are familiar with the underlying facts and procedural history.

9  Therefore, I will not recite those in detail. To the extent

10  that any of the facts in this case are pertinent to my

11  decision, those facts are embedded in my analysis. For the

12  reasons that follow, I am going to deny Defendants' motions to

13  exclude all of the testimony of each of the Government's

14  experts' testimony. However, I am going to exclude some of the

15  proposed testimony by Dr. Shelley and Agent Hanratty.

16      Both Mr. Wolfson and Mr. Bond have sought to exclude

17  the testimony of the Government's expert witnesses. See Bond

18  Mem. at 12-16; Wolfson Expert Mem. In their motions, the

19  defendants have challenged the admissibility of the testimony

20  of Dr. Shelley and Agent Hanratty on the basis that it is not

21  relevant—or helpful to the jury—and that it is unduly

22  prejudicial. They seek to exclude the testimony of Mr. Santos

23  because, they assert, his anticipated testimony includes

24  descriptions of the legal operation of the U.S. sanctions

25  regime and would supplant the role of the Court. I believe that

expert testimony regarding the use of shell corporations and

the like to obscure ownership is something that is beyond the

ken of a lay juror: Expert testimony on how such structures

work will be helpful to the jury. But I conclude that the

testimony suggesting the use of such structures by wealthy

Russians—as opposed to wealthy people of any other nationality

does not have sufficient indicia of reliability.  In

particular, I plan to preclude them from testifying that these

are techniques that Russians in particular use, or that

Russians use these techniques for any particular purpose—in

particular to evade sanctions.

I. Legal Standard

a. FRE 702 Generally

Federal Rule of Evidence 702, which governs the

admissibility of expert testimony, reads:

"A witness who is qualified as an expert by knowledge,

skill, experience, training, or education may testify in the

form of an opinion or otherwise if the proponent demonstrates

to the court that it is more likely than not that: (a) the

expert's scientific, technical, or other specialized knowledge

will help the trier of fact to understand the evidence or to

determine a fact in issue; (b) the testimony is based on

sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert's opinion

reflects a reliable application of the principles and methods

1    to the facts of the case."

2          Fed. R. Evid. 702. Rule 702 was recently amended. The

3    Advisory Committee on Evidence Rules modified the text of the

4    rule in response to several court decisions that admitted

5    expert testimony too liberally. The revised language, which

6    went into effect on December 1, 2023, clarifies that (i) the

7    party introducing expert testimony has the burden to show that

8    "the proffered testimony meets the admissibility requirements,"

9    and (ii) "each expert opinion must stay within the bounds of

10   what can be concluded from a reliable application of the

11   expert's basis and methodology." Fed. R. Evid. 702 advisory

12   committee's note to 2023 amendment.

13         In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

14   U.S. 579 (1993), the Supreme Court explained that Rule 702

15   requires district courts to act as gatekeepers by ensuring that

16   expert testimony "both rests on a reliable foundation and is

17   relevant to the task at hand." *Id*. at 597. As such, the Court

18   must make "a preliminary assessment of whether the reasoning or

19   methodology underlying the testimony is scientifically valid

20   and of whether that reasoning or methodology properly can be

21   applied to the facts in issue." *Id*. at 592-93. In short, the

22   Court must "make certain that an expert, whether basing

23   testimony upon professional studies or personal experience,

24   employs in the courtroom the same level of intellectual rigor

25   that characterizes the practice of an expert in the relevant

field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

b. Qualification as Expert

"Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352-53 (S.D.N.Y. 2003). "Courts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert." *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.,* 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)); accord *Plew v. Ltd. Brands, Inc.*, 2012 WL 379933, at *4 (S.D.N.Y. Feb. 6, 2012). "To determine whether a witness qualifies as an expert, the Court must first ascertain whether the proffered expert has the educational background or training in a relevant field." *Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.*, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013) (citation and internal quotation marks omitted). "Any one of the qualities listed in Rule 702—knowledge, skill, experience, training, or education—may be sufficient to qualify a witness as an expert." *Id.* (citing *Tiffany (N.J.) Inc. v. eBay Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007)).

Even if a proposed expert lacks formal training in a

given area, he may still have "practical experience" or

"specialized knowledge" qualifying him to give opinion

testimony under Rule 702.  See *McCullock v. H.B. Fuller Co.,* 61

F.3d 1038, 1043 (2d Cir. 1995) (quoting Fed. R. Evid. 702)

(internal quotation marks omitted). But "[i]f the witness is

relying solely or primarily on experience then [he] must

explain how that experience leads to the conclusion reached,

why that experience is a sufficient basis for the opinion, and

how that experience is reliably applied to the facts." *Pension

Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,

LLC,* 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting

Fed. R. Evid. 702 Advisory Committee Note). Where a witness's

"expertise is too general or too deficient," the Court "may

properly conclude that [he is] insufficiently qualified." *Stagl

v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

A court must then "compare the area in which the

witness has superior knowledge, education, experience, or skill

with the subject matter of the proffered testimony." *United

States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004) (citing

*United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)). "The

expert's testimony must be related to those issues or subjects

within his or her area of expertise."  *Crown Cork*, 2013 WL

978980, at *2 (citing *Malletier v. Dooney & Bourke, Inc.*, 525

F. Supp.  2d 558, 642 (S.D.N.Y. 2007)). "If the expert has

educational and experiential qualifications in a general field

closely related to the subject matter in question, the court

will not exclude the testimony solely on the ground that the

witness lacks expertise in the specialized areas that are

directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F.

Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl*, 117 F.3d at

80). "Thus, an expert 'should not be required to satisfy an

overly narrow test of his own qualifications,' and the court's

focus should be on 'whether the expert's knowledge of the

subject is such that his opinion will likely assist the trier

of fact in arriving at the truth.'" *Crown Cork*, 2013 WL 978980,

at *2 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA

Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)).

"Assertions that the witness lacks particular educational or

other experiential background, 'go to the weight, not the

admissibility, of [the] testimony.'" *Zyprexa Prods.*, 489 F.

Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044).

  C. Expert Testimony Must Assist the Trier of Fact

  A district court must conclude that the proposed

testimony will assist the trier of fact. *In re Rezulin Products

Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004).

"Testimony is properly characterized as 'expert' only if it

concerns matters that the average juror is not capable of

understanding on his or her own." *United States v. Mejia*, 545

F.3d 179, 194 (2d Cir. 2008); see also *United States v. Amuso*,

21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit

P63LKOSC

manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.")

"Weighing whether the expert testimony assists the trier of fact goes primarily to relevance." *Faulkner v. Arista Records LLC,* 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (citing *Daubert*, 509 U.S. at 591). Relevance can be expressed as a question of "fit"—"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). The testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). Expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help" should not be admitted. *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

d. Expert Testimony Must Be Reliable

In assessing reliability, courts should consider "the

1    indicia of reliability identified in Rule 702, namely, (1) that

2    the testimony is grounded on sufficient facts or data; (2) that

3    the testimony is the product of reliable principles and

4    methods; and (3) that the witness has applied the principles

5    and methods reliably to the facts of the case." *Amorgianos v.*

6    *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)

7    (citing Fed. R. Evid. 702). "Under Daubert, factors relevant to

8    determining reliability include 'the theory's testability, the

9    extent to which it 'has been subjected to peer review and

10   publication,' the extent to which a technique is subject to

11   'standards controlling the technique's operation,' the 'known

12   or potential rate of error,' and the 'degree of acceptance'

13   within the 'relevant scientific community.'" *Restivo v.*

14   *Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017) (quoting *United*

15   *States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015)). *Daubert*

16   set forth a non-exhaustive list of factors that district courts

17   may consider in gauging the reliability of scientific

18   testimony, which include: (1) whether the theory has been

19   tested; (2) whether the theory has been subjected to peer

20   review and publication; (3) the known or potential rate of

21   error and whether standards and controls exist and have been

22   maintained with respect to the technique; and (4) the general

23   acceptance of the methodology in the scientific community.

24   *Daubert*, 509 U.S. at 593-95. "Whether some or all of these

25   factors apply in a particular case depends on the facts, the

expert's particular expertise, and the subject of his

testimony." *In re Fosamax Products Liab. Litig.*, 645 F. Supp.

2d 164, 173 (S.D.N.Y. 2009) (citing *Kumho Tire*, 526 U.S. at

138).

When evaluating the reliability of an expert's

testimony, the court must "undertake a rigorous examination of

the facts on which the expert relies, the method by which the

expert draws an opinion from those facts, and how the expert

applies the facts and methods to the case at hand." *Amorgianos*,

303 F.3d at 267. "In undertaking this flexible inquiry, the

district court must focus on the principles and methodology

employed by the expert, without regard to the conclusions the

expert has reached or the district court's belief as to the

correctness of those conclusions." *Id*. at 266. But as the

Supreme Court has explained, "conclusions and methodology are

not entirely distinct from one another," and a district court

is not required to "admit opinion evidence that is connected to

existing data only by the ipse dixit of the expert. A court may

conclude that there is simply too great an analytical gap

between the data and the opinion proffered." *Gen. Elec. Co. v.

Joiner,* 522 U.S. 136, 146 (1997) (citation omitted). "Thus,

when an expert opinion is based on data a methodology, or

studies that are simply inadequate to support the conclusions

reached, *Daubert* and Rule 702 mandate the exclusion of that

unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. On

P63LKOSC

the other hand, "[w]here an expert's methodology overcomes the hurdle of being based on a reliable process, remaining controversies as to the expert's methods and conclusions generally bear on the weight and credibility—but not admissibility—of the testimony." *Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.,* 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (citation omitted).

If an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relies with the jury, rather than the trial court. *Kumho Tire*, 526 U.S. at 153. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n. 10).

Still, testimony that is admissible under Rule 702 may be excluded under Federal Rule of Evidence 403 if the court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

P63LKOSC

time, or needlessly presenting cumulative evidence." Fed. R.

Evid. 403. Expert testimony is particularly susceptible to

these dangers, "given to the unique weight such evidence may

have in a jury's deliberations." *Nimely v. City of New York*,

414 F.3d 381, 397 (2d Cir. 2005). "Expert evidence can be both

powerful and quite misleading because of the difficulty in

evaluating it. Because of this risk, the judge in weighing

possible prejudice against probative force under Rule 403 . . .

exercises more control over experts than lay witnesses."

*Daubert*, 509 U.S. at 595 (quotations omitted).

II. Discussion of Proposed Testimony from the

Government Experts

a. Qualifications

The defendants do not take the position that any of

the Government's proposed witnesses lack the qualifications

necessary to be designated as expert witnesses. Still, I have

reviewed their qualifications and believe that each is

qualified to serve as an expert on the topics for which they

have been designated.

B. Reliability of Experts' Testimony

The defendants have also not challenged the

reliability of the Government's experts' testimony. However,

concerns regarding the reliability of portions of Dr. Shelley's

and Agent Hanratty's proposed testimony is an important

underpinning of my decision to exclude their testimony in part,

1   so I am going to begin my discussion of the issue under this

2   heading. Dr. Shelley proposes to testify regarding the

3   "financial activities of Russian oligarchs and other wealthy

4   Russian citizens," and will testify about the frequency with

5   which they use certain tools to obscure their ownership of

6   assets and the reasons why they do so. Dkt. No. 142-1 ("Expert

7   Disclosures") at 4.

8           I accept that the experts have a basis to testify that

9   some Russians engage in the conduct that they describe in their

10  expert disclosures. However, by testifying that these are

11  techniques used by Russians, in particular, these experts'

12  testimony will inform the jury that when one sees these

13  techniques in use, they are being implemented by a Russian.

14  That testimony makes it more likely that the jury will see

15  evidence of the use of shell companies in the ownership

16  structures at issue in this case and conclude that—because

17  there are shell companies—there must have been Russians

18  involved. That makes it more likely that the jury will find

19  that Mr. Wolfson or Mr. Kostin, both Russians, were behind

20  these structures.

21          The problem with the testimony is that neither

22  Dr. Shelley nor Agent Hanratty has provided any basis for the

23  conclusion that the use of this type of technique to shield the

24  ownership of assets is limited to wealthy Russians, as opposed

25  to wealthy people of any nationality. Their testimony is that

1   Russians use these techniques. That implies that the use of

2   these techniques is an indicator that a Russian was involved,

3   but there is nothing in either expert's report that supports

4   the conclusion that these are indicators of asset obfuscation

5   by wealthy Russians, as opposed to by wealthy people of any

6   other nationality. They propose to testify that the use of

7   shell companies is indicative of Russian involvement, but there

8   is nothing in the report that shows how it is that either

9   expert has determined that it is distinctive of Russians in

10  particular. They do not say that other nationalities do not do

11  these things. And that may be the result of their dataset:

12  these experts have seen Russians do these things because they

13  have studied Russians. There is no basis in the expert's

14  reports to support the conclusion that these techniques are

15  used by only or predominantly by Russians, rather than my

16  members of any other nationality. To support the conclusion

17  that when you see a shell company, you know that a Russian was

18  behind it, the experts need to give some basis to conclude that

19  it was not a wealthy American or Brit or other nationality.

20  There is no comparative data that permits these experts to

21  opine that this conduct is emblematic of Russians in

22  particular.  The Government's response to the defendants'

23  motion fails to address this problematic aspect of the proposed

24  experts' testimony.

25          Similarly, these experts provide no basis in their

reports for their determinations regarding the frequency with

which wealthy Russian people use the various ownership

techniques that are described in their reports. For example,

Dr. Shelley proposes to testify that "Russian oligarchs

frequently use proxies . . . ," that "Russian oligarchs often

use legal structures . . . ," and that "Typically the Russian

oligarch or his family would be named . . . ." Expert

Disclosures at 4. But she provides no data to support her

assertions regarding the frequency with which Russian oligarchs

use the various techniques. Why does she say that a particular

tool is used "typically"—does that mean 50% of the time; 20%;

80%? How did she reach that conclusion, based on what data set?

Because Dr. Shelley and Agent Hanratty are involved in the

study of corruption and law enforcement, I can perceive a

substantial issue with the data set on which their conclusions

rest—namely, that they may be looking at cases that involve

corruption and criminality, rather than across the universe of

all wealthy Russians. Or are they assuming that all wealthy

Russians are corrupt or criminal? If so, they do not describe

how they reached that conclusion. With respect to Agent

Hanratty of the FBI in particular, I have no basis to conclude

that he has conducted any study of the behaviors of wealthy

Russians or others who are not alleged to be involved in the

commission of any crime.

        Again, the defendants do not expressly contest the

1   proposed testimony of these experts based on a lack of

2   reliability, but it's the underpinning of their 403 objection.

3   On the face of their reports, I do not see how the experts have

4   justified the attribution of particular ownership techniques to

5   wealthy Russians, as opposed to wealthy people generally, or

6   the basis for their attribution of particular frequencies by

7   which Russians implement any one of these tools.

8           C. Helpfulness to The Jury

9           With respect to Dr. Shelley and Agent Hanratty, expert

10  testimony regarding how wealthy people can use shell companies

11  and other structures to obscure their ownership of assets will

12  be helpful to the jury. This case involves the use of

13  complicated structures used to obscure the beneficial ownership

14  of an asset, including the use of shell companies, straw

15  owners, and call options. The transactions involve the use of

16  entities organized under the laws of foreign states.  These are

17  topics that are not within the ken of a lay juror. The

18  Government presented some interesting statistics about the

19  financial condition of the median U.S. citizen. While lawyers

20  may have familiarity with tax structuring and indirect

21  ownership, I think that the ordinary citizen juror would

22  benefit from information about how such ownership structures

23  function, and how they can be used to obscure the ownership of

24  an asset. Such testimony will assist the trier of fact.

25          With respect to Mr. Santos, testimony regarding what a

P63LKOSC

sanctions program is and how it operates will also assist the

trier of fact. While jurors may be aware of what a sanction is,

how a sanctions program operates and can develop is outside the

ken of a lay person. It will provide helpful background for the

jury as they consider the issues presented in the case.

Information about the operation of the sanctions program—rather

than merely the output of it—is helpful because one of the

issues is the alleged response to anticipated sanctions. So,

some information about how sanctions programs can develop over

time will help the jury understand the evidence regarding the

timing of the alleged transfer of the Aspen Home.

        D. Rule 403

        Substantial portions of the testimony of each of

Dr. Shelley, Agent Hanratty and Mr. Santos must be excluded

under Rule 403. Under Rule 403, relevant evidence may be

excluded if "its probative value is substantially outweighed by

a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence." Fed R.

Evid. 403.

        The Second Circuit has instructed that "[d]istrict

courts have broad discretion to balance probative value against

possible prejudice" under Rule 403. *United States v. Bermudez*,

529 F.3d 158, 161 (2d Cir. 2008) (citation omitted). Because

virtually all evidence is prejudicial to one party or another,

1    to justify exclusion under Rule 403, as I said earlier, the

2    prejudice must be unfair. I refer you to my earlier comments

3    regarding Rule 403.

4         Now, as to Dr. Shelley and Agent Hanratty, the

5    testimony that wealthy Russians, as opposed to wealthy people

6    generally, use these structures would be unduly prejudicial. As

7    I described before, the reports do not tell me that either

8    expert has a basis to conclude that these techniques are not

9    used by people of other nationalities. Particularly lacking

10   such a bridge, it would be unduly prejudicial to testify that

11   the techniques at issue are ones that are used by Russians in

12   particular. It would suggest the guilt of the defendants based

13   on the nationality of Mr. Kostin and Mr. Wolfson.  Here is a

14   simplified version of the chain of reasoning that the testimony

15   supports: shell companies are used by Russians; we see shell

16   companies; therefore, a Russian must be involved, which makes

17   it more likely that the Russian defendants are at fault. That

18   string of reasoning does not have support in the experts'

19   reports for the reasons that I described before. And, as the

20   defendants argue, it asks the jury to make a determination

21   based on the national origin of the defendant:  People of this

22   nationality do these things.  These people are that

23   nationality.  Things done by people of that nationality are

24   seen here.  Therefore, it must have been the defendant.

25        The testimony as proposed is also unduly prejudicial

1   because it asks the jury to do what the Second Circuit

2   prohibited in *United States v. Castillo*, 924 F.2d 1227 (2d

3   Cir.1991). Dr. Shelley and Agent Hanratty are prepared to

4   testify, for example, that wealthy Russian people used these

5   techniques to avoid sanctions following Russia's invasion in

6   Ukraine. "The government is free to offer expert testimony both

7   as background for an offense and to assist in proving one or

8   more elements of the offense. What the government cannot do is

9   to ask the jury to find that because criminals of a certain

10  type classically engage in a certain kind of behavior, the

11  defendants engaged in that behavior." *U.S. v. Mulder*, 273 F.3d

12  91, 102 (2d Cir. 2001) (internal citations omitted). This is

13  what the proposed testimony would do—tell the jury that rich

14  Russian people hide assets to avoid sanctions and ask them to

15  draw the conclusion that the Russian people at issue here hid

16  assets to avoid sanctions. It is always inappropriate to

17  propound a theory that a defendant is guilty because of the

18  behavior of unrelated persons. See *Castillo*, 924 F.2d at 1234.

19  The inference is particularly prejudicial in this instance

20  because, as I have already described, there is nothing in

21  Dr. Shelley or Agent Hanratty's reports to explain the basis

22  for their opinions about the frequency with which Russians

23  engage in this kind of activity. So, the Government would ask

24  the jury to find that the defendants engaged in the charged

25  conduct because some unspecified percentage of people with

P63LKOSC

1   similar demographics did so.

2          I conclude that any testimony from Dr. Shelley or

3   Agent Hanratty regarding the fact that Russians in particular

4   use these techniques to obscure ownership, wealthy Russians'

5   motivations to obscure their ownership of assets and the

6   frequency with which they do so would be unduly prejudicial and

7   that the prejudicial effect of the testimony outweighs any

8   probative value of the testimony. Those experts may testify

9   regarding the mechanisms that can be used by wealthy people to

10  obscure the ownership of their assets and how such structures

11  operate, but they may not testify (1) that the conduct is

12  particularly attributable to wealthy Russians, (2) why wealthy

13  Russians are motivated to engage in that conduct, (3) the

14  frequency with which wealthy Russians deploy the various tools,

15  or (4) that the Russians engaged in this conduct to avoid

16  sanctions.

17         With respect to the proposed testimony of Mr. Santos,

18  testimony by him regarding what conduct violates IEEPA or a

19  description of the operation of the statute is excluded. He, a

20  nonlawyer, would be asked functionally to tell the jury what

21  the law is and what it prohibits. That is the role of the

22  Court. Any deviation from the charges promulgated by the Court

23  risks juror confusion.  That risk substantially outweighs the

24  probative value of having a non-lawyer describe the

25  requirements for compliance with the law and the executive

1   orders. I would not prohibit the witness from reading the text

2   of executive orders or other documents that may be admitted

3   into evidence, but he cannot explain what he understands them

4   to prohibit. I will do that in my instructions to the jury.

5   This instruction with respect to the limitations of Mr. Santos

6   applies regardless of whether he testifies as an expert or a

7   fact witness.

8           III. Discussion of Proposed Testimony from

9   Mr. Wolfon's Expert

10          a. Introduction

11          The Government has moved to exclude the testimony of

12  Mr. McCausland on several grounds. It contends that his expert

13  disclosures are inadequate. The Government also asserts that

14  the expert's testimony is not sufficiently reliable, and that

15  it will not be helpful to the jury. I agree with the

16  Government's assessment of Mr. McCausland's proposed testimony

17  and am going to exclude it in its entirety.

18          Mr. McCausland proposes to provide three opinions: (1)

19  that Mr. Wolfson "is not a logical selection to be a proxy or

20  facilitator for Andrey Kostin . . ."; (2) that Mr. Wolfson's

21  transactions "were substantive in nature and the primary

22  payment made in 2019 was made in Wolfson's own name . . ."; and

23  (3) that Mr. McCausland's "review of the Government's provided

24  discovery gives no indication of payments from Wolfson to

25  Kostin in 2019." Dkt. No. 137-1 ("McCausland Report") at 3. To

P63LKOSC

1    reach each of these opinions, the defendant proposes to ask

2    Mr. McCausland to describe a narrative of information that he

3    learned during his investigation—from unspecified sources—to

4    support these final opinions. Mr. Wolfson has not demonstrated

5    that any of these proposed opinions satisfies the requirements

6    of Rule 702. I am going to discuss each of the proposed

7    opinions in turn. Then I will discuss the Government's argument

8    regarding the sufficiency of the defendant's disclosures.

9        B. Opinion that Wolfson is not a "Logical" Selection

10   as a Proxy

11       The opinion that Mr. Wolfson is not a "logical"

12   selection by Mr. Kostin to serve as his proxy is neither

13   sufficiently reliable nor helpful. Mr. McCausland proposes to

14   testify to his conclusion that Mr. Wolfson is not a "logical"

15   selection to serve as a proxy. In his disclosure, he recites

16   several facts about Mr. Wolfson and Mr. Kostin and then

17   concludes that using Mr. Wolfson as a "nominee does not make

18   sense." McCausland Report at 5. It would be hard to develop a

19   clearer example of a proposed opinion that is based on the ipse

20   dixit of the expert than this. Mr. McCausland describes no

21   methodology that he used to reach the conclusion that this

22   "does not make sense." He describes no means by which a person

23   in his line of work—or any other—would evaluate whether a

24   course of conduct would "make sense" or be "logical." There is

25   no way to test the reliability of his methodology or

1  conclusion: Mr. McCausland proposes to testify that this is not

2  logical because he is an expert, and he says that it is not.

3  This is a classic example of the ipse dixit of an expert.

4  Mr. McCausland's ultimate opinion that it is not "logical" for

5  Mr. Kostin to use Mr. Wolfson as a proxy is not sufficiently

6  reliable to be accepted.

7       Mr. McCausland's subsidiary opinion that "Mr. Kostin

8  has a number of options outside of the United States, including

9  family members, who could assist in any alleged sanctions

10  evasions," *id*. At 6, suffers from the same lack of

11  reliability. For example, he opines that "he believes" that

12  high net worth individuals use only their closest and most

13  trusted associates as nominees and facilitators.  That

14  statement is based on four itemized examples in which EU

15  officials sanctioned family members of oligarchs. But there is

16  no baseline for anyone to conclude that these four examples are

17  anything more than just a curated subset of such proxy use:

18  these are four instances in which people were caught. It says

19  little unless we know how many other people used proxies who

20  were not family members. Maybe the examples provided show that

21  the use of family members is a bad idea, because they are

22  readily caught. Mr. McCausland's opinion is based on four

23  examples that support his view with no baseline that

24  establishes the reliability of the data set or his conclusions

25  from it. The same issues with Mr. McCausland's data apply to

1    his sourcing in paragraph 22 of his report, where he says that

2    "multiple . . . western governmental agencies have, in recent

3    years, cited the increasing frequency of oligarchs transferring

4    beneficial ownership of corporate entities to their children,

5    other family members, or close business associates." *Id.* at 6.

6    His data does not identify the time period at issue except in

7    the broadest of terms—in recent years—which may, or may not, be

8    applicable here. "Increasing frequency" says little about the

9    actual frequency—does it mean that it went from 10 a year to

10   100; or 5 to 6? The description of the supporting data is so

11   vague as to be nearly meaningless.

12           This proposed opinion is also not helpful to the jury.

13   Expert testimony is helpful when it "sheds light on activities

14   not within the common knowledge of the average juror." *United*

15   *States v. Wexler,* 522 F.3d 194, 204 (2d Cir. 2008). Such

16   testimony "provide[s] the groundwork to enable the[trier of

17   fact] to make its own informed determination[s]" on relevant

18   issues. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab.*

19   *Litig.,* 725 F.3d 65, 114 (2d Cir. 2013). So, when an expert

20   offers his opinion, he must take care not to "usurp the role"

21   of the trier of fact by dictating the result or otherwise

22   straying from the proper lane of an expert witness. *Nimely,* 414

23   F.3d at 397; see *Mar-Can Transp. Co. v. Loc. 854 Pension Fund,*

24   2024 WL 1250716, at *4 (S.D.N.Y. Mar. 22, 2024).

25           In concrete terms, this means that "legal

P63LKOSC

conclusions," *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.

1994); "credibility" determinations; "motivations,"

"intentions," and other states of mind, *Marvel Characters, Inc.*

*v. Kirby,* 726 F.3d 119, 135–36 (2d Cir. 2013); and "'lay

matters' which the trier of fact can understand without the

expert's help" are off limits to expert witnesses, *United*

*States v. Jiau,* 734 F.3d 147, 154 (2d Cir. 2013); accord *United*

*States v. Zhong,* 26 F.4th 536, 555 (2d Cir. 2022).

"[E]xperts are not percipient witnesses to facts, and

they cannot offer factual narratives in the form of expert

opinion that would displace the role of the factfinder." *In re*

*M/V MSC FLAMINIA,* 2017 WL 3208598, at *2 (S.D.N.Y. July 28,

2017). A party that uses an expert witness as a vehicle to

"summarize the relevant facts . . . and then opine—or, more

accurately, argue—that" its theory of the case is the correct

one is, "in essence, giving a summation from the witness

stand." *Lippe v. Bairnco Corp.,* 288 B.R. 678, 687–88 (Bankr.

S.D.N.Y. 2003). However, that is counsel's job.  It is "not the

function of an expert witness." *Id.* at 688. Like other opinions

that lack "a layer of expertise or cogent analysis beyond that

which a lay jury would so clearly understand," factual

narratives must be excluded. *Est. of Jaquez v. City of New*

*York,* 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015).

The core premises of Mr. McCausland's testimony are

not beyond the ken of the jury. They are, at base, simply

P63LKOSC

1   common-sense propositions: that someone would be expected to

2   use someone they trust as a proxy; that someone opposed to a

3   regime is unlikely to be the person to support it; and that a

4   rich person at the head of a company would have a lot of

5   contacts. His opinion based on these common sense premises that

6   using Mr. Wolfson as a proxy would not be "logical" is not

7   beyond the ken of a lay person. While Mr. Wolfson argues to the

8   contrary, I agree with the Government's argument that the value

9   of this testimony is to ascribe motive and intention to

10  Mr. Kostin. I think that the defendant would accept that

11  Mr. McCausland cannot testify that the Government's case is not

12  logical. So, what is left is testimony by Mr. McCausland about

13  Mr. Kostin's thinking process—this is opinion testimony about

14  the motive or intent of an individual, not testimony that an

15  expert can helpfully provide to the jury.

16          Mr. McCausland's proposed testimony on this topic is

17  also inappropriate because it channels the defense's factual

18  narrative and serves as a second closing argument. Experts can

19  provide testimony regarding the facts upon which they rest

20  their opinions even if they are not personally known to them.

21  But it is apparent that the defense seeks to use Mr. McCausland

22  to introduce facts into evidence about which he has no personal

23  knowledge to support its factual narrative, not merely to

24  support the proposed flawed opinions. One example of this

25  problematic characteristic of Mr. McCausland's testimony is the

1   proposal that he testify at length about Mr. Wolfson's life,

2   career, and political activism. There is no information in

3   Mr. McCausland's report regarding how he obtained that

4   information if not through discussions with Mr. Wolfson himself

5   or his counsel. Without Mr. McCausland's testimony, it is

6   unclear how that information would reach the jury.  So, through

7   Mr. McCausland, it appears, the defense seeks to introduce

8   Mr. Wolfson's personal narrative without the need for direct

9   testimony from Mr. Wolfson or anyone else who would be subject

10  to cross examination. This is problematic and should not be

11  permitted under the guise of "expert" testimony.

12      Because his proposed testimony simply threads facts

13  through common sense arguments to conclude that a portion of

14  the Government's case is not "logical," or that Mr. Kostin

15  would not have been "logical" to act as the Government

16  contends, this aspect of Mr. McCausland's proposed testimony

17  acts functionally as an additional closing argument, which is

18  not a helpful use of expert testimony.

19      c. The "Substantive" Nature of Mr. Wolfson's

20  Transactions

21      The second set of proposed opinions by Mr. McCausland

22  have the same flaws as the first:  The defendant has not made a

23  sufficient showing regarding the reliability of the testimony;

24  and the testimony as proposed is not helpful to the jury.

25      Let me start with the second part of this proposed

1  opinion, namely that "the primary payment made in 2019 was made

2  in Wolfson's own name . . . ." McCausland Report at 3. This is

3  simply a fact, not an expert opinion. Mr. McCausland cannot

4  provide testimony about this fact based on personal knowledge.

5      I agree with the Government's critique that the

6  description of Mr. McCausland's opinion that the transaction by

7  Mr. Wolfson was "substantive" in nature is unclear and that it

8  is unclear what the characteristics are of a "substantive"

9  transaction are. The more detailed description of that proposed

10  opinion in the report describe the intended testimony in more

11  depth. It does not provide sufficient support for the proposed

12  opinions.

13      In paragraph 24, Mr. McCausland describes as a fact

14  that Mr. Wolfson obtained a "$10 million loan from Capital

15  Business Finance in connection with his purchase of 100% of the

16  shares of 40 Northstar LLC." His report does not describe the

17  documents or reporting upon which he based those underlying

18  facts. Mr. McCausland goes on to state that "As a result of my

19  review, I believe Capital Business Finance is primarily owned

20  by [CC-3] . . . ." The defendant has not established that this

21  statement of Mr. McCausland's "belief" is reliable. The report

22  does not state what the expert reviewed to reach that

23  conclusion. Nor is there any information regarding the process

24  used by the expert to reach his belief based on the evidence.

25  Again, Mr. McCausland's opinion boils down to his ipse dixit:

1  he looked at something, and he believes that a conclusion is

2  correct with no explanation of the basis for the belief that

3  can be interrogated for reliability. The defendant has not

4  shown that this opinion is reliable.

5       The proposed opinions or foundations for them

6  described in Paragraph 25 of Mr. McCausland's report suffer

7  from the same flaws. Mr. McCausland begins by reciting a set of

8  factual assertions for which he does not provide a foundation,

9  but which are consistent with the Defendant's theory of the

10 case. He then says that "My review has resulted in the

11 following findings:  a. There was no change in the ultimate

12 beneficial ownership of the Colorado property since 2014 . .. .

13 (b) I see no indication that Kostin benefited in any respect

14 from any transaction made in 2019." *Id*. at 7. Again, no

15 information regarding how Mr. McCausland reached those

16 conclusions from the evidence presented was provided, simply

17 that his "review has resulted in the following findings." There

18 is no information about the process utilized to reach those

19 findings to establish the reliability of the methodology used.

20 Mr. McCausland believes it is sufficient to say that he has

21 made certain findings and to ask the jury to accept them

22 because he is an expert. This is not reliable. It is another

23 example of the ipse dixit of an expert.

24       Nor is this testimony helpful. Mr. McCausland's

25 proposed testimony supplants the role of the jury. The jury is

P63LKOSC

going to be asked to determine whether the evidence establishes

whether there was a change in beneficial ownership in the

property. Mr. McCausland proposes to tell them his answer based

on his review of the facts; not to provide them with

information or tools that will help the jury make its

determination. This is not helpful to the jury—Mr. McCausland's

proposed testimony supplants the role of the jury by telling

them how to resolve the disputed issues, without adding

anything to help them evaluate the evidence. Again, Mr.

McCausland says that these are his results, because these are

his results. That is not helpful.

      D. Mr. McCausland's View of the Evidence

      Mr. McCausland's final proposed opinion suffers from

the same flaws as his earlier opinions.  In his final opinion,

Mr. McCausland proposes to state that in his review of the

Government's discovery, he has found "no indication of payments

from Wolfson to Kostin in 2019." *Id*. at 3. He also proposes to

testify that he sees "no evidence that Andrey Kostin benefited

in any way from repayment of the loan in 2019." *Id*. at 7.

      Again, Mr. McCausland provides no explanation for how

he reached his conclusions—this is again his ipse dixit; he

read documents and he reached his conclusion and asks us to

credit it because he is an expert.

      And again, Mr. McCausland's proposed testimony is not

helpful to the jury. Whether the Government has proven its case

with the evidence that it presents at trial is the question

that the jury must answer. Mr. McCausland proposes to supplant

their role and to say that the evidence does not show that

Mr. Kostin received any benefit. This proposed use of his

expert testimony is not helpful to the jury. Instead, he seeks

to supplant the role of the jury.

The proposed testimony is more problematic because the

proposal that Mr. McCausland testify about the universe of the

materials collected by the Government throughout the course of

the investigation is a not-very-thinly veiled attack on the

Government's investigation itself. The Government's

investigation is not on trial. Having a former senior FBI agent

testify that he thinks that the Government does not have a case

based on evidence that has not been presented to the jury has

very little probative value. On the other hand, it is extremely

confusing and unfairly prejudicial.  Those adverse

characteristics substantially outweigh any probative value and

thus, such evidence should be excluded under rule 403.

E. Sufficiency of Defendant's Notice

I agree with the Government's view that the expert

notice provided for Mr. McCausland is inadequate. As amended in

2022, Federal Rule of Criminal Procedure 16(b)(1)(C) requires a

defendant to disclose certain information in writing "for any

testimony that the defendant intends to use at trial under

Federal Rule of Evidence 702, 703, or 705 during the

1   defendant's case-in-chief at trial . . . ." Fed. R. Crim. P.

2   16(b)(1)(C)(i). In particular, "[t]he disclosure for each

3   expert witness must contain," inter alia, "a complete statement

4   of all opinions that the defendant will elicit from the witness

5   in its case-in-chief" and "the bases and reasons for" each of

6   those opinions. Rule 16(b)(1)(C)(iii). Mr. McCausland's

7   disclosure fails to provide "the bases and reasons for" his

8   opinions.

9           I agree with the Government's arguments regarding the

10  insufficiency of Mr. McCausland's disclosures generally, and I

11  adopt them here. I end with the notice issue because I think

12  that the issues with Mr. McCausland's notice are tied to the

13  flaws with his opinions that I described earlier when I

14  discussed the absence of a showing regarding their reliability.

15  Mr. McCausland says what his opinion is, but he never says how

16  he arrived at them, or what the process or methodology was to

17  arrive at his conclusion. His opinions are flawed ipse dixit

18  statements. I do not have a basis to conclude that there is any

19  methodology behind his flat assertions of his beliefs. That may

20  be why the defendant thinks that the disclosure is adequate:

21  There is no more detailed explanation of the bases for

22  Mr. McCausland's opinion to provide. But the lack of any

23  explanation for the reasoning process that led to his

24  conclusions is what makes his notice deficient.

25          The notice is also deficient because it does not

include a sufficient description of the factual predicate upon

which Mr. McCausland's opinions purport to rely. Just as two

examples among many: we do not know how he learned all the

details of Mr. Wolfson's life about which he intends to

testify. Nor do we do know what records he reviewed to reach

his opinions regarding Mr. Kostin's network and family members.

His report does not set forth the predicates for the

information that he wishes to present to the jury as the basis

for his opinions. By failing to provide sufficient information

regarding the factual predicates for his opinion testimony, his

report again fails to provide a sufficient description of the

bases for his opinions.

IV. Conclusion

For the foregoing reasons, Defendants' motion in

limine to exclude the testimony of the government's expert

witnesses is granted in part and denied in part.  The

government's motion to exclude the testimony of Mr. Wolfson's

expert witness is granted.

So thank you so much for all of your time during the

course of today's proceeding.  Counsel, I don't know what else

there is for us to talk about.  Two things I want to talk

about, I guess, briefly are two issues that I teased in my

suppression decision, which relate to the privilege issue in

particular.  And also, I note that the government has

recently -- will have completed its 404(b) disclosures.  I

1    don't know to what extent either of those matters is going to

2    again provoke more issues for the Court to resolve prior to

3    trial.  So I just wanted to ask what your views are so that I

4    can set in place a framework for the resolution of any

5    anticipated or potential issues regarding those matters.

6          Counsel for the government, what do you think?

7          MS. DEININGER:  Your Honor, we produced a list of

8    anticipated exhibits last Monday, which included a list of all

9    of the materials we are currently planning on that were

10   received from the Cyprus law firm that was the subject of the

11   privilege motion.  We do not believe that any of those

12   materials contain any attorney/client privilege material and

13   defense has raised no issue to us.

14         THE COURT:  Thank you.  Fine.

15         So counsel for Defendant, anything you want to raise

16   on that point?

17         MR. RYBICKI:  Yes, your Honor.  And with respect to

18   your Honor's rulings as well, we would like to make a

19   statement.  But with respect to the privilege issue, the

20   government did produce voluminous exhibits.  We are still going

21   through those.  There are many hundreds, and we have not been

22   able to make an evaluation as to whether any of the privileged

23   issues are implicated.

24         THE COURT:  Thank you.  That's fine.  I do want to set

25   a schedule to the extent that there are any issues that are

1   going to be presented to the Court for resolution while we

2   adjourn the trial for the reasons that we discussed.  We should

3   not use this time in a way that would lead us to an inefficient

4   trial process.  So I do want to propose that we set a deadline

5   for submission of any motion with respect to those documents.

6   As I said, I teased in my suppression motion that those

7   determinations need to be made on a document-by-document and

8   fact-based basis.

9           So counsel for Defendant, I appreciate that you are

10  still going through the exhibits.  By when will you know and be

11  able to present any issues regarding those on the basis of

12  privilege?  And I will just bundle this with any potential

13  404(b) issues.  By when will you know those things?

14          MR. RYBICKI:  Your Honor, we would ask for four weeks.

15          THE COURT:  Thank you.

16          Mr. Bond, what does Mr. Bond's counsel think?

17          MR. KOUSOUROS:  We would concur with that, Judge.

18          THE COURT:  Thank you.

19          Counsel for the United States, how long do you think

20  you would need in order to respond to any briefing on that

21  question?

22          MS. DEININGER:  Your Honor, not knowing exactly the

23  scope of what they are going to object to, we would ask for two

24  weeks, if they are taking four weeks to make that

25  determination.

P63LKOSC

1          THE COURT:  Thank you.  I will require that any

2     briefing on these issues be due three weeks from now.  Any

3     opposition will be due two weeks thereafter.  Any reply would

4     be due a week after that.  I need to keep the briefing a little

5     tighter than was suggested by the defendant in order to make

6     sure that I have enough time to review and resolve these

7     motions before trial.

8          Counsel, for Defendant you wanted to make a comment?

9          MR. RYBICKI:  Yes, your Honor.  I would like to begin

10    by thanking the Court for its exhaustive opinions related to

11    the expert issues.  We would respectfully ask for leave of

12    Court to supplement Mr. McCausland's expert report.  There

13    is -- we can clarify the -- first, I would like to say that the

14    government has requested supplementation under Rule 16 for the

15    bases and reasons for Mr. McCausland's opinions.  We have

16    provided such information several weeks ago, including a long

17    list of Bates numbered documents and other sources for the

18    conclusions that Mr. McCausland arrived at in his report.

19         We would also respectfully request leave of Court to

20    supplement the methodology that Mr. McCausland used, as well as

21    clarify to the Court the fact that additional fact witnesses

22    that Mr. Wolfson intends to produce at trial will form, in

23    part, the bases for some of the factual issues that are

24    discussed in the report and the analytical framework that

25    Mr. McCausland applied to those facts.

P63LKOSC

1          THE COURT:  Thank you.  That's fine.  I would be happy

2     to allow supplement -- let me say a couple of things.  First,

3     as you know, the party advancing an expert bears the burden of

4     showing the admissibility of the expert's testimony under

5     *Daubert*.

6          Second, my rulings today are based on what's been

7     presented to me to date.  I am not concluding that there is no

8     potential basis upon which the defense might be able to

9     supplement the expert's report or provide testimony at a

10    *Daubert* hearing that would provide me with adequate support in

11    order to reach this conclusion.  Any supplemental submissions

12    to the Court would need to address the issues that I mentioned.

13    There are, I will say, concerns about the nature of his

14    testimony, particularly the opinion that something is logical

15    or does not make sense.  These are hardly, I will call it,

16    scientific terms.  But I am happy to give the defense another

17    opportunity to present additional evidence to support the

18    proposed testimony.  But as to this too, I would also need to

19    set a schedule to allow the parties to fully resolve the issue

20    before the trial.

21          So counsel for Defendant, what's your proposal?

22          MR. RYBICKI:  We would suggest the same schedule as

23    for the privilege documents, your Honor; three weeks, two

24    weeks, and one week for replies.

25          THE COURT:  Thank you.

1       Counsel for the government?

2       MS. DEININGER:  Your Honor, that's fine with us.  The

3   government also wants to take the time to review its own expert

4   opinions and see if it feels that it's going to try to

5   supplement under the same time schedule.

6       THE COURT:  Thank you.  That's fine.  I will permit

7   the parties to do that with respect to each of your respective

8   experts on the schedule that we have just discussed.  Good.

9       Anything else that any party would like to raise with

10  the Court?  First, counsel for the government.

11      MS. DEININGER:  Just briefly, your Honor.

12      THE COURT:  Please.

13      MS. DEININGER:  Your Honor had set a deadline for

14  reciprocal discovery by the defendants to be produced to the

15  government by last Monday, the 26th.  I just want to state for

16  the record that we did not receive anything besides the small

17  subset of materials that were produced to us in connection with

18  a supplemental disclosure for Mr. McCausland, which contained

19  publicly-available -- generally publicly-available links to

20  websites.

21      Also, the parties had agreed to exchange Rule 3500 and

22  Rule 26.2 materials yesterday.  Although we understood that

23  trial was likely to get adjourned for at least some period of

24  time, defense counsel asked that we still produce our Rule 3500

25  materials, and we did so on an "attorney's possession only"

P63LKOSC

1    basis.  So I just want to state for the record that we did not

2    receive any Rule 26.2 materials.

3              THE COURT:  Thank you.

4              Counsel for each of the defendants, let me hear from

5    you about the status of your reciprocal productions to the

6    government.

7              MR. RYBICKI:  Yes, your Honor.  We have no

8    supplemental discovery to produce at this time, nor do we have

9    any 26.2 or 3500 material to produce.

10             THE COURT:  Thank you.

11             Counsel for Mr. Bond.

12             MR. KOUSOUROS:  Same with us, your Honor.

13             THE COURT:  Thank you.

14             MS. DEININGER:  Your Honor, I would just note that

15   that may very well be true, but in my experience, it is very

16   unusual not to have any Rule 26.2 materials, at least for an

17   expert witness.

18             THE COURT:  Thank you.

19             Counsel for each of the defendants, any response?

20             Counsel first for Mr. Wolfson.

21             MR. RYBICKI:  We will certainly confirm that that's

22   the fact, your Honor, but my belief now is that we have none.

23             THE COURT:  Thank you.

24             MR. KOUSOUROS:  We have not served expert notice.

25             THE COURT:  Thank you.  Fine.  So I accept the

1    defendants' counsels' proffer.  Counsel, I accept your proffer.

2           Counsel for the government, anything else that you

3    would like to raise?

4           MS. DEININGER:  No, your Honor.

5           THE COURT:  Thank you.

6           Counsel for Mr. Wolfson, anything that you would like

7    to raise with the Court?

8           MR. RYBICKI:  No.

9           THE COURT:  Thank you.

10          Counsel for Mr. Bond?

11          MR. KOUSOUROS:  Nothing from us.  Thank you very much.

12          THE COURT:  Thank you all for your time.  This

13   proceeding is adjourned.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25